```
                                      Volume:     I
                                      Pages:      1 to 107
                                      Exhibits:   1 to 4



                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS

        * * * * * * * * * * * * * * * *
        WILLIAM PARZIALE,
                              Plaintiff,


                vs.                           Civil Action
                                              No. 04-11377-RBC
        AMERICAN HERITAGE LIFE INSURANCE
        COMPANY, A WHOLLY OWNED SUBSIDIARY
        OF THE ALLSTATE CORPORATION,
                              Defendant.
        * * * * * * * * * * * * * * * *




                        DEPOSITION OF ROBERT S. EHRLICH, a
        witness called on behalf of the Defendant, taken
        pursuant to the applicable provisions of the Federal
        Rules of Civil Procedure before Cynthia A. Powers,
        Shorthand Reporter and Notary Public in and for the
        Commonwealth of Massachusetts, at the law offices of
        Day, Berry & Howard LLP, 260 Franklin Street, Boston,
        Massachusetts, on Tuesday, March 22, 2005, commencing
        at 10:09 a.m.




                              * * * * *




                        KACZYNSKI REPORTING
                     72 Chandler Street, Suite 3
                     Boston, Massachusetts 02116
                          (617) 426-6060
```

2

1      APPEARANCES:

2              PATRICIA MICHAELS, ESQUIRE
               10 Tremont Street, 4th Floor
3              Boston, Massachusetts 02108
               (617) 227-1550
4              Representing the Plaintiff

5              DAY, BERRY & HOWARD LLP
               By Hobart F. Popick, Esquire
6              260 Franklin Street
               Boston, Massachusetts 02110
7              (617) 345-4600
               Representing the Defendant
8
               JOHN J. McCARTHY, ESQUIRE
9              1821 Centre Street
               West Roxbury, Massachusetts 02132
10             (617) 363-0004
               Representing the Witness
11

12

13

14

15

16

17

18

19

20

21

22

23

24

64

1           Q.    I have all day.

2           A.    You're not going to keep me here all

3     day.  When I first started selling life insurance at

4     Bankers Life and Casualty, I have a state rep -- it

5     was one of my students, and he's going to buy a life

6     insurance policy, actually called me.  And I show him

7     the options.  The manager is with me.  I don't know

8     anything.  The manager says, oh, take this.  All you

9     have to do is take a physical.  Policy rejected.  Why

10    take the physical?  He's got diabetes.  And he's

11    hopping mad because now he's on record.  I'm hopping

12    mad.  I don't get a commission.  Make another

13    appointment, somebody else, and we're going to sell a

14    life insurance policy, also one of my students, a

15    nurse from Boston State College, last name began with

16    H.  I can't remember exactly.  Maybe it will come.

17    And I meet her, nice lady.  Manager is with me.  I've

18    been burned once.  Margaret Henderson.  She works at

19    the VA Hospital.  So now we start to talk.  Manager

20    is the one doing all the talking.  Ms. Henderson, you

21    want to get this, this, and this policy.  You can get

22    it.  She said, get a policy for fifteen thousand

23    dollars, no physical.  Why don't we do that?  Nope.

24    We're going to get her a twenty thousand dollar

65

```
 1    policy, demands a physical.  Low and behold, guess
 2    what?  When she gets a physical, she also has
 3    diabetes.  That's the last policy I would ever write
 4    where somebody had to require a physical.
 5               If I went ninety-nine thousand and one
 6    dollars, this policy needs a physical.  Huh-uh.  You
 7    want more insurance, you get this in your hands
 8    first, then I'll supplement and I'll get you another
 9    one later on.  Never would I ever call for a
10    physical.  And unless the company demanded a
11    physical, and that one company did way back when we
12    talked about, I would never ask for a physical,
13    never.  It was my standard practice.
14          Q.    Is it your testimony that if this
15    policy that's in issue in this case had been for
16    ninety-nine thousand and one dollars a physical would
17    have been required?
18          A.    Yes.
19          Q.    And you knew that when you sold the
20    policy?
21          A.    Yeah.
22          Q.    How do you know that?
23          A.    It's in the underwriting.  It's right
24    there in front of you when you open the book.  Maybe
```

```
 1   it was a hundred thousand, I don't know, whatever the
 2   amount was.
 3            Q.    But is it fair to say you wrote the
 4   policy for the maximum that you could --
 5            A.    Sure.
 6            Q.    -- without having a physical required?
 7            A.    Absolutely.
 8            Q.    Do you have any reason to believe that
 9   Ms. Veronesi would be rejected if she had a physical?
10            A.    No.  Did she have diabetes or anything
11   else?  I don't know.
12            Q.    I'll take you back to July 25, 2001.
13   Does that date have any significance to you?
14            A.    No.
15            Q.    If you take a look at the policy
16   application which has been marked Exhibit 1, does the
17   date July 25th have any significance to you?
18            A.    Yep, there it is.  That's the day,
19   that's the application, that's the date on the
20   application.
21            Q.    If that was the date on the
22   application, does that mean that's the date that you
23   would have met with Ms. Veronesi?
24            A.    Okay.  How much time do we have again?
```

67

1    Now you're talking about standard practices.

2    Applications are going to sit in my desk.  How long?

3    Maybe a day, maybe two days, maybe three days, maybe

4    four days.  I don't think it's going to stay there

5    longer than that.  What do I do?  Do I date

6    everything at the person's home?  Often times I leave

7    it blank.  Why?  I'll date it the day I mail it.  God

8    help me sometimes if they die in the interim, he

9    said.  Did it happen often?  Yeah, yeah.

10            Q.    You can recall an instance in which

11   you took an application and you held onto it for a

12   few days when you mailed and the applicant died in

13   the interim?

14            A.    No, nobody ever died.  I was hoping

15   they wouldn't.

16            Q.    Well, I'll ask you this:  Did you take

17   this application on July 25th, 2001?

18            A.    I don't know.

19            Q.    Do you have any --

20            A.    To be honest, honest, best of my

21   ability, I don't know, I don't remember.

22            Q.    Do you have any reason to believe that

23   you would have dated it a date differently than you

24   took the application?

76

1          A.    Yes.

2          Q.    Now, if I could point you to questions
3     one and two on that page?

4          A.    Mm-hmm.

5          Q.    It says, question number one says, You
6     verbally advised me that you took Ms. Veronesi's
7     application after 7 p.m. on July 25, 2001.

8          A.    Right.

9          Q.    Does that change your answer that you
10    gave earlier about what time you met with
11    Ms. Veronesi?

12         A.    Yeah, it does change the answer.

13         Q.    How is that?

14         A.    I'm not sure.  Now, they asked me
15    these questions, when was it, September 18, 2002.
16    I'm just out of the hospital.  I just had, you know,
17    stomach cancer, a month in chemo now.  If you think I
18    can actually remember, absolutely not.  Seven
19    o'clock, could have been five o'clock.  Was it the
20    25th?  I don't know.  And that's the best and the
21    honest answer, the most honest answer I can give you.

22         Q.    Is it your testimony that you took
23    this application at 7 p.m.?

24         A.    No, I don't know what time I took the

77

1    application.

2           Q.    When you stated earlier it was in the

3    afternoon?

4           A.    Yeah, I'm sure it was the afternoon,

5    but what time exactly I don't know.

6           Q.    Would you say that seven o'clock is in

7    the afternoon?

8           A.    That's night.

9           Q.    So when you say you're sure it was in

10   the afternoon, how is it that you're sure it was in

11   the afternoon?

12          A.    I don't think I had anything to do

13   that day.  It would have been the afternoon.  What

14   time?  Anywhere, maybe five-ish.

15          Q.    Who didn't have anything to do that

16   day?

17          A.    I didn't.

18          Q.    You didn't?

19          A.    I don't think I did.  It was probably

20   a day like every other day.

21          Q.    Did it seem unusual at all to you that

22   Ms. Veronesi was at home at three o'clock in the

23   afternoon?

24          A.    Was she at home at three?

78

1           Q.    When you took the application?

2           A.    At three?  I don't even know if I took

3    it at three.

4           Q.    What time?

5           A.    I don't remember.

6           Q.    You said it was in the afternoon?

7           A.    Could have been four, could have been

8    five.  If it was three o'clock, would I have thought

9    about it, no, it wouldn't have seemed strange.

10          Q.    Did Ms. Veronesi appear to you to be

11   in good health that on that day?

12          A.    Yeah.

13          Q.    Was she complaining of any symptoms --

14          A.    No.

15          Q.    -- of any kind?

16          A.    No.

17          Q.    Did she have a scratchy or hoarse

18   voice?

19          A.    I don't remember anything about the

20   voice.

21          Q.    But you did speak with Ms. Veronesi?

22          A.    Yeah, yes.

23          Q.    Was Mr. Parziale present during your,

24   the meeting that you had with Ms. Veronesi?

86

1    wrote it or she wrote it.

2         Q.    Was it typical that the applicants

3    would fill out the applications themselves?

4         A.    Absolutely.  I got lots of those.

5         Q.    How did you explain this application

6    to Ms. Veronesi?  We're going back to Exhibit 1

7    again.  How did you explain how to fill this out?

8         A.    Here, fill it out.  You know yourself

9    better than I do.  I would standardly say that to

10   everybody.

11        Q.    You didn't explain anything more

12   specifically than that?

13        A.    No.  The questions are, you got

14   diabetes, you can ask me what do I do then.  Then I

15   might tell you, maybe I would tell the applicant fill

16   it out, who's your doctor, what's the last time you

17   saw the doctors, have you been hospitalized, what's

18   the condition you were hospitalized for.  If somebody

19   doesn't have anything, they check off no, no, no.

20        Q.    Did Ms. Veronesi ask you any questions

21   about this application?

22        A.    God knows.  Who knows.

23        Q.    I'll direct your attention to question

24   14 on page two?

105

1          A.     That's her handwriting on the

2    signature.

3          Q.     On the signature line?

4          A.     That's hers.

5          Q.     Can you tell me whose handwriting the

6    25 July 2001 is?

7          A.     I think that's mine.

8          Q.     That might be yours?

9          A.     Yeah.

10         Q.     You testified that there were times

11   when these applications might sit for a day or two on

12   your desk --

13         A.     Or three or four.

14         Q.     -- before you sent them out.  So fair

15   to say that this application was signed on or before

16   July 25th?

17         A.     Yeah, absolutely.

18                MS. MICHAELS:  I have no further

19   questions.

20                MR. McCARTHY:  And I don't.

21                (Whereupon, the deposition was

22   concluded at 12:37 p.m.)

23

24

107

1    COMMONWEALTH OF MASSACHUSETTS)
                                 )
2    SUFFOLK, SS.                )

3

4         I, Cynthia A. Powers, Shorthand Reporter and
     Notary Public in and for the Commonwealth of
5    Massachusetts, do hereby certify that there came
     before me on the 22d day of March 2005, at 10:09
6    a.m., the person hereinbefore named, who was by me
     duly sworn to testify to the truth and nothing but
7    the truth of his knowledge touching and concerning
     the matters in controversy in this cause; that he was
8    thereupon examined upon his oath, and his examination
     reduced to typewriting under my direction; and that
9    the deposition is a true record of the testimony
     given by the witness.

10

          I further certify that I am neither attorney
11   or counsel for, nor related to or employed by, any of
     the parties to the action in which this deposition is
12   taken, and further that I am not a relative or
     employee of any attorney or counsel employed by the
13   parties hereto or financially interested in the
     action.

14

          IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 30th day of
     March 2005.

16

17

18
                              CYNTHIA A. POWERS
19                            NOTARY PUBLIC
                              MY COMMISSION EXPIRES
20                            JULY 2, 2010

21

22

23

24