UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WILLIAM PARZIALE,<br><br>            *Plaintiff,*<br><br>v.<br><br>AMERICAN HERITAGE LIFE INSURANCE COMPANY, A WHOLLY OWNED SUBSIDIARY OF THE ALLSTATE CORPORATION,<br><br>            *Defendant.* | Civil Action No. 04-11377-RBC |

**DEFENDANT AMERICAN HERITAGE LIFE INSURANCE COMPANY'S RESPONSE TO PLAINTIFF WILLIAM PARZIALE'S STATEMENT OF MATERIAL FACTS OF RECORD AND STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

Pursuant to Local Rule 56.1, Defendant American Heritage Life Insurance Company ("AHL") hereby responds to the numbered paragraphs of Plaintiff William Parziale ("Parziale")'s Statement of Material Facts of Record filed in Support of His Motion for Summary Judgment (the "Statement"). Notwithstanding that Parziale's Statement incorporates numerous inadmissible and unauthenticated documents, and contains numerous immaterial facts, and non-factual conclusions, AHL further responds as follows:[1]

1.      AHL does not dispute that it issued Policy No. 95071110 insuring the life of Ms. Maryann Veronesi ("Veronesi") in the amount of $99,000.00 (the "Policy"), of which Parziale is

---

[1] As set forth in AHL's Opposition to Parziale's Motion, which AHL specifically incorporates herein by reference, Parziale has appended numerous documents to his Statement that are not properly authenticated pursuant to Fed. R. Civ. P. 56(e), and therefore the Court may not consider these documents in support of Parziale's Motion for Summary Judgment. To the extent that the Court considers these documents, however, Parziale's Motion must nonetheless be denied because he has failed to demonstrate an absence of any issue of material fact.

named as a beneficiary. AHL disputes that the Policy was "issued" on July 25, 2001. Rather, the AHL Policy was issued on September 21, 2001, with an effective date of July 25, 2001. (See Defendant's Response to Plaintiff's First Set of Interrogatories, Ans. No. 2a, Ex. 1[2]). Further, AHL disputes that Parziale attached a true and accurate copy of the Policy, as the document attached to Parziale's Statement as Exhibit A does not include all pages of the Policy. To the extent that Parziale's characterization of the Policy is incomplete or inaccurate, AHL disputes Parziale's characterization of the Policy and states that the terms of the Policy speak for themselves. (See American Heritage Life Insurance Company Policy Specifications, Ex. 2.)

2. AHL does not dispute that independent agent Robert Ehrlich ("Ehrlich") solicited Veronesi's application for the Policy sometime on or before July 25, 2001. However, Ehrlich testified that Veronesi wrote the answers to all of the substantive application questions herself, and therefore, AHL disputes Parziale's characterization to the extent that it implies that Ehrlich, and not Veronesi, completed the application. (See Deposition of Robert Ehrlich, March 22, 2005 at 82:14-83:7, Ex. 3)

3. AHL does not dispute that Ehrlich testified in his deposition that he cannot be certain of the date he met with Veronesi to solicit her application for the Policy. However, AHL disputes Parziale's characterization to the extent that it implies that Ehrlich never was certain as to the date he met with Veronesi. In fact, Ehrlich at one time informed AHL in a written statement that he solicited the application the evening of July 25, 2001, sometime after 7:00 p.m. (See Ehrlich Depo. at 76:5-8, Ex. 3; Fax from R. Ehrlich to S. Marchy, page 3, Ex. 4).

---

[2] The reference "Ex. __" refers to documents appended as exhibits to the attached Affidavit of Hobart F. Popick.

4a.     AHL does not dispute that Ehrlich testified that it was his practice not to sell policies that called for a physical examination.  However, AHL disputes that Ehrlich <u>never</u> wrote policies requiring a physical examination.  The undisputed facts show that Ehrlich sold policies requiring a physical examination on at least two occasions during his career as an insurance salesman.  (<u>See</u> Ehrlich Depo. at 64:3-65:13, Ex. 3.)

4b.     AHL disputes that Ehrlich <u>always</u> dated applications the date that he mailed them, rather, Ehrlich testified that he "<u>often</u>" leaves them blank.  (<u>Id.</u> at 67:6-7.)  Moreover, Ehrlich testified that he did not know whether he dated Veronesi's application the date that he mailed it.  Indeed, Ehrlich had no memory of when he dated Veronesi's application.  (<u>Id.</u> at 67:16-68:10.)

7.     AHL disputes that Ehrlich did not explain the application to Veronesi.  Rather, Ehrlich testified that he handed the application to Veronesi and asked her to fill it out, and he did not remember whether Veronesi asked any questions about the application.  (<u>Id.</u> at 86:5-22.)

8.     AHL does not dispute that Ehrlich testified that he "standardly" told applicants to fill out applications themselves.  (<u>Id.</u> at 86:8-10.)  However, AHL disputes that Ehrlich <u>always</u> asked applicants to complete applications themselves.  Rather, Ehrlich testified that he would <u>often</u> have applicants fill out applications, but sometimes he would fill out the applications himself.  (<u>Id.</u> at 32:4-13.)

9.     AHL does not dispute that Veronesi worked a full forty hours per week at Connaughton Construction until February 26, 2002.  However, to the extent that Parziale relies upon the documents in his Ex. C, AHL states that the copies Parziale submits are incomplete, in that they omit certain information along the margins of the page.  Accordingly, AHL attaches hereto as Ex. 5, complete copies of the documents contained in Parziale's Exhibit C.

10 & 12.   As noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit E, and Parziale's characterization thereof, as the documents therein have not been authenticated.

15.   AHL does not dispute that it denied Parziale's claim under the Policy at least in part due to Veronesi's responses to Question 14 Parts 2 (a) and (b) on the Policy application.  To the extent that Parziale references the contents of the March 7, 2003 letter from AHL to Parziale, AHL states that the letter speaks for itself, and AHL objects to Parziale's characterization to the extent that it is inconsistent with the March 7, 2003 letter.  (See Plaintiff's Ex. H.)

16.   AHL disputes that Parziale has accurately quoted Question 14 of the Policy application.  To the extent that Parziale has incompletely or inaccurately quoted Question 14 of the Policy application, AHL states that the terms of the Policy and the application incorporated therein speak for themselves.  (See American Heritage Life Insurance Company Policy Specifications, AHL 00052, Ex. 2).

18.   AHL disputes the admissibility of Ms. Ouellette's statement.  Ms. Ouellette was not present at the time Veronesi completed the application, nor had Veronesi spoken to her in any meaningful way about the Policy.  (See Deposition of Karin Ouellette, March 23, 2005 at 18:15-20:7, Ex. 6.)  Accordingly, Ms. Ouellette's statement about Veronesi's character is irrelevant with respect to the truth or falsity of Veronesi's statements on the Policy application.[3]  Moreover, any such opinion of Ms. Ouellette is inadmissible hearsay and may not be considered.[4]

---

[3] See Fed. R. Evid. 402.

[4] See Fed. R. Evid. 801(c), & 802, Fed. R. Civ. P. 56(e).

19.   AHL does not dispute that Veronesi was seen by Dr. John McCarthy in December 2000.  However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit K, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated, and therefore they are inadmissible.  To the extent that the Court considers these documents, AHL disputes that Veronesi only complained of "right flank pain," rather, she also complained of dizziness, cold sweats, dysuria, and urinary frequency.  (See Lahey Clinic Emergency Department Admission Record, December 13, 2000, Ex. 7.)  Moreover, Veronesi returned to the emergency room at the Lahey Clinic four days later, on December 17, complaining of right flank pain and vomiting. (See Lahey Clinic Emergency Department-Patient Flow Sheet, December 17, 2000, Ex. 9.)

20-21.   AHL does not dispute that Veronesi was seen by Dr. Joseph Rothchild on July 12, 2001.  However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit L, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated.

22.   AHL does not dispute that Veronesi had a chest x-ray taken on or about July 12, 2001.  However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit M, and Parziale's characterization thereof, as Parziale has provided no evidence that the document therein is authenticated.

23.   AHL disputes that "[t]here is no evidence that Veronesi was informed of the results of the radiological study."  First, it is unclear which radiological study Parziale is referring to.  Second, Veronesi's medical records show that she visited Dr. Christina Williamson on July 30, 2001, who noted that Veronesi "had a chest x-ray ordered by her primary care physician last week, which would be mid-July of this year, which showed some question of

adenopahy in the chest, and … she was planning of have a CT scan of the chest to investigate this." (See Lahey Clinic Discharge Summary, July 30, 2001, Ex. 10.) Dr. Williamson's Discharge Summary suggests that Veronesi was aware not only of the results of her x-ray ordered by Dr. Rothchild, but that she had planned to have a CT scan to follow-up on the results of that x-ray.

24. AHL does not dispute that Veronesi had a blood test taken on July 12, 2001. However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit N, and Parziale's characterization thereof, as the documents therein have not been authenticated.

25-26. AHL does not dispute that Veronesi was seen by Dr. Joseph Rothchild on July 12, 2001. However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit O, and Parziale's characterization thereof, as Parziale has provided no evidence that the document therein is authenticated.

27. AHL does not dispute that Veronesi went to the emergency room at the Lahey Clinic on July 25, 2001. However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit P, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated.

29. AHL does not dispute that Parziale testified in his deposition that he was not concerned enough about Veronesi's health to go with her to the emergency room on July 25, 2001. However, AHL objects on the grounds that Parziale's hearsay statement is admissible only for the narrow purpose of showing Parziale's state of mind at the time.[5]

---

[5] See Fed. R. Evid. 803.

30.     AHL does not dispute that Veronesi had a CT scan performed on July 25, 2001. However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit Q, and Parziale's characterization thereof, as Parziale has provided no evidence that the document therein is authenticated.

31.     AHL does not dispute that Veronesi went to the emergency room on July 25, 2001.  However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit P, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated.

32-33.[6]  AHL does not dispute that Veronesi consulted with Dr. Weiner on July 26, 2001. However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit N, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated.

34-36.[7] AHL does not dispute that Veronesi went to Massachusetts General Hospital on August 21, 2001.  However, as noted in Footnote 1 and discussed more fully in AHL's Opposition, AHL objects to Plaintiff's Exhibit R, and Parziale's characterization thereof, as Parziale has provided no evidence that the documents therein have been authenticated.

37.     AHL does not dispute that on or about April 26, 2001, its claim examiner recommended internally to reconsider the denial of Parziale's claim based on her initial review

---

[6] The paragraph following paragraph 32 in Parziale's Statement is numbered in as paragraph 29.  For simplicity and continuity with AHL's Statement of Additional Material Facts, AHL numbers its responses as if the paragraphs in Parziale's Statement had been numbered consecutively.

[7] As stated in footnote 5, AHL numbers its responses as if Parziale had numbered his paragraphs consecutively.

of the documents that Parziale had submitted. However, AHL ultimately denied Parziale's claim at least in part due to Veronesi's responses to Question 14 Parts 2 (a) and (b) on the Policy application. (See Plaintiff's Ex. H.)

## DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS

38. AHL attaches and specifically incorporates herein by reference a true and accurate copy of the Policy as Ex. 2.

39. Veronesi went to the emergency room at the Lahey Clinic on December 13, 2000, complaining of right flank pain, dizziness, cold sweats, dysuria, and urinary frequency. (See Lahey Clinic Emergency Department Admission Record, Dec. 13, 2000, Ex. 7.) Following Veronesi's visit on December 13, 2000, Dr. John McCarthy's prognosis was "probable cystitis." (See Progress Notes of John E. McCarthy, M.D., December 13, 2000, Ex. 8). Four days later, on December 17, 2000 Veronesi returned to the emergency room complaining of right flank pain and vomiting. (See Lahey Clinic Emergency Department-Patient Flow Sheet, Dec. 17, 2000, Ex. 9.)

40. Veronesi contacted Dr. Pazirandeh at the Lahey Clinic on June 15, 2001, complaining of "falling asleep at the wheel." (See Lahey Clinic Ambulatory Order Form, June 15, 2001, Ex. 11.)

41. Veronesi visited the office of Dr. Joseph Rothchild on July 12, 2001, complaining of fatigue, chest pain, difficulty swallowing, and regurgitation. (See Lahey Clinic Progress Notes of Joseph Rothchild, M.D., July 12, 2001, Ex. 12.) Several diagnostic tests were performed, including an HIV screen, to which Veronesi specifically consented. (See Lahey Clinic Ambulatory Order Form, July 12, 2001, Ex. 13; Lahey Clinic Consent to HIV Laboratory Test, July 11, 2001, Ex. 14; Lahey Clinic Department of Laboratory Medicine Final Event

Report, July 12, 2001, Ex. 15.)  Dr. Rothchild's assessment noted he would "consider various infections including hepatitis, HIV and mono." (<u>See</u> Lahey Clinic Progress Notes of Joseph Rothchild, M.D., July 12, 2001, Ex. 12).  An x-ray was also taken, which revealed "fullness in the AP window," and a CT scan was recommended to "exclude the possibility of adenopathy." (<u>See</u> Lahey Clinic Diagnostic Radiology Requisition M965236, July 13, 2001, Ex. 16).  Veronesi was likely aware that a CT scan had been recommended, as Dr. Christine Williamson, who operated on Veronesi after her July 25, 2001 emergency room visit, noted that Veronesi "had a chest x-ray ordered by her primary care physician … mid-July of this year, which showed some question of adenopathy in the chest … <u>she was planning to have a CT scan of the chest to investigate this</u>." (<u>See</u> Ex. 10) (emphasis added).

42.     Parziale and Veronesi became engaged in September 2000 and lived together in a home located at Two Banks Street in Woburn, Massachusetts beginning in the late winter of 2001.  (<u>See</u> Deposition of William Parziale, March 9, 2005 at 37:15-38:4; 38:16-18; 40:6-14, Ex. 17.)  Parziale testified that he had a "[f]un, loving, compassionate" relationship with Veronesi and that she was his "soul mate." (<u>Id.</u> at 62:21, 64:19-20.)  Parziale testified that he and Veronesi would tell one another about anything out of the ordinary that they did on a given day. (<u>Id.</u> at 64:11-14.).  Nonetheless, Parziale testified that Veronesi did not tell him about her visit to Dr. Rothchild on July 12, 2001.  (<u>Id.</u> at 58:15-59:24.)  Indeed, Parziale testified that he believed Veronesi was in "excellent" health prior to her July 25, 2001 emergency room visit.  (<u>Id.</u> at 51:7-10.)

43.     Veronesi was admitted to the emergency room at the Lahey Clinic on July 25, 2001 at approximately 5:10 p.m., complaining of difficulty breathing and hoarseness.  (<u>See</u> Lahey Clinic Emergency Department Admission Record, July 25, 2001, Ex. 18.)  Veronesi's

medical records also show that Veronesi had been experiencing difficulty breathing for three weeks, and that she had experienced hoarseness since Sunday (July 22, 2001), and had "lost her voice" by the time she had appeared at the emergency room. (See Lahey Clinic Consultation Form, July 25, 2001, Ex. 19, Emergency Medicine notes of Tristam C. Dammin, M.D., July 25, 2001, p. 1, Ex. 20.) While at the emergency room, Veronesi had a CT scan performed, which revealed a "hilar mass with anterior mediastinal mass." (Id.) Veronesi's preliminary diagnosis was lymphoma and Hodgkin's disease, and she was scheduled to be seen the following day for "a workup which may well involve a Chamberlain procedure." (Id.) Veronesi's medical records also indicate that her preliminary diagnosis and treatment options were discussed with her and her "significant other." (Id., p. 2.)

44.     Ehrlich informed AHL during its investigation of Parziale's claim that he visited Veronesi's home to solicit the Policy the evening of July 25, 2001, sometime after 7:00 p.m. (See Ehrlich Dep. at 76:5-8, Ex. 3; Fax from R. Ehrlich to S. Marchy, p. 3, Ex. 4.) Ehrlich stated in his deposition that he often solicited policies at applicants' homes in the nighttime hours. (Ehrlich Dep. at 70:8-15, Ex. 3.)

45.     Ehrlich also told AHL that he recorded Veronesi's answers on the application. (Id. at 85:11-16, Fax from R. Ehrlich to S. Marchy, p. 3, Ex. 4.) Ehrlich later disavowed this statement in his deposition. (Ehrlich Dep. at 85:7-85:16, Ex. 3.)

46.     Parziale testified in his deposition that Ehrlich visited the Parziale-Veronesi home on July 25, 2001, the same day that Veronesi went to the emergency room at the Lahey Clinic. (Parziale Dep. at 78:21-79:11, Ex. 17.)

47.     Both Ehrlich and Parziale testified that Veronesi applied for the Policy herself. (Ehrlich Dep. at 85:7-86:10, Ex. 3; Parziale Dep. at 106:11-22, Ex. 17.) Parziale testified that

the application was solicited around 3:30 p.m.  (Parziale Dep. at 79:6-11, Ex. 17.)  Ehrlich also testified in his deposition that he solicited the application in the afternoon.  (Ehrlich Dep. at 61:8-13, Ex. 3.)

48.     Veronesi worked as an office manager at Connaughton Construction forty hours per week through February 26, 2002.  Veronesi's regular hours were 9:00 a.m. to 5:00 p.m.  Veronesi worked a full forty hours the week of July 24, 2001, without taking any sick or vacation time.  (Plaintiff's Ex. C, Letter from S. Marchy to Connaughton Construction, AHL 00175 & 179, Ex. 5.)

49.     Parziale submitted a written Claimant's Statement in support of his claim under the Policy on or about March 14, 2002.  (Parziale Dep. at 117:3-19, Ex. 17; American Heritage Life Claimant's Statement, Ex. 21.)

50.     Parziale's Claimant's Statement failed to disclose all of the doctors who had treated Veronesi during the past five years, even though he was aware of Veronesi's other physicians from accompanying Veronesi to her chemotherapy appointments.  (Parziale Dep. at 119:3-12, Ex. 17.)  Parziale also had accompanied Veronesi on several other appointments, including to Dr. McCarthy on December 13, 2000, to the emergency room on July 25, 2001, and to Dr. Williamson on July 26 and August 23, 2001.  (See Lahey Clinic Emergency Department-Patient Flow Sheet, Dec. 17, 2000, Ex. 9 (noting "Discharge home – Accompanied by Boyfriend"); Lahey Clinic Progress Notes, July 26, 2001, Ex. 22 ("I have had a long discussion with the patient and her boyfriend"); Radiation Therapy Note, August 23, 2001, Ex. 23 ("role of radiation therapy was clearly explained to Ms. Fink and her boyfriend.")).

51.     AHL responded to Parziale's inquiries during the investigation, speaking to him on the telephone on several occasions.  (Parziale Dep. at 124:10-22, Ex. 17.)  AHL also

corresponded regularly with Parziale to inform him of the status of the claim.  (Letter from S. Marchy to W. Parziale, May 7, 2002, Ex. 24; Letter from S. Marchy to W. Parziale, November 1, 2002, Ex. 25; Letter from S. Marchy to W. Parziale, December 4, 2002, Ex. 26.)  Although AHL requested that Parziale provide Veronesi's complete medical records, the process was delayed because AHL was required to obtain a medical release from Veronesi's executrix.  (See Letter from S. Marchy to K. Ouellette, December 10, 2002, Ex. 27.)  As a result, AHL did not have Veronesi's complete medical records until sometime after December 10, 2002.  (See Letter from S. Marchy to W. Parziale, November 1, 2002, Ex. 25.)

52.   By letters to Veronesi's executrix, Karin Ouellette, and to Parziale dated March 7, 2003, AHL denied Parziale's claim and rescinded the AHL Policy due to material misrepresentations on the Policy application.  (Plaintiff's Ex. H, Letter from S. Marchy to K. Ouellette, March 7, 2003, Ex. 28.)  AHL stated that because Veronesi had failed to disclose her July 12, 2001 visit to Dr. Rothchild, and because she stated that she had not "been examined or treated at a hospital or other medical facility (within the last five years)," she had made a material misrepresentation on the Policy application with regard to her medical history.  (Id.)  AHL further stated that had Veronesi correctly informed AHL of her medical history, that AHL would not have issued the Policy.  (Id.)

53.   In response to AHL's Interrogatory No. 5 ("State the basis for your contention in the Complaint that 'no reasonable offer of settlement has been made' by AHL") Parziale stated, in full: "My attorney sent a 30-day demand letter, pursuant to M.G.L. c. 93A, to AHL.  The only response from AHL was to deny liability.  No offer of settlement was made." (See Plaintiff's Answers to Interrogatories, Ans. Int. No. 5, Ex. 29.)

-12-

54.   The only purported symptom of emotional distress that Parziale alleges is "disbelief" that his claim under the Policy was denied.[8] (See Parziale Dep. at 126:23-127:8, Ex. 17.) Parziale has never received treatment of any kind for his alleged emotional distress. (Id. at 127:9-15.)

> Respectfully submitted,
>
> AMERICAN HERITAGE LIFE INSURANCE COMPANY,
>
> By its attorneys,
>
> /s/ Hobart F. Popick
> Jonathan I. Handler (BBO # 561475)
> Hobart F. Popick (BBO # 658763)
> DAY, BERRY & HOWARD LLP
> 260 Franklin Street
> Boston, Massachusetts 02110
> (617) 345-4600

Dated: June 13, 2005

### CERTIFICATE OF SERVICE

I, Hobart F. Popick, hereby certify that on the 13th day of June, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to: Patricia Michaels, Esq., 10 Tremont St., 4th Floor, Boston, Massachusetts 02108.

> /s/ Hobart F. Popick
> Hobart F. Popick

---

[8] Parziale makes no mention whatsoever of his emotional distress claim in his Motion. To the extent that the Court construes Parziale's Motion as a motion for summary judgment on his emotional distress claim, however, AHL opposes the Motion on the grounds that Parziale has demonstrated no basis in fact or in law for his claim, and accordingly, he is not entitled to summary judgment.