## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WILLIAM PARZIALE, )<br><br>*Plaintiff,* )<br>v. )<br><br>AMERICAN HERITAGE LIFE INSURANCE )<br>COMPANY, A WHOLLY OWNED )<br>SUBSIDIARY OF THE ALLSTATE )<br>CORPORATION, )<br><br>*Defendant.* ) | Civil Action No. 04-11377-RBC |

### AFFIDAVIT OF HOBART F. POPICK

1.      I am an attorney with the law firm Day, Berry & Howard LLP, 260 Franklin Street, Boston, Massachusetts 02110.  I represent the Defendant, American Heritage Life Insurance Company ("AHL") in this matter.

2.      This affidavit is made in support of and submitted in conjunction with Defendant American Heritage Life Insurance Company's Opposition to Plaintiff William Parziale's Motion for Summary Judgment, filed herewith.

3.      The attachments hereto consist of pleadings, excerpts from deposition transcripts, and documents produced in discovery in this case.

4.      Documents falling in the AHL 00001-00671 Bates range constitute the complete file generated by AHL during its review of Plaintiff William Parziale's claim under AHL Policy No. 95071110, insuring the life of Maryann Veronesi.

51309722_1.DOC

5.      Documents falling in the ROTH 0001-0731 Bates range were produced in

discovery in this case by the Lahey Clinic in response to a subpoena I caused to be served upon

the office of Dr. Joseph Rothchild.  These records were produced pursuant to M.G.L. c. 233,

§ 79G, with the certification of Lori Jayne, Lahey Clinic's keeper of records, that the documents

constitute the complete file of the patient, Maryann Fink Veronesi.  The certification bears Bates

No. ROTH 0002, and is attached hereto as Exhibit 7.

Signed under the pains and penalties of perjury this 10th day of June, 2005.

_____
Hobart F. Popick

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILLIAM PARZIALE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civil Action No. 04-11377-RBC |
| | ) | |
| THE ALLSTATE CORPORATION a/k/a | ) | |
| ALLSTATE WORKPLACE DIVISION | ) | |
| ("ALLSTATE") AND AMERICAN | ) | |
| HERITAGE LIFE INSURANCE COMPANY, | ) | |
| A WHOLLY OWNED SUBSIDIARY OF | ) | |
| THE ALLSTATE CORPORATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

### DEFENDANTS' RESPONSE
### TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants,

Allstate Corporation, Allstate Workplace Division, and American Heritage Life Insurance

Company (collectively, "AHL") hereby respond and object to the following interrogatories

propounded by Plaintiff William Parziale ("Parziale").

### GENERAL OBJECTIONS AND CONDITIONS OF PRODUCTION

AHL incorporates each of the following General Objections (the "General Objections")

into each of its responses to Plaintiff's First Set of Interrogatories to Be Answered by Defendants

("Parziale's Interrogatories") below:

1.     AHL objects to and will not answer Parziale's Interrogatories to the extent they

seek to impose any obligation upon AHL beyond the scope of the Federal Rules of Civil

Procedure.

2.    AHL objects to and will not answer Parziale's Interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or Federal Rule of Civil Procedure 26(b)(3). Any inadvertent disclosure of information that is subject to any such privilege or immunity from discovery shall not be deemed to constitute a waiver of any such privilege or protection.

3.    AHL objects to and will not answer Parziale's Interrogatories to the extent that they seek information from experts retained in anticipation of litigation or preparation for trial who have not been designated to be called as witnesses at trial.

4.    AHL objects to the definitions and instructions contained in Parziale's Interrogatories to the extent they purport to impose discovery obligations broader than those required under the Federal Rules of Civil Procedure. AHL further objects to the definitions contained in Parziale's Interrogatories to the extent they are inaccurate, incomplete, or misleading.

5.    AHL objects to and will not answer Parziale's Interrogatories to the extent that they purport to require AHL to identify, obtain, or produce information not within AHL's possession, care, custody, or control.

6.    AHL objects to and will not answer each and every individual interrogatory set forth in Parziale's Interrogatories to the extent it, whether standing alone or taken in conjunction with any other interrogatory, is vague or over broad, or is calculated, or would operate to, annoy, embarrass, oppress, unduly burden, or unduly cause expense to AHL, or would be unduly vexatious or unduly burdensome to respond to, on the ground that said interrogatory or interrogatories exceed the permissible scope of discovery available under the Federal Rules of Civil Procedure.

7.      AHL objects to and will not answer Parziale's Interrogatories to the extent that information sought therein is irrelevant to the dispute between AHL and Parziale and is not reasonably calculated to lead to the discovery of admissible evidence.

8.      AHL objects to and will not answer Parziale's Interrogatories to the extent that they are repetitive or duplicative and therefore exceed the permissible scope of discovery available under the Federal Rules of Civil Procedure.

9.      AHL objects to and will not answer Parziale's Interrogatories to the extent that information sought therein is equally or more readily available to Parziale.

10.     AHL responds to Parziale's Interrogatories without waiving the right to object on any grounds to the admission into evidence of any information produced in response to Parziale's Interrogatories in this or any other proceeding.

11.     AHL responds to Parziale's Interrogatories without waiving the right to object at any time to any demand for further discovery involving the subject matter of individual interrogatories.

12.     The specific answers and objections set forth below are based upon information now known.  AHL has not yet completed discovery or preparation for trial in this action and, therefore, reserves its right to amend, modify, or supplement these objections or answers as stated here.

## INTERROGATORIES

## INTERROGATORY NO. 1.

Please identify yourself giving your full name, residence, business address, length of service, and job title you hold with the defendant AHL.

**RESPONSE NO. 1.**

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is overbroad and not reasonably calculated

to lead to the discovery of admissible evidence, in particular with respect to its request for the

home address and length of service of the individual answering these interrogatories. Subject to

and without waiving these objections, AHL states that these interrogatories are answered on its

behalf by Pearl Harrison, Vice President, Claims, American Heritage Life Insurance Company,

1776 American Heritage Life Drive, Jacksonville, Florida, 32224.

**INTERROGATORY NO. 2.**

Did the American Heritage Life Insurance Company issue a policy of insurance to
Maryann Veronesi, covering her life? If so, state:

- a.    when the policy was issued;
- b.    where the policy was issued;
- c.    the manner in which the insured received the policy;
- d.    the name, address, telephone number and job title or capacity at the time of issuance, of the person who sold the policy;
- e.    the name, address, telephone number and job title or capacity at the time of issuance, of the person who issued the policy;
- f.    the name, address, telephone number and job title or capacity at the time of issuance, of the person who authorized the issuance;
- g.    the scope of coverage;
- h.    the amount of coverage;
- i.    the name, address, telephone number and job title or capacity at the time of issuance of each person who witnessed the issuance of the policy;
- j.    the dates of payment of premium;
- k.    the amount of premium due on each date listed in the preceding subdivision.

**RESPONSE NO. 2.**

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Subject to, and without waiving these objections, in response to this interrogatory, AHL states

that it issued a ten-year renewable and convertible term life insurance policy to Maryann

Veronesi under policy number 95071110 (the "Policy"), and that the terms of the Policy speak

-4-

for themselves.  Further answering, AHL refers Parziale to documents produced in Defendants'

Response to Plaintiff's First Request for Production of Documents, Bates Nos. AHL 00003-

00671 and responds as follows to the subparts of Interrogatory No. 2:

    a.    September 21, 2001, effective date of July 25, 2001;

    b.    American Heritage Life Insurance Company, 1776 American Heritage Drive,
Jacksonville, Florida, 32224;

    c.    because the agent identified in subpart "d" below (the "Agent") did not quote the
correct premium to Ms. Veronesi, AHL corrected the premium in accordance with
AHL procedure, and then sent the Policy to the Agent for delivery to Ms.
Veronesi to explain the premium difference;

    d.    Robert Ehrlich, Independent Agent, 438 Massachusetts Avenue, Unit 119,
Arlington, Massachusetts, 02474; telephone:  (617) 566-8155;

    e.    Rhonda Gardner, Senior Clerk, Policy Issuance Department, American Heritage
Life Insurance Company, 1776 American Heritage Drive, Jacksonville, Florida,
32224;

    f.    Karen Phillips, Underwriting Specialist, American Heritage Life Insurance
Company, 1776 American Heritage Drive, Jacksonville, Florida, 32224;

    g.    AHL refers Parziale to the Policy, produced in Defendants' Response to
Plaintiff's First Request for Production of Documents, Bates Nos. AHL 00040-
00054 and AHL 00137-00154, the terms of which speak for themselves;

    h.    AHL refers Parziale to the Policy, produced in Defendants' Response to
Plaintiff's First Request for Production of Documents, Bates Nos. AHL 00040-
00054 and AHL 00137-00154, the terms of which speak for themselves;

i.    Rhonda Gardner, Senior Clerk, Policy Issuance Department, American Heritage

Life Insurance Company, 1776 American Heritage Drive, Jacksonville, Florida

32224;

j.    the Policy premium was paid monthly via automatic deduction from Ms.

Veronesi's checking account, which occurred on or about the 24th, 25th, or 26th

of each month and, accordingly, the premium due date was the date of the

deduction from Ms. Veronesi's account;

k.    AHL refers Parziale to the following table:

| Payment date: | Amount: |
|---|---|
| 9/24/2001 | 25.48 |
| 9/25/2001 | 12.74 |
| 10/25/2001 | 12.74 |
| 11/26/2001 | 12.74 |
| 12/26/2001 | 12.74 |
| 1/25/2002 | 12.74 |
| 2/25/2002 | 12.74 |
| 3/24/2003 (premiums refunded) | -101.92 |

## INTERROGATORY NO. 3.

Other than the agent listed in answer to interrogatory number 2, who else was present at the time that Maryann Veronesi's application for life insurance was completed.

## RESPONSE NO. 3.

For the reasons stated in the General Objections, AHL objects to this interrogatory. Further objecting, AHL states that this interrogatory is vague and ambiguous. Subject to, and without waiving these objections, AHL states that it is without information responsive to this interrogatory.

**INTERROGATORY NO. 4.**

List chronologically the dates of all interviews and/or conversations that AHL or its agents (including, but not limited to the agent who sold Maryann Veronesi the policy in question) had with Ms. Veronesi or the plaintiff, William Parziale. Include in your answer a summary of all such interviews and/or conversations.

**RESPONSE NO. 4.**

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is unduly burdensome, overbroad, and not

reasonably calculated to lead to the discovery of admissible evidence, in particular with respect

to its request for a chronological listing of "all interviews and/or conversations" and a "summary

of all such interviews and/or conversations." Subject to, and without waiving these objections,

AHL refers Parziale to documents produced in response to Parziale's First Request for

Production of Documents to Defendants, Bates Nos. AHL 00052-00053; AHL 00056-00057;

AHL 00059; AHL 00060-00061; AHL 00066; AHL 00080; AHL 00082; AHL 00118; AHL

00170; AHL 00174; AHL 00228; AHL 00234; AHL 00237; AHL 00245; and AHL 00439.

**INTERROGATORY NO. 5.**

Describe in detail the process that was employed to verify Ms. Veronesi's responses to the medical history questions on the application.

**RESPONSE NO. 5.**

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is vague and ambiguous. Subject to, and

without waiving these objections, in response to this interrogatory, AHL refers Parziale to

documents produced in response to Parziale's First Request for Production of Documents to

Defendants, Bates Nos. AHL 00003-00671.

## INTERROGATORY NO. 6.

State whether the process that AHL employed in Ms. Veronesi's application verification was a standardized process.

## RESPONSE NO. 6.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is not reasonably calculated to lead to the

discovery of admissible evidence, and is vague and ambiguous, particularly with respect to its

failure to define the term "standardized process."

## INTERROGATORY NO. 7.

State why AHL's initial investigation failed to discover the information that was subsequently used to rescind Ms. Veronesi's policy.

## RESPONSE NO. 7.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is vague and ambiguous, and not reasonably

calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these

objections, in response to this interrogatory, AHL refers to documents produced in response to

Parziale's First Request for Production of Documents to Defendants, Bates Nos. AHL 00007;

AHL 00020-21; AHL 00082-00085; AHL 00088-00092; AHL 00107-108; AHL 00111-00118;

AHL 00120-00121; AHL 00123-00125; AHL 00129-00132; AHL 00181; AHL 00183; AHL

00194-00196; AHL 00225-00226; AHL 00228-00229; and AHL 00665.

## INTERROGATORY NO. 8.

State whether defendant required Ms. Veronesi to undergo a medical exam prior to issuing the policy to her.

**RESPONSE NO. 8.**

      For the reasons stated in the General Objections, AHL objects to this interrogatory.

Subject to, and without waiving these objections, in response to this interrogatory, AHL refers

Parziale to the Policy, produced in Defendants' Response to Plaintiff's First Request for

Production of Documents, Bates Nos. AHL 00040-00054 and AHL 00137-00154, the terms of

which speak for themselves.

**INTERROGATORY NO. 9.**

      Describe how AHL discovered Maryann Veronesi's alleged medical treatments were not
disclosed on the insurance application.

**RESPONSE NO. 9.**

      For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is vague and ambiguous.  Subject to, and

without waiving these objections, in response to this interrogatory, AHL refers to documents

produced in response to Parziale's First Request for Production of Documents to Defendants,

Bates Nos. AHL 00020-21; AHL 00082-00085; AHL 00089-00092; AHL 00107-108; AHL

00111-00118; AHL 00120-00121; AHL 00123-00125; AHL 00129-00132; AHL 00181; AHL

00183; AHL 00186-00198; AHL 00221-00226; AHL 00228-00229; AHL 00235-00237; and

AHL 00665.

**INTERROGATORY NO. 10.**

      Describe the circumstances that prompted AHL to question the veracity of the responses
provided on Maryann Veronesi's insurance application.

**RESPONSE NO. 10.**

      For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is vague and ambiguous.  Subject to, and

without waiving these objections, in response to this interrogatory, AHL refers to documents

produced in response to Parziale's First Request for Production of Documents to Defendants,

Bates Nos. AHL 00020-21; AHL 00082-00085; AHL 00089-00092; AHL 00107-108; AHL

00111-00118; AHL 00120-00121; AHL 00123-00125; AHL 00129-00132; AHL 00181; AHL

00183; AHL 00186-00198; AHL 00221-00226; AHL 00228-00229; AHL 00235-00237; and

AHL 00665.

## INTERROGATORY NO. 11.

State the total amount of premiums paid by or on behalf of Marynn Veronesi to maintain
the life insurance policy at issue.

## RESPONSE NO. 11.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Subject to, and without waiving these objections, in response to this interrogatory, AHL

incorporates by reference its response to Interrogatory No. 2(j) as if fully restated herein.  Further

answering, AHL refers Plaintiff to documents produced in response to Parziale's First Request

for Production of Documents to Defendants, Bates Nos. AHL 00006-00007; AHL 00011-00012;

AHL 00080-00081; AHL 00088; AHL 00170-00171; AHL 00238-00240; and AHL 00439-

00440.

## INTERROGATORY NO. 12.

Please state the number of life insurance policies that were issued by AHL from January
1, 1994 through the present, which did not require the applicant to undergo a medical
examination prior to issuing the life insurance policy.

-10-

## RESPONSE NO. 12.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is unduly burdensome, overbroad, and not

reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 13.

Based on your answer to the preceding interrogatory, how many such policies issued were subsequently rescinded due to an incorrect statement concerning whether the applicant had been examined or treated by at a hospital or medical facility within five (5) years preceding the application?

## RESPONSE NO. 13.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is unduly burdensome, overbroad, and not

reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 14.

Based on your answer to Interrogatory No. 12, how many such policies issued were subsequently rescinded due to an incorrect statement concerning whether the applicant was currently under a doctor's care?

## RESPONSE NO. 14.

For the reasons stated in the General Objections, AHL objects to this interrogatory.

Further objecting, AHL states that this interrogatory is unduly burdensome, overbroad, and not

reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 15.

Based on your answer to Interrogatory No. 12, how many such policies issued were subsequently rescinded due to an incorrect statement concerning whether the applicant had been advised to have or contemplate having any diagnostic test, treatment or surgery?

**RESPONSE NO. 15.**

For the reasons stated in the General Objections, AHL objects to this interrogatory. Further objecting, AHL states that this unduly burdensome, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

## VERIFICATION

On behalf of Allstate Corporation, Allstate Workplace Division, and American Heritage Life Insurance Company (collectively, "AHL") in the above-captioned action, I, Pearl Harrison, have read the foregoing interrogatory answers and know their contents. These answers were prepared with the assistance and advice of counsel, upon whose advice I have relied. The answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of these answers, and currently available. Consequently, AHL reserves the right to make any changes in or additions to the answers if it appears at any time that omissions or errors have been made therein or that more accurate information has become available. Subject to the limitations set forth herein, these answers are true to the best of my knowledge, information, and belief.

Pearl Harrison

As to Objections:

Jonathan I. Handler (BBO #561475)
Hobart F. Popick (BBO #659531)
DAY, BERRY & HOWARD LLP
260 Franklin St.
Boston, MA 02110
(617) 345-4600

Dated: January 27, 2005

-13-

## **CERTIFICATE OF SERVICE**

I, Hobart F. Popick, hereby certify that on the 27th day of January, 2005, I caused a true and correct copy of the foregoing **Defendants' Response to Plaintiff's First Set of Interrogatories** to be served via hand delivery upon Plaintiff's counsel, Patricia Michaels, Esq., Law Office of Patricia Michaels, 10 Tremont St., 4th Floor, Boston, Massachusetts  02108.

_____
Hobart F. Popick

**EXHIBIT 2**

# AMERICAN HERITAGE LIFE INSURANCE COMPANY
### 1776 American Heritage Life Drive, Jacksonville, Florida 32224

## POLICY SPECIFICATIONS

| FORM NO. | DESCRIPTION OF BENEFITS | PREMIUMS NUMBER OF YEARS PAYABLE | ANNUAL AMOUNT |
|---|---|---|---|
| 10YTP-80 | TEN YEAR RENEWABLE AND CONVERTIBLE TERM INSURANCE - CURRENT PREMIUM | 10* | $140.09 * |
| | | TOTAL | $140.09 |
| | TEN YEAR RENEWABLE AND CONVERTIBLE TERM INSURANCE - MAXIMUM PREMIUM | | $331.16 * |



*CURRENT PREMIUM MAY BE CHANGED AFTER 5 YEARS.   SEE PAGE 3A.

The effective date and issue age of each benefit is the Policy Date and Issue Age of the policy unless otherwise specified.
### TOTAL PREMIUMS
The Total Premiums include the charge for any additional benefits.

| ANNUAL | SEMI-ANNUAL | QUARTERLY | MONTHLY | BILLABLE PREMIUM |
|---|---|---|---|---|
| $140.09 * | $76.41 * | $38.21* | $12.74 * | $12.74 |

Premium Payment Method  PRE-AUTHORIZED CHECK - MONTHLY      Premium Class  NON-SMOKER

BENEFICIARY:   UNLESS CHANGED AS PROVIDED IN THIS POLICY,THE BENEFICIARY
SHALL BE AS DESIGNATED IN THE APPLICATION FOR THIS POLICY.

INSURED:  MARYANN VERONESI                    POLICY NUMBER:  95071110

POLICY DATE:  JULY 25, 2001                   ISSUE AGE:  F  32

AMOUNT OF INSURANCE:  $99,000.00      DATE OF EXPIRY  JULY 25, 2011
                                      FINAL RENEWAL DATE:  JULY 25, 2064
                                      CONVERTIBLE PERIOD:  38  YEARS*
                                           *PROVIDING POLICY RENEWED

FORM:  10YTP-80         TEN YEAR RENEWABLE AND CONVERTIBLE TERM      FEMALE

AHL 00040

SPECIMEN

SPECIMEN

## PREMIUM CHANGE PROVISION

During the first five years of this ten year contract the Current Premium as shown on page 3 is payable. Thereafter, for the balance of the ten year period, the current Premium can be changed as follows:

In the absence of any notice from the Company, the Current Premium will continue to be payable. If the Current Premium is to be changed, the Company will write the Owner before the beginning of the policy year of such change. The Premium for the Ten Year Term Insurance will never be changed so as to exceed the Maximum Premium shown on page 3. Any change in the Current Premium will be on a uniform basis for Insureds of the same:

    (a) Issue Age;

    (b) Premium Class; and

    (c) Duration in Force.

No change in premium class or premium will occur on account of any deterioration of the Insured's health. The premium will not be changed due to losses or gains of the Company prior to the date of change. Any premium change will be based on the Company's expectations of future cost factors. These cost factors include interest, persistency, expenses and mortality. Details of all changes in premium rates will be filed with the Insurance Department if required.

AHL 00042

## SETTLEMENT OPTION PROVISIONS

**Election of Option** - All rights of the Owner provided in the Owner and Beneficiary provision apply to any election or change of election of a Settlement Option. If the Beneficiary is not an individual receiving payment in his or her own right, the Company must consent to any option other than a lump sum payment. A change of beneficiary revokes a prior election option. The Beneficiary has no right to change or revoke an election unless this right was given by the Owner and agreed to by the Company in writing. If the Owner does not elect an option, the Beneficiary will have the right at the time of settlement.

If all named beneficiaries die prior to the death of the Insured, the Company will pay the Proceeds in one sum to the executors or administrators of the Insured's estate.

**Proceeds** - All or part of the policy proceeds may be paid to the payee in one sum or under one or more of the Settlement Options. The amount which may be applied under an option must be at least $1,000 or provide for periodic payments of at least $10. If not, the proceeds will be paid in a lump sum.

**Supplementary Contract** - A Supplementary contract will be issued in exchange for this policy when settlement is made by any of the options. If settlement is a result of the Insured's death, the effective date of that contract will be the date when proof of death is received by the Company. If applicable and if settlement is a result of policy maturity as an endowment or cash value surrender, the effective date of the contract will be the date of maturity or surrender.

Interest under Option 1 will be earned from the effective date of the contract. The first installment under Options 2, 3, 4 and 5 will be paid on the effective date of the contract unless a written election provides otherwise.

**Interest Rate** - The interest rate for these options may vary, but will not be less than 3%. The interest rate may be changed by the Company. If so, the Company will determine the amount and the method of payment of such earnings.

**Death of the Payee** - If the payee dies after the option goes into effect, the then present or commuted value of any guaranteed amount unpaid will be paid in one sum to the executors or administrators of the payee's estate, unless otherwise provided.

## SETTLEMENT OPTIONS

**Option 1. Interest:** The proceeds may be left with the Company to earn interest for a specified period. This period of time may not exceed 30 years or the lifetime of the payee. The interest earned may be paid as agreed upon or credited annually and added to the proceeds. At the end of the specified period, the proceeds will be paid to the payee. If the payee dies before the end of this period, the proceeds will be paid as previously agreed upon.

**Option 2. Installments For a Guaranteed Period:** The proceeds may be used to provide equal installments for a guaranteed period. This period may not exceed 30 years. The equal installment may be paid on an annual, semi-annual, quarterly or monthly basis. The amount of each installment for each $1,000 of proceeds is shown in the following table:

| Number of Years Guaranteed | Ann. | S. A. | Quar. | Mo. | Number of Years Guaranteed | Ann. | S.A. | Quar. | Mo. | Number of Years Guaranteed | Ann. | S.A. | Quar. | Mo. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $1,000.00 | $503.69 | $252.78 | $84.47 | 11 | $104.93 | $52.85 | $26.52 | $8.86 | 21 | $62.98 | $31.72 | $15.92 | $5.32 |
| 2 | 507.39 | 255.57 | 128.26 | 42.86 | 12 | 97.54 | 49.13 | 24.66 | 8.24 | 22 | 60.92 | 30.69 | 15.40 | 5.15 |
| 3 | 343.23 | 172.88 | 86.76 | 28.99 | 13 | 91.29 | 45.98 | 23.08 | 7.71 | 23 | 59.04 | 29.74 | 14.92 | 4.99 |
| 4 | 261.19 | 131.56 | 66.02 | 22.06 | 14 | 85.95 | 43.29 | 21.73 | 7.26 | 24 | 57.33 | 28.88 | 14.49 | 4.84 |
| 5 | 211.99 | 106.78 | 53.59 | 17.91 | 15 | 81.33 | 40.97 | 20.56 | 6.87 | 25 | 55.76 | 28.09 | 14.09 | 4.71 |
| 6 | 179.22 | 90.27 | 45.30 | 15.14 | 16 | 77.29 | 38.93 | 19.54 | 6.53 | 26 | 54.31 | 27.36 | 13.73 | 4.59 |
| 7 | 155.83 | 78.49 | 39.39 | 13.16 | 17 | 73.74 | 37.14 | 18.64 | 6.23 | 27 | 52.97 | 26.68 | 13.39 | 4.47 |
| 8 | 138.31 | 69.67 | 34.96 | 11.68 | 18 | 70.59 | 35.56 | 17.84 | 5.96 | 28 | 51.74 | 26.06 | 13.08 | 4.37 |
| 9 | 124.69 | 62.81 | 31.52 | 10.53 | 19 | 67.78 | 34.14 | 17.13 | 5.73 | 29 | 50.60 | 25.49 | 12.79 | 4.27 |
| 10 | 113.82 | 57.33 | 28.77 | 9.61 | 20 | 65.26 | 32.87 | 16.50 | 5.51 | 30 | 49.53 | 24.95 | 12.52 | 4.18 |

10YTP-80

AHL 00043

## SETTLEMENT OPTIONS (Continued)

**Option 3. Special Settlement:** The proceeds may be paid in installments of equal or varied amounts. This option must be agreed to by the company. Such installments will be paid until the proceeds plus interest credited on unpaid balances are paid in full.

**Option 4. Life Income With a Guaranteed Period:** The proceeds may be used to provide equal monthly installments for a guaranteed period and thereafter during the lifetime of the payee. This guaranteed period may be 5, 10, 15, or 20 years.

The Company can require satisfactory evidence of the payee's age before making any payment under this option. The amount of the monthly installment is determined by: (a) the guaranteed period chosen, and (b) the payee's attained age on the date the first installment would be paid. The amount for each $1,000 of proceeds is shown in the following table:

| Age | No of Months Certain | | | Age | No of Months Certain | | | Age | No of months Certain | | |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
|     | 120 | 180 | 240 |     | 120 | 180 | 240 |     | 120 | 180 | 240 |
| 10 | $2.95 | $2.94 | $2.94 | 35 | $3.55 | $3.54 | $3.51 | 60 | $5.28 | $5.04 | $4.73 |
| 11 | 2.96 | 2.96 | 2.95 | 36 | 3.59 | 3.58 | 3.54 | 61 | 5.39 | 5.12 | 4.79 |
| 12 | 2.98 | 2.97 | 2.96 | 37 | 3.63 | 3.62 | 3.58 | 62 | 5.51 | 5.21 | 4.84 |
| 13 | 2.99 | 2.99 | 2.98 | 38 | 3.68 | 3.66 | 3.62 | 63 | 5.63 | 5.29 | 4.90 |
| 14 | 3.00 | 3.00 | 2.99 | 39 | 3.72 | 3.70 | 3.66 | 64 | 5.75 | 5.38 | 4.95 |
| 15 | 3.02 | 3.02 | 3.01 | 40 | 3.77 | 3.75 | 3.70 | 65 | 5.88 | 5.47 | 5.00 |
| 16 | 3.04 | 3.03 | 3.03 | 41 | 3.82 | 3.79 | 3.74 | 66 | 6.01 | 5.55 | 5.05 |
| 17 | 3.05 | 3.05 | 3.04 | 42 | 3.87 | 3.84 | 3.78 | 67 | 6.14 | 5.64 | 5.10 |
| 18 | 3.07 | 3.07 | 3.06 | 43 | 3.93 | 3.89 | 3.83 | 68 | 6.28 | 5.73 | 5.14 |
| 19 | 3.09 | 3.09 | 3.08 | 44 | 3.98 | 3.94 | 3.87 | 69 | 6.42 | 5.81 | 5.19 |
| 20 | 3.11 | 3.11 | 3.10 | 45 | 4.04 | 4.00 | 3.92 | 70 | 6.57 | 5.90 | 5.23 |
| 21 | 3.13 | 3.13 | 3.12 | 46 | 4.10 | 4.05 | 3.97 | 71 | 6.71 | 5.98 | 5.26 |
| 22 | 3.16 | 3.15 | 3.14 | 47 | 4.17 | 4.11 | 4.02 | 72 | 6.86 | 6.06 | 5.30 |
| 23 | 3.18 | 3.18 | 3.17 | 48 | 4.23 | 4.17 | 4.07 | 73 | 7.02 | 6.14 | 5.33 |
| 24 | 3.20 | 3.20 | 3.19 | 49 | 4.30 | 4.23 | 4.12 | 74 | 7.17 | 6.21 | 5.36 |
| 25 | 3.23 | 3.23 | 3.21 | 50 | 4.37 | 4.29 | 4.17 | 75 | 7.32 | 6.29 | 5.38 |
| 26 | 3.26 | 3.25 | 3.24 | 51 | 4.45 | 4.36 | 4.23 | 76 | 7.48 | 6.35 | 5.41 |
| 27 | 3.28 | 3.28 | 3.26 | 52 | 4.53 | 4.43 | 4.28 | 77 | 7.63 | 6.42 | 5.43 |
| 28 | 3.31 | 3.31 | 3.29 | 53 | 4.61 | 4.50 | 4.34 | 78 | 7.78 | 6.48 | 5.44 |
| 29 | 3.34 | 3.34 | 3.32 | 54 | 4.69 | 4.57 | 4.39 | 79 | 7.93 | 6.53 | 5.46 |
| 30 | 3.37 | 3.37 | 3.35 | 55 | 4.78 | 4.64 | 4.45 | 80 | 8.08 | 6.58 | 5.47 |
| 31 | 3.41 | 3.40 | 3.38 | 56 | 4.87 | 4.72 | 4.50 | 81 | 8.22 | 6.63 | 5.48 |
| 32 | 3.44 | 3.43 | 3.41 | 57 | 4.97 | 4.79 | 4.56 | 82 | 8.36 | 6.67 | 5.49 |
| 33 | 3.48 | 3.46 | 3.44 | 58 | 5.07 | 4.87 | 4.62 | 83 | 8.50 | 6.70 | 5.49 |
| 34 | 3.51 | 3.50 | 3.47 | 59 | 5.17 | 4.95 | 4.68 | 84 | 8.62 | 6.73 | 5.50 |

## GENERAL PROVISIONS

**Contract -** This policy is issued in consideration of the application for it and the payment of the premium. This policy and the application make up the entire contract. The policy is all the pages shown in the Table of Contents and any attached endorsements. All statements made in the application will be deemed representations and not warranties. No statement made by the Insured or on his behalf shall be used in defense of a claim under this policy unless it is contained in the application, a copy of which is attached to this policy when issued.

Only the President, a Vice President, the Secretary, or an Assistant Secretary of the Company can change or waive any of the provisions of the policy. Any change must be made in writing.

**Incontestability -** The Company may not contest this policy after it has been in force during the lifetime of the Insured for two years from the Issue Date, except for failure to pay premiums. If allowed by laws of the state in which this policy is delivered, this will not apply to benefits for total and permanent disability or accidental death which may be contained in a rider which is a part of this policy.

**Suicide Exclusion -** If the Insured commits suicide, while sane or insane, within two years after the Issue Date, the Company will pay a benefit equal to the amount of premiums paid. When the laws of the state in which this policy is delivered require less than this two-year period, the period will be as stated in such laws.

**Owner and Beneficiary -** While the Insured is alive, the Owner has all rights conferred in this policy. The named Beneficiary will receive the proceeds of this policy when the Insured dies. If all named beneficiaries die prior to the death of the Insured, the Company will pay the proceeds in one sum to the executor or administrator of the Insured's estate.

The Owner has the right to change any Beneficiary, subject only to the consent of any living irrevocable Beneficiary. This change may be requested on forms provided by the Company. The Company must approve the change in writing. When approved, the change will take effect on the date of the request. This will be true whether or not the Insured is living on the date of such approval. But the Company shall not suffer loss because of payments made before the approval of such change.

SPECIMEN

Form10YTP-80

Page 5

AHL 00044

### GENERAL PROVISIONS (Continued)

The Owner shall be the person who applied for this policy. Someone else can be the Owner if a form satisfactory to the Company is filed at the Home Office.

**Premium -** The Policy Date is when the first premium is due. It is also the date from which policy years, premium due dates and policy anniversaries are determined. Premiums are to be paid during the lifetime of the Insured for the number of years shown on page 3. The amount and mode of premium payment are also shown on page 3.

Premiums must be paid to the Company at the Home Office on or before the due date. On request, the Company will give the Owner a receipt. Premiums may be paid 1, 2, 4, or 12 times a year according to the Premium Payment Method selected.

This method may be changed on any policy anniversary.

| Premium Payment Method | Number of Premium Payments Per Year |
|---|---|
| Annual | 1 |
| Semi-Annual | 2 |
| Quarterly | 4 |
| Monthly | 12 |

**Grace Period -** A grace period of 31 days is allowed to pay each premium but the first. During this grace period the policy will be in force. If the Insured dies during a grace period, the premium due will be deducted from the proceeds.

If the premium is not paid at the end of the grace period, the policy will lapse.

**Misstatement of Age -** If the age of the Insured as shown on the application is not correct, the benefit to be paid will be adjusted. This adjusted benefit will be an amount which the premium paid would have purchased for the correct age.

**Reinstatement -** The policy may be reinstated within 5 years after it ceases to be in full force.

Reinstatement is subject to:
  (a) evidence of insurability satisfactory to the Company,
  (b) payment of past due premiums with compound interest at 5.7% per year.

**Assignment -** The Company is not responsible for the validity of any assignment. The Company will not be bound by an assignment unless a duplicate of the written original is filed with the Company.

**Settlement -** All payments by the Company are payable at its Home Office.

**Non-Participating -** The policy is not entitled to share in surplus distribution.

### RIGHT TO CONVERT

This term policy may be exchanged without evidence of insurability for any then current whole life or endowment policy:
  (a) if this term policy is in full force, and
  (b) if the exchange takes place within the convertible period shown on page 3,
  (c) except that the conversion of a waiver of premium rider shall be subject to evidence of insurability, unless this policy is converted to whole life paid up at age 100.

To convert this policy, the Owner must:
  (a) send a written request for the exchange, stating the plan of insurance and the effective date of the new policy,
  (b) surrender this term policy, and
  (c) pay the first premium on the new policy.

The face amount of the new policy cannot be greater than the amount of insurance in the policy year following that in which the exchange is made. The premiums will be those in effect for the Insured's age as of the birthday prior to the date of exchange. The new policy must retain the same mortality class and the same Insured as this policy.

SPECIMEN

Form 10YTP-80

Page 6

AHL 00045

## RIGHT TO RENEW

This term policy may be renewed without evidence of insurability for successive term periods equal to the original:
  (a) if this term policy is in full force, and
  (b) if the renewal takes place prior to the Final Renewal Date.

To renew this policy, the Owner must:
  (a) send a written request for renewal, and
  (b) pay the required premium shown in the Schedule below.

## SCHEDULE OF MAXIMUM RENEWAL RATES

The Maximum Annual Premium for renewal of this policy shall be determined by:
  (a) multiplying the Annual Rate per $1000 by the number of $1000 of Amount of Insurance, and
  (b) then adding $50.00

These rates do not include the additional premiums payable under:
  (a) any riders which may be attached to the policy, or

  (b) which might be required by a Substandard rating at issue.

These are annual rates and should be adjusted for other payment methods.

At renewal, Current Rates lower than these Maximum Rates may be charged.

| Attained Age* | Maximum 10 Year Term Annual Rate per $1,000 | Attained Age* | Maximum 10 Year Term Annual Rate per $1,000 | Attained Age* | Maximum 10 Year Term Annual Rate per $1,000 | Attained Age* | Maximum 10 Year Term Annual Rate per $1,000 |
|---|---|---|---|---|---|---|---|
| 15 | $1.70 | 35 | $3.53 | 55 | $20.11 | 75 | $201.29 |
| 16 | 1.74 | 36 | 3.82 | 56 | 21.99 | 76 | 229.99 |
| 17 | 1.78 | 37 | 4.15 | 57 | 24.02 | 77 | 259.60 |
| 18 | 1.81 | 38 | 4.50 | 58 | 26.22 | 78 | 289.68 |
| 19 | 1.84 | 39 | 4.90 | 59 | 28.61 | 79 | 319.79 |
| 20 | 1.87 | 40 | 5.35 | 60 | 31.24 | 80 | 349.49 |
| 21 | 1.90 | 41 | 5.84 | 61 | 34.09 | 81 | 378.42 |
| 22 | 1.94 | 42 | 6.37 | 62 | 37.16 | 82 | 407.10 |
| 23 | 1.97 | 43 | 6.95 | 63 | 40.44 | 83 | 435.66 |
| 24 | 2.02 | 44 | 7.59 | 64 | 43.96 | 84 | 464.24 |
| 25 | 2.07 | 45 | 8.30 | 65 | 47.73 | 85 | 492.98 |
| 26 | 2.13 | 46 | 9.07 | 66 | 49.71 | 86 | 521.16 |
| 27 | 2.20 | 47 | 9.91 | 67 | 50.92 | 87 | 549.04 |
| 28 | 2.28 | 48 | 10.82 | 68 | 53.39 | 88 | 577.41 |
| 29 | 2.38 | 49 | 11.82 | 69 | 59.19 | 89 | 607.07 |
| 30 | 2.51 | 50 | 12.93 | 70 | 70.31 | 90 | 638.80 |
| 31 | 2.66 | 51 | 14.13 | 71 | 89.66 | 91 | 671.81 |
| 32 | 2.84 | 52 | 15.43 | 72 | 114.25 | 92 | 706.51 |
| 33 | 3.04 | 53 | 16.83 | 73 | 142.27 | 93 | 743.68 |
| 34 | 3.27 | 54 | 18.39 | 74 | 171.89 | 94 | 783.72 |
|  |  |  |  |  |  | 95 | 826.63 |

*Age at date of renewal equal to Issue Age plus number of whole policy years the policy has been in force.

## RESERVE

The reserves on this ten year term policy are based on the Commissioners 1980 Standard Ordinary 10 year select and ultimate mortality table, Male or Female, Non-smoker or Smoker with 5% interest.

They are computed by the Commissioners Reserve Valuation Method. All tables are based on age last birthday.

Form 10YTP-80

AHL 00046

SPECIMEN

AHL 00047

# AMERICAN HERITAGE LIFE INSURANCE COMPANY

### Jacksonville, Florida 32224-6688

### AMENDMENT

The following provision is added to the General Provisions of the policy to which this amendment is attached:

**Receipt of Premiums.** You will be given credit for premiums under this policy at the time the premiums are actually received by us or our authorized agent. Financial institutions (such as banks and credit unions) and employers who send your premiums to us directly at your request, are not our agents, and premiums paid by those parties are not credited until actually received by us.

This Amendment does not change, alter or amend the policy except as stated above.

This Amendment becomes effective as of the policy date.

Secretary

RPA1

AHL 00048

SPECIMEN

AHL 00049

# AMERICAN HERITAGE LIFE INSURANCE COMPANY
### Jacksonville, Florida 32224-6688

### AMENDMENT

The following is added to the General Provisions of the policy/certificate to which it is attached:

**Cooperation of Beneficiary.**    The beneficiary must reasonably cooperate during any investigation and/or adjudication of a claim.  This includes the authorization for the release of medical records and other information.

This Amendment does not change, alter, or amend the policy/certificate except as stated.

This Amendment becomes effective as of the policy/certificate date.

SPECIMEN

Secretary

CBA1

AHL 00050

SPECIMEN

AHL 00051

**14. NON-MEDICAL QUESTIONNAIRE.** (Exclude history of: colds, flu, minor injuries, normal childbirth, seasonal hay fever, appendicitis or tonsillitis.)

**Part 1:** Has any person to be insured ever had, been treated for, or been told by a member of the medical profession they have: — Yes / No

a. high blood pressure, diabetes, emphysema, asthma, ulcer, hernia, mental or nervous disorder, congenital disorder or any disorder of the kidney, liver, lung, stomach, digestive tract, neck or back? ☐ / ☑

b. Acquired Immune Deficiency Syndrome (AIDS), AIDS related complex (ARC)? ☐ / ☑

c. had any impairment, illness or chronic disease not already mentioned (last 5 years)? ☐ / ☑

**Part 2:** Has any person to be insured:

a. been examined or treated at a hospital or other medical facility (within last 5 years) or are they currently under the care of a doctor? ☐ / ☑

b. been advised to have or contemplate having any diagnostic test, treatment or surgery? ☐ / ☑

c. been counseled for or excessively used alcohol or drugs (within last 5 years) or are they currently taking any drug not prescribed by a doctor (within last 5 years)? ☐ / ☑

d. ever had any new insurance or reinstatement limited, postponed, or declined; or claimed or been refused disability income benefits? ☐ / ☑

e. flown other than as a passenger on a scheduled airline flight or engaged in any hazardous sport (within last 3 years)? ☐ / ☑

**Part 3:** Has any person to be insured ever had, been treated for, or been told by a member of the medical profession they have:

a. cancer or malignancy, including: carcinoma, sarcoma, Hodgkin's disease, leukemia, lymphoma or malignant tumor? — Yes ☐ / No ☑

b. heart condition, heart attack, heart murmur or stroke? ☐ / ☑

c. rocky mountain spotted, scarlet, typhoid or undulant fever; Addison's or Hansen's disease; polio or osteo myelitis; bubonic plague; diphtheria; encephalitis; meningitis; muscular dystrophy; multiple sclerosis; rabies; sickle cell anemia; smallpox; tetanus; tuberculosis or tularemia? ☐ / ☑

**Part 4** (Cancer/Specified Disease/Intensive Care only): If any question in Part 3 is anwered "Yes", list below person(s) and condition(s) excluded from coverage.

Person(s) _____

Condition(s) _____

**Part 5** (Health Only): List persons to be insured who reside in Arkansas, Utah, Virginia, or South Carolina and are also covered under any Title XIX/Medicaid program. Such person (s) is to be excluded from Health coverage.

Person(s) _____

SPECIMEN

---

**15. EXPLANATION OF "YES" OF ANSWERS to # 14.**

| Part/# | Name | Disease or injury - Dates | Duration | Result | Name & Address of Doctor |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

---

**REPRESENTATION AND AGREEMENT.** The statements and answers given on this application are true, complete and correctly recorded to the best of my knowledge. I (the owner) certify that my SSN/TIN has been correctly recorded. It is agreed that: 1. This application and any required medical exam form are the basis for any policy issued; 2. No agent may waive policy provisions, make, alter or discharge contracts, waive questions in the application, or pass on insurability; 3. I have received the M.I.B. Notice and the Important Notice.

**AUTHORIZATION:** I authorize any physician, medical practitioner, hospital, clinic, medical related facility, other health care provider, employer, insurance company, consumer reporting agency, government agency and the Medical Information Bureau, Inc. to disclose to American Heritage Life, or its reinsurers, all information and records with respect to myself (or any minor child to be insured) relating to diagnosis, treatment, prognosis, medical history, physical and mental condition, and nonmedical information relevant to insurability. Such information may be used in connection with the evaluation of my application for insurance, reinstatement, renewal or continuance of any insurance policy, and claims on any insurance policy. If a medical exam or medical test is required to complete my application, I authorize American Heritage Life or its representative to disclose the information required to arrange such exam or test. This authorization (or a copy of it) is valid for 30 months from its date.

Signed at _____ on _25 July_ 19 01

Proposed Insured _____       Spouse if to be Covered _____

Owner if other than above _____       Parent/Guardian _____

---

**Agent's Statement.** To your knowledge, is replacement or change involved? ☐ Yes ☑ No
I have given the applicant the required notice forms and have asked the applicant every question which is answered, and have accurately recorded the applicant's answers.

Date _7/25/01_

Agent Signature _____

Agent (Printed Name) _Robert Ehrlich_

Medical Examiner _____

| Case # _____ | Agent # | Prem. Split% |
|---|---|---|
| Employee/Loan # _____ | | |
| Deduction Frequency _____ | | |
| First Deduction Date _____ | | |
| Deduction Amount: Life _____ Health _____ | | |
| Annuity _____ Total _____ | | |

If Universal Life - The premium quoted is based on:
☐ Target ☐ Minimum ☐ Other _____

AHL 00052

**AMERICAN HERITAGE LIFE INSURANCE COMPANY**  
**9507111**

1776 American Heritage Life Drive, Jacksonville, Florida _____

Application for:  
Life/ Health/Annuity

(Please Print with Black Ink)

**1. NAMES OF PERSONS PROPOSED FOR COVERAGE**

| Last | First | M.I. | Relationship | Sex | Birthdate Mo/Day/Yr | Age | State of Birth | Height (Ft. In.) | Weight (Lbs) |
|------|-------|------|--------------|-----|---------------------|-----|----------------|------------------|--------------|
| Veronesi | Maryann | / | Primary Insured | F | 2/2/69 | 32 | MA | 5'0 | 135 |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**2. RESIDENCE ADDRESS**

No. and St. 2 Banks St

City Hudson   State MA   Zip 01801

Phone ( 781 ) 376-1767  How Long? 2 months

Social Security Number 030 / 56 / 0509

**3. OCCUPATION** COM ARIGHTON CON STRVC

Employer Ocean Arighton Construction

Exact Duties Administrative

Change contemplated? ☐ Yes ☒ No   Any other job? ☐ Yes ☒ No

If "Yes", explain _____

Phone ( 781 ) 899-1438  Date Employed 7/99

For Disability Income Only (complete all)

Earned Income ☒ Annual ☐ Monthly]

Insured $ 60,000/yr  Spouse $ _____

Other Signif. Income $ _____  Job Class Quoted 3O

**4. PREMIUM MODE**

Direct Billing: ☐ ANN ☐ S-A ☐ QTLY ☒ PAC (Mo. Pre-Auth. Check)

List Billing (Show as monthly in #5): ☐ PA ☐ GA ☐ MPO

**5. PLANS REQUESTED**

| | Plan | Units or Amount | Prem Based on Mode in #4 |
|---|---|---|---|
| Life - Base | Uget Term 99 30 | | |
| Rider | | | |
| Rider | | | |

UL Death Benefit Option  
☐ 1 - Spec. Amt.  
☐ 2 - Spec. Amt. + F.V.

Total Life _____

UL Lump Sum Payment _____

Cancer - Base _____  
Rider _____  
Rider _____  
Rider _____

Disability Income - Base  DI-3  1400/70 monthly

Income Period 2 Years  
Elimination Period 30 Days

Rider _____

Other Health - Base _____  
Rider _____

Total Health _____

Annuity - Flex Prem.  Total Annuity _____  
If Tax Qualified ☐ IRA ☐ Other _____

Single Premium - Life _____

Single Premium - Annuity _____

**6. CHANGES TO EXISTING UL** (explain other changes in #12)

Plan/Pol # _____

Specified Amount:  Change From _____  To _____

Planned Periodic Premium:  Change From _____  To _____

**7. OWNER** ( If owner is other than Insured/Annuitant)

Full Name _____

Relationship _____

No. and St. _____

City _____  State _____  Zip _____

Phone ( ) _____  SSN/TIN _____ / _____

**8. BENEFICIARY** (Name, age, relationship)

Primary William Particle  
Fiancé

Contingent Arthus Paquin, Jr  
Brother

**9. TOBACCO HABITS**

Has any proposed insured ever used tobacco in any form?

☐ Yes ☒ No   Type? _____

Person(s) _____

Dates(s) last used _____

**10. ACTIVELY AT WORK**

Is the primary insured actively at work now and has he/she worked at least 30 hours a week for the last 6 months (except for minor illness or injury or normal pregnancy)?

☒ Yes ☐ No   If "No", explain in #12.

**11. EXISTING INSURANCE/REPLACEMENT**

Existing insurance in force or applied for on life of each proposed insured. (If "NONE", so state).

Life Insurance (if applied for) - List Co., Yr issued, Am't & ADB

None

Disability Income (if applied for) - List Company, Year Issued, Monthly Income, Income Period & ADB

None

Will this policy applied for replace or change any insurance or annuity now in force?

☐ Yes ☒ No   If Yes, give Company, Policy # & Amount.

**12. SPECIAL REQUESTS**

Requested Issue Date: _____

**13. HOME OFFICE USE**

_____ WITH APPLICAT  
1900-95

B-365B

AHL 00053

**Allstate.**

_____
Workplace Division

**AMERICAN HERITAGE LIFE INSURANCE COMPANY**
HOME OFFICE:
1776 AMERICAN HERITAGE LIFE DRIVE
JACKSONVILLE, FLORIDA 32224-6688
(904) 992-1776

**A Stock Company**

**LIFE POLICY**

**TERM LIFE POLICY - PREMIUMS PAYABLE DURING LIFETIME OF INSURED FOR NUMBER OF YEARS STATED IN POLICY SPECIFICATIONS - AMOUNT OF INSURANCE PAYABLE AT DEATH PRIOR TO EXPIRY DATE - NON-PARTICIPATING - SUBJECT TO MAXIMUM PREMIUM.**

Form 10YTP-80

AHL 00054



AHL 00055

**EXHIBIT 3**

```
1                                    Volume:    I
                                     Pages:     1 to 107
2                                    Exhibits:  1 to 4

3

4                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
5
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
6       WILLIAM PARZIALE,

7                        Plaintiff,

8            vs.                              Civil Action
                                             No. 04-11377-RBC
        AMERICAN HERITAGE LIFE INSURANCE
9       COMPANY, A WHOLLY OWNED SUBSIDIARY
        OF THE ALLSTATE CORPORATION,
10                            Defendant.
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11

12

13              DEPOSITION OF ROBERT S. EHRLICH, a
        witness called on behalf of the Defendant, taken
14      pursuant to the applicable provisions of the Federal
        Rules of Civil Procedure before Cynthia A. Powers,
15      Shorthand Reporter and Notary Public in and for the
        Commonwealth of Massachusetts, at the law offices of
16      Day, Berry & Howard LLP, 260 Franklin Street, Boston,
        Massachusetts, on Tuesday, March 22, 2005, commencing
17      at 10:09 a.m.

18

19                        *   *   *   *   *

20

21              KACZYNSKI REPORTING
22           72 Chandler Street, Suite 3
             Boston, Massachusetts 02116
23                (617) 426-6060

24
```

32

wasn't listed on the application.  Can I elaborate?

1

2      Q.    Well, when you say you didn't fill out

3 the application, was that unusual?

4      A.    No, I often did it.  I had people

5 always fill out the applications.  Couple of reasons.

6 One, there were a lot of private questions that they

7 may feel comfortable responding to.  You know

8 yourself better than I know you, so you fill it out.

9 Also I would get letters from insurance companies.

10 Your handwriting is abominable.  Either clean it up

11 or take time doing it.  They couldn't read my

12 handwriting.  I often had people fill out a

13 applications.

14      Q.    Would you always be present when they

15 were filled out?

16      A.    Mostly, yeah, I think I always was

17 there.

18      Q.    Can you recall any occasion when you

19 had an insured fill out the application without you

20 being present?

21      A.    No.

22      Q.    Are you currently employed?

23      A.    No, I'm retired.

24      Q.    When did you retire?

61

1          A.    No, no.  I would have seen her and if

2     he's there, okay.  I would not have met with him

3     before.  I don't think.

4          Q.    Okay.  So when you spoke to

5     Mr. Parziale, he made the appointment for you to meet

6     with Ms. Veronesi?

7          A.    Yes.

8          Q.    Do you recall what time of day that

9     appointment was made for?

10          A.    Hum, after noon-ish, sort of

11     night-ish, somewhere around that time, I think.

12     That's the best I can recall.

13          Q.    Did you send anything to Mr. Parziale

14     or to Ms. Veronesi in the mail before you met with

15     them?

16          A.    No, I don't think so.  I don't

17     remember doing that.

18          Q.    Do you ever meet Ms. Veronesi

19     face-to-face?

20          A.    Yeah.

21          Q.    Do you recall what she looks like or,

22     I'm sorry, what she looked like?

23          A.    Not really.

24          Q.    Do you recall about how tall she was?

64

```
 1              Q.     I have all day.
 2              A.     You're not going to keep me here all
 3     day.  When I first started selling life insurance at
 4     Bankers Life and Casualty, I have a state rep -- it
 5     was one of my students, and he's going to buy a life
 6     insurance policy, actually called me.  And I show him
 7     the options.  The manager is with me.  I don't know
 8     anything.  The manager says, oh, take this.  All you
 9     have to do is take a physical.  Policy rejected.  Why
10     take the physical?  He's got diabetes.  And he's
11     hopping mad because now he's on record.  I'm hopping
12     mad.  I don't get a commission.  Make another
13     appointment, somebody else, and we're going to sell a
14     life insurance policy, also one of my students, a
15     nurse from Boston State College, last name began with
16     H.  I can't remember exactly.  Maybe it will come.
17     And I meet her, nice lady.  Manager is with me.  I've
18     been burned once.  Margaret Henderson.  She works at
19     the VA Hospital.  So now we start to talk.  Manager
20     is the one doing all the talking.  Ms. Henderson, you
21     want to get this, this, and this policy.  You can get
22     it.  She said, get a policy for fifteen thousand
23     dollars, no physical.  Why don't we do that?  Nope.
24     We're going to get her a twenty thousand dollar
```

65

1    policy, demands a physical.  Low and behold, guess

2    what?  When she gets a physical, she also has

3    diabetes.  That's the last policy I would ever write

4    where somebody had to require a physical.

5                    If I went ninety-nine thousand and one

6    dollars, this policy needs a physical.  Huh-uh.  You

7    want more insurance, you get this in your hands

8    first, then I'll supplement and I'll get you another

9    one later on.  Never would I ever call for a

10   physical.  And unless the company demanded a

11   physical, and that one company did way back when we

12   talked about, I would never ask for a physical,

13   never.  It was my standard practice.

14                    Q.    Is it your testimony that if this

15   policy that's in issue in this case had been for

16   ninety-nine thousand and one dollars a physical would

17   have been required?

18                    A.    Yes.

19                    Q.    And you knew that when you sold the

20   policy?

21                    A.    Yeah.

22                    Q.    How do you know that?

23                    A.    It's in the underwriting.  It's right

24   there in front of you when you open the book.  Maybe

1      Now you're talking about standard practices.

2      Applications are going to sit in my desk.  How long?

3      Maybe a day, maybe two days, maybe three days, maybe

4      four days.  I don't think it's going to stay there

5      longer than that.  What do I do?  Do I date

6      everything at the person's home?  Often times I leave

7      it blank.  Why?  I'll date it the day I mail it.  God

8      help me sometimes if they die in the interim, he

9      said.  Did it happen often?  Yeah, yeah.

10           Q.    You can recall an instance in which

11     you took an application and you held onto it for a

12     few days when you mailed and the applicant died in

13     the interim?

14           A.    No, nobody ever died.  I was hoping

15     they wouldn't.

16           Q.    Well, I'll ask you this:  Did you take

17     this application on July 25th, 2001?

18           A.    I don't know.

19           Q.    Do you have any --

20           A.    To be honest, honest, best of my

21     ability, I don't know, I don't remember.

22           Q.    Do you have any reason to believe that

23     you would have dated it a date differently than you

24     took the application?

1          A.      I don't remember.

2          Q.      But you stated earlier that if you did

3    date it a date that was different than the date that

4    you took the application you would date it the date

5    that you mailed it; is that correct?

6          A.      Yes, I would have probably if I did

7    that on this application, on any particular

8    application.  I just don't remember.  I don't even

9    know, I might have had another appointment after this

10   one somewhere.  I just don't remember.

11              Now, I don't have appointment books.

12   When I have appointments I make them on the phone.

13   I'll do it with pieces of paper, large piece of

14   paper.  Why don't I do an appointment book?  It's not

15   enough room to write.  And I have to know how to get

16   there.  So what I would do is take a large piece of

17   paper, okay, where are you, give me your name, phone

18   number, how do I get to you.

19         Q.      Do you have any of those sorts of

20   notes in relation to this appointment?

21         A.      I have no notes like that in relation

22   to any application.  I'd have a house full of blank

23   pieces of paper that are useless.  I know I never

24   kept them.

70

```
 1              Q.    When you say early morning, what do
 2     you mean by that?
 3              A.    Five, six, seven, eight a.m.
 4              Q.    Did you ever meet anyone at those
 5     times?
 6              A.    Oh, yes.  I go down there, I get Big
 7     Dig guys.
 8              Q.    Did you ever make calls to people's
 9     homes at night?
10              A.    Oh, yeah, yes.  You mean phone calls
11     or visits?
12              Q.    Visits?
13              A.    Oh, sure.
14              Q.    Was that common?
15              A.    Oh, yes.
16              Q.    Was that the majority of the
17     appointments you had?
18              A.    No.  Most of the time I would try to
19     see them early in the afternoon.  Why?  Could we go
20     off the record for a second?  All right, I'll tell
21     you.  One eye is this way and the other eye, I have
22     trouble driving, and it's getting worse, and it was
23     bad then.
24              Q.    It's easier for you to drive in the
```

76

1          A.      Yes.

2          Q.      Now, if I could point you to questions

3     one and two on that page?

4          A.      Mm-hmm.

5          Q.      It says, question number one says, You

6     verbally advised me that you took Ms. Veronesi's

7     application after 7 p.m. on July 25, 2001.

8          A.      Right.

9          Q.      Does that change your answer that you

10    gave earlier about what time you met with

11    Ms. Veronesi?

12         A.      Yeah, it does change the answer.

13         Q.      How is that?

14         A.      I'm not sure.  Now, they asked me

15    these questions, when was it, September 18, 2002.

16    I'm just out of the hospital.  I just had, you know,

17    stomach cancer, a month in chemo now.  If you think I

18    can actually remember, absolutely not.  Seven

19    o'clock, could have been five o'clock.  Was it the

20    25th?  I don't know.  And that's the best and the

21    honest answer, the most honest answer I can give you.

22         Q.      Is it your testimony that you took

23    this application at 7 p.m.?

24         A.      No, I don't know what time I took the

82

1   to approximately $28 monthly.

2           Q.    Okay.  Did Ms. Veronesi complain that

3   her chest hurt when you met with her?

4           A.    What?

5           Q.    Did she say anything to you about her

6   chest hurting?

7           A.    If anybody is going to start

8   complaining I'm walking out because I'm never going

9   to get a policy issued.

10          Q.    Did you say that to your applicants?

11          A.    Why would I say it to the applicants?

12  If they started telling me they got conditions I'm

13  useless to them, they're useless to me.

14          Q.    The application that's been marked as

15  Exhibit 1, did you record the answers to the

16  questions?

17          A.    No, that's her handwriting.

18          Q.    That's Ms. Veronesi's handwriting on

19  the application?

20          A.    Yeah, it is.  My handwriting is also

21  on there because I had to do the plans, I had to sign

22  it, but that's her handwriting and that's her

23  checking off.

24          Q.    Okay.  So it's your testimony that the

83

1          only parts of this that you wrote are in box five?

2                    A.    Five.

3                    Q.    And then on page two where it says --

4                    A.    They check off and that's my signature

5          on the bottom of page two.  I would have put in on

6          section three, job class quoted.  She wouldn't have

7          known that.  I would fill that in.  That's a good,

8          preferred classification.

9                    Q.    What classification is that?

10                   A.    The 3-A.  See where that says 3-A, job

11         class quoted?

12                   Q.    What does that mean?

13                   A.    She's a preferred risk.

14                   Q.    Why?

15                   A.    I gather that occupation means she

16         sits and didn't get her hands dirty.

17                   Q.    Why did you classify her as a 3-A?

18                   A.    Because I would have looked in the

19         occupation manual.

20                   Q.    So an administrative professional

21         would be a 3-A; is that correct?

22                   A.    Yes, or a 4-A sometimes.

23                   Q.    What's a 4-A?

24                   A.    That's as good as you can get.  You're

85

1          Q.     You don't remember?

2          A.     No.  It's my handwriting, I think.

3     Yeah, it's my handwriting.

4          Q.     If I could point you to question

5     number one --

6          A.     Mm-hmm.

7          Q.     -- toward the bottom.  It says, Were

8     the questions asked and were the answers recorded

9     exactly as the insured responded, and what is your

10    answer there?

11         A.     Yeah, I asked the questions, I have

12    recorded them as answered.  You know something, I

13    didn't take out the application to look at it.  I

14    didn't recognize that she had written this in her own

15    handwriting until I got your subpoena.  I had to dig

16    through records and I found it.

17         Q.     What records did you look through?

18         A.     The application, the records -- oh,

19    all the applications I may have from people.  When

20    they asked me this question here, yeah, I answered.

21    What am I going to do, tell them that I had the

22    applicants fill out the application in their own

23    handwriting?  I could have said ask the questions,

24    let it go with that.  I wasn't sure that I asked and

86

1    wrote it or she wrote it.

2         Q.    Was it typical that the applicants

3    would fill out the applications themselves?

4         A.    Absolutely.  I got lots of those.

5         Q.    How did you explain this application

6    to Ms. Veronesi?  We're going back to Exhibit 1

7    again.  How did you explain how to fill this out?

8         A.    Here, fill it out.  You know yourself

9    better than I do.  I would standardly say that to

10   everybody.

11        Q.    You didn't explain anything more

12   specifically than that?

13        A.    No.  The questions are, you got

14   diabetes, you can ask me what do I do then.  Then I

15   might tell you, maybe I would tell the applicant fill

16   it out, who's your doctor, what's the last time you

17   saw the doctors, have you been hospitalized, what's

18   the condition you were hospitalized for.  If somebody

19   doesn't have anything, they check off no, no, no.

20        Q.    Did Ms. Veronesi ask you any questions

21   about this application?

22        A.    God knows.  Who knows.

23        Q.    I'll direct your attention to question

24   14 on page two?

105

1        A.      That's her handwriting on the

2   signature.

3        Q.      On the signature line?

4        A.      That's hers.

5        Q.      Can you tell me whose handwriting the

6   25 July 2001 is?

7        A.      I think that's mine.

8        Q.      That might be yours?

9        A.      Yeah.

10        Q.      You testified that there were times

11   when these applications might sit for a day or two on

12   your desk --

13        A.      Or three or four.

14        Q.      -- before you sent them out.  So fair

15   to say that this application was signed on or before

16   July 25th?

17        A.      Yeah, absolutely.

18              MS. MICHAELS:  I have no further

19   questions.

20              MR. McCARTHY:  And I don't.

21              (Whereupon, the deposition was

22   concluded at 12:37 p.m.)

23

24

**EXHIBIT 4**

SEP-25-02 11:56 AM EHRLICH

# Ehrlich
## 438 Massachusetts Avenue
## Unit 119
## Arlington, MA 02474
## Fax: (781) 488-3038

RECEIVED
SEP 2 5 2002
CLAIMS DEPT.

Date: _____

To: _Summb MARC(JW)_

From: _____

Re: _____

Number of pages sent including cover: ___4___

Comments: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

If there are problems in transmission of this document, please call: (781) 488-3330

AHL 00096



# Allstate.

## FINANCIAL

*Workplace Division*

# FAX

Date *Sept 18, 2002*

Number of Pages *3*
(including Cover Sheet)

To *Mr Ehrlich*

Company _____

Department _____

Phone _____ Fax *781-488-3038*

From *Susannah Marchy*

Department *Individual Claims*

Phone *1-904-992-1776 x 4577* Fax *1-904-992-2718*

Subject *Mary Ann Veronesi policy application*

Notes *Mr Ehrlich — I'm very sorry to have to contact you again regarding the above. Our Legal Dept. has prepared a few more questions for you to answer. We will need this information just as soon as possible. Thank you for your help. Susie*

Notice of Confidentiality. The document accompanying this facsimile transmission contains information which is confidential and/or legally privileged. The information is intended only for the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original document.

American Heritage Life Insurance Company
1776 American Heritage Life Drive  Jacksonville, FL 32224  E-mail someone@ahl.com

AHL 00097

RECEIVED

SEP 2 5 2002

CLAIMS DEPT.

September 18, 2002

Dear Mr. Ehrlich:

Thank you for your 9-17-2002 response to our questions regarding your sale of a $99,000 term life policy to Ms. Mary Ann Veronesi in 2001. As a follow-up to those questions, please advise on the following:

Please answer the questions in the space provided and return as soon as possible.

1. You verbally advised me that you took Ms. Veronesi's application after 7:00 P.M. on July 25, 2001. Please confirm in writing that you took the application after 7:00 P.M on July 25, 2001.

2. Could you be more specific by pinpointing a time from 7:00 P.M. to midnight that you visited Ms. Veronesi at her home to take the application?

3. You advised that you knew the beneficiary, William Parziale, prior to taking the application on Ms. Veronesi. You also advised that you met him once because of a referral. Who referred Mr. Parziale to you?

4. Was William Parziale in attendance at the time you took the application from Ms. Veronesi on 7/25/2001?

5. What did Mr. Parziale said to you when he contacted you to make an appointment for insurance coverage on his then girlfriend, Mary Ann Veronesi?

AHL 00098

6. In as much as Mr. Parziale was contacting you to procure life insurance on an individual that was not his family, did you have any thoughts or concerns about this? _No_

Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony in the third degree. Florida Statute Section 817.234.

_Robert Ehrlich_                    _9-13-07_
Robert Ehrlich                         Date

Thank you for your assistance.

Sincerely,

Susannah Marchy
American Heritage Life Insurance Company
Individual claims

RECEIVED TIME   FEB 22  11:26AM

AHL 00099

**EXHIBIT 5**



**Allstate.**
FINANCIAL

*Workplace Division*

RECEIVED
APR 0 8 2002
CLAIMS DEPT.

March 15, 2002

Connaughton Construction
564 Main Street
Waltham MA 01801
ATTN: PERSONNEL DEPT - *Ellen*

Re: Mary Ann Veronesi
    Policy: 95071110
    Claim: 02-V-03

Dear Sir/Madam:

We have been presented with a claim on the life of Ms Mary Ann Veronesi. In order to properly evaluate our liability, may we please have your assistance in obtaining the following information:

1. When did Ms Veronesi begin working for Connaughton Construction (month, day and year)  *11|29|00*

2. Please advise if Ms Veronesi was actively at work from January 2001 through July 2001  *Yes - See attached 2001 earnings record which also tracked vacation + sick time.*

3. What were her regular hours  *9-5, 40 Hrs work*

4. May we please have a brief description of her responsibilities  *- See attached job description*

5. The date Ms Veronesi last worked  *2|26|02*

6. May we have a copy of her work attendance report from January 2001 through July 2001  *- The Paychex System was used to track vacation + sick time. No other records were maintained By Connaughton Construction.*

Thank you for your prompt response to this inquiry. A pre-addressed envelope is enclosed for your convenience.

Sincerely,

*Susannah Marchy*
Susannah Marchy
Claims Examiner

**American Heritage Life Insurance Company**
1776 American Heritage Life Drive    Jacksonville, Florida  32224-6688    Phone 904.992.1776

AHL 00175

**Job Description**
**Office Manager**
**10/13/00**

RECEIVED

APR 0 8 2002

CLAIMS DEPT.

## Accounting

<u>Accounts Receivable</u>

- Allocate and track all incoming monies to appropriate job
- Deposit of all incoming monies to Fleet Account
- Update on a weekly basis the list of all outstanding monies and when next requisition is due

<u>Accounts Payable</u>

- Inputting and tracking of all invoices
- Have all invoices approved by appropriate employee
- Ensure all invoices are paid in a timely fashion according to date received
- Match all monthly payables to Statements to ensure accuracy
- Weekly payment of all Subcontractors are tracked appropriately and Subs Payable list is printed weekly

<u>Peachtree</u>

- Monthly reports are printed and given John for review and file copy kept
  - Balance Sheet
  - Income Statement
  - Trial Balance
  - General Ledger

<u>Bank Statement</u>

- Reconciliation of Bank Statement on a monthly basis

## Human Resources

- Fill out appropriate forms for all new employees
- Enroll all new employees into payroll
- Inform all new employees of policies and procedures
- Keep updated list of all employee anniversary dates and wages
- Inform all employees of any changes in company policy or company meetings
- Update company policy manual when needed
- Place Ads when necessary and compile all resumes that are received

<u>Payroll</u>
- Track weekly hours of all employees
- Wednesday mornings report weekly hours to Paychex
- Thursday mail out paychecks (Rafael's check goes to Glenn)
- Track vacation and sick time for all employees
- Input on a weekly basis amount of payroll and verify against bank statement

AHL 00176

<u>401K</u>

- Update monthly report to Manulife on disk
- Make monthly payment and proper allocations for all employees enrolled in plan
- Send out quarterly statements to all employees

## Project Coordination

<u>Subcontractors</u>

- Work with Project Coordinator to ensure that a written quote for all subcontractors is received to include scope of work

- When verbal quote is given a standard Connaughton Subcontractor Quote form will be typed and signed by Subcontractor to include scope of work

- A Change Order Form is filled out and signed by appropriate parties for any changes to a Subcontractor Quote

- Copy given to John for appropriate Formal Change Orders to Customers

- All Subcontractor Changes are recorded on Subs Payable Sheet

<u>Weekly Meeting</u>

- Ensure that all meeting minutes are typed after each Project meeting
- All minutes are distributed to appropriate parties in a timely fashion

<u>Requisitions</u>

- Prepare all requisitions for current payment due to include cover letter (lien's and exhibit's when necessary)

- Send Requisition to appropriate parties

<u>Formal Change Orders</u>

- Typing of all formal Change Orders to Customers using standard Connaughton Construction Format

<u>Job Activity Reports</u>

- Once a month a job activity report will be updated for each job
  - All monies allocated to that job are recorded to included A/P and Subcontractors
  - All Receivables are recorded
  - All labor is allocated appropriately
  - Verify that Job Activity Sheet matches Peachtree Job Report

AHL 00177

PAYROLLS BY **PAYCHEX**
0011-D064 CONNAUGHTON CONSTRUCTION

EMPLOYEE EARNINGS RECORD
PERIOD END DATE 12/31/01

AHL 00178

40007 (R-7)

| ER. ID/DATE | PAY RATE | C/D | HOURS REG. | HOURS O.T. | EARN REG. | EARN O.T. | BONUS | TOTAL EARNINGS | SS MED | FEDERAL | STATE | LOCAL | DBL | 401K | SECT 125 | CREDIT UNION | CHECK ING | SAVINGS | CHECK ING | VAC ACCR | SICK | PUCC | HLTH INS | NET PAY | OTHER COMP | OTHER COMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | 4000 | | | | | |
| 09 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | INFO | | | | | |
| 16 | | VCHRE | | | | | | | | | | | | | | | | | INFO 3212 | | | | | | | |
| 16 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | INFO | | | | | |
| 23 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | INFO | | | | | |
| 30 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | INFO | | | | | |
| 06 | | | 90400 | | 90400 | | | 90400 | 6916 | 17373 | 4847 | | | | | | | 61264 | | 154 | INFO | | | | | |
| 13 | | | 95400 | | 95400 | | 10000 | 105400 | 8063 | 21573 | 5687 | | | | | | | 70077 | | 154 | INFO | | | | | |
| 20 | | | 95400 | | 95400 | | | 95400 | 7298 | 18773 | 5127 | | | | | | | 64202 | | 154 | INFO | | | | | |
| 27 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 04 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 13 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 20 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 27 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| QTD | | | 1210200 | | 1210200 | | 10000 | 1220200 SS 75655 MED 17692 | | 230639 | 63161 | | | | | | | 833053 | | 5214 | 4000 | | | | | |
| 03 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 03 | | BN | | | 95400 | | 600000 | 600000 | 45900 | 69188 | 24870 | | | | | | | 66238 | | 154 | INFO | | | | 460042 | |
| 10 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 17 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 24 | | | 4000 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 24 | | VA | 4000 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | | | 3846 | INFO CR | | | | 66238 | |
| 01 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 08 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 15 | | | 95400 | | 95400 | | | 95400 | 7298 | 17211 | 4653 | | | | | | | 66238 | | 154 | INFO | | | | | |
| 22 | | | 95400 | | 95400 | | | 95400 | 7298 | 16511 | 4513 | | 2500 | | | | | | 64578 | | 154 | INFO | | | | | |
| 29 | | | 4000 | | 95400 | | | 95400 | 7298 | 16511 | 4729 | | 2500 | | | | | | 64362 | | 154 | INFO | | | | | |
| 05 | | | 95400 | | 95400 | | | 95400 | 7298 | 16511 | 4729 | | 2500 | | | | | | 64362 | | 154 | INFO | | | | | |
| 12 | | | 95400 | | 95400 | | | 95400 | 7298 | 16511 | 4729 | | 2500 | | | | 30000 | | | | 154 | INFO | | | | 34362 | |
| 19 | | | 95400 | | 95400 | | | 95400 | 7298 | 16511 | 4729 | | 2500 | | | | 30000 | | | | 154 | INFO | | | | 34362 | |
| 26 | | | 95400 | | 95400 | | | 95400 | 7298 | 16511 | 4729 | | 2500 | | | | 30000 | | | | 154 | INFO | | | | 34362 | |

(handwritten note: "Vacation" with arrow pointing to VA row)

| MPL. # | TERM | C/D | DEPT. # | SOCIAL SECURITY NBR | SALARY | RATES | BIRTH DATE | A/ND | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER | NO | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00011 | | | 000100 | 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 | 954.00 | | | 1 | 401K | | | | | | | | |
| 13-8199-0 | | SVE | | | | FR 1 OT.FACT 1.5 WS S FD EX 1 ST EX 1 | START DATE 11/29/00 | 2 | SECT 125 | 25.00 | | | | | | | |
| 07768690 | | | | | | | | 3 | CREDITUNION | 300.00 | 211370493 | 880796248 | | | | | |
| | | | | | | | | 4 | CHECKING | | | | | | | | |
| | | | | PREVIOUS SALARY 904.00 | | LAST RAISE DATE 02/14/01 | 5 | SAVINGS | | | | | | | | |
| JERNONES, MARYANN | | | | | | | | 6 | CHECKING | | | | | | | | |
| 305 SALEM STREET #202 | | | | PREVIOUS RATE | REV FREQ | LAST REVIEW | 7 | VAC ACCR | 1.54 | | | | | | | |
| WOBURN, MA | | | | 01801 | | | 8 | SICK | | | | | | | | |
| | | | | | | | 9 | PUCC | | | | | | | | |
| | | | | | | | 10 | HLTH INS | | | | | | | | |

PAYROLLS BY *PAYCHEX*
0011-D064  CONNAUGHTON CONSTRUCTION

EMPLOYEE EARNINGS RECORD
PERIOD END DATE 12/31/01

AHL 00179

| ER. END DATE | PAY RATE | C D | HOURS REG. | O.T. | EARNINGS REG. | O.T. | BONUS | TOTAL EARNINGS | SS MED. | FEDERAL | STATE | LOCAL. | DBL. | 1 401K | SECT 125 | 3 CREDIT UNION | 4 CHECK ING | SAVIN GS | CHECK ING | 7 VAC ACCR | 8 SICK | 9 PUCC | 10 HLTH INS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | QTD | | 12000 | | 1335600 | | 600000 | 1935600 | SS 120010 MED 28062 | 305942 | 90252 | | | 15000 | | | 90000 | 656968 | | 1844CR | | | | 629366 |
| 703 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 710 | | | | 4000 | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 717 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 724 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 731 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 307 | BN | | | | 95400 | | 600000 | 600000 | 45900 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 554100 34683 |
| 307 | | | | | | | | 95400 | 7298 | | | | | | | | | | | | | | | |
| 314 | | | 3200 | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | 800 | | | 34683 |
| 314 | NS | | 800 | | | | | | | | | | | | | | | | | INFO | INFO CR | | | |
| 321 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 328 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 904 | | | | 4000 | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 911 | | | | 4000 | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 918 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 925 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO | | | | 34683 |
| | QTD | | 16000 | | 1240200 | | 600000 | 1840200 | SS 114095 MED 26675 | 210470 | 61477 | | | 32500 | | | 390000 | | | 2002 | 800CR | | | 1004979 |
| 002 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 009 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 016 | BN | | | | | | 600000 | 600000 | 45900 | 69188 | 27440 | | | | | | | | | INFO | | | | 457472 |
| 016 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 023 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 030 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 06 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 13 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 20 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 27 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 04 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 11 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 11 | VA | | 4000 | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | INFO 154 | | | | 34683 |
| 18 | BN | | | | | | 600000 | 600000 | 45900 | 69188 | 27440 | | | | | | | | | INFO 3846 CR | | | | 457472 |

*(handwritten annotation near 314 NS row: "one sick day")*
*(handwritten annotation near 11 VA row: "vacation")*

| PL # | TERM | DEPT. # | SOCIAL SECURITY NBR | SALARY | RATES | BIRTH DATE | A I D | NO | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER | NO | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0011 | | 000100 | 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 | 954.00 | | | | 1 | 401K | 25.00 | | | | | | | |
| 13-8799-0 | | | SVE | | | | | 2 | SECT 125 | | | | | | | | |
| 77768690 | | | | | | START DATE | | 3 | CREDIT UNION | | | | | | | | |
| | | | FR OT FAC TNG FD EX ST EX | | | 11729/00 | | 4 | CHECKING | 300.00 | 211370493 | 880796248 | | | | | |
| | | | 1 1.5 5 | | | | | 5 | SAVINGS | | | | | | | | |
| | | | | PREVIOUS SALARY 904.00 | LAST RAISE DATE 02/14/01 | | | 6 | CHECKING | | | | | | | | |
| ERNONES, MARYANN | | | | | | | | 7 | VAC ACCR | 1.54 | | | | | | | |
| 05 SALEM STREET #202 | | | PREVIOUS RATE REV FREQ LAST REVIEW | | | | | 8 | SICK | | | | | | | | |
| OBURN, MA | | | | | | | | 9 | PUCC | | | | | | | | |
| 064 | | 01801 | | | | | | 10 | HLTH INS | | | | | | | | |

PAYROLLS BY **PAYCHEX**   0011-D064   CONNAUGHTON CONSTRUCTION

EMPLOYEE EARNINGS RECORD   PERIOD END DATE 12/31/01   AHL 00180

| ER. ND ATE | PAY RATE | C D | REG. | O.T. | REG. | O.T. | BONUS | TOTAL EARNINGS | SS MED. | FEDERAL | STATE | LOCAL | DBL | 401K | SECT 125 | CREDIT UNION | CHECK ING | SAVIN GS | CHECK ING | VAC ACCR | SICK | PUCC OTHER COMP | HLTH INS OTHER COMP | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 218 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | 154 INFO | | | | 34683 |
| 225 | | | | | 95400 | | | 95400 | 7298 | 16190 | 4729 | | | 2500 | | | 30000 | | | 154 INFO | | | | 34683 |
| QTD | | | 4000 | | 1335600 | 1200000 | | 2535600 SS 157210 MED 36762 | | 365036 | 121086 | | | 35000 | | | 420000 | | | 1844CR | | | | 1400506 |
| YTD | | | 32000 | | 5121600 | 2400000 | 10000 | 7531600 SS 466970 MED 109195 | | 1112087 | 335976 | | | 82500 | | | 900000 | 1490021 | | 3528 | 3200 | | | 3034851 |

| EARNINGS REG HR | MISC TOT | HOLIDAY | VACATION 1908.00 80.00 | SICK/QUALIFIED | SICK/NON-QUAL 8.00 |
|---|---|---|---|---|---|

| PL # | TERM | DEPT # | SOCIAL SECURITY NBR | SALARY | RATE B | BIRTH DATE | A NO D J | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER | NO | ADJ. NAME | AMOUNT | R & T | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0011 | | 000100 | 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 | 954.00 | | | 1 | 401K | 25.00 | | | | | | | |
| 13-8199-0 | SVE | | | | | | 2 | SECT 125 | | | | | | | | |
| 7768690 | | FR OT FACT AUS FD EX ST EX 1 1.5 S 1 1 | | | 11/29/00 START DATE | | 3 | CREDITUNION | | | | | | | | |
| | | | | | | | 4 | CHECKING | 300.00 | 211370493 | 880796248 | | | | | |
| ERNONES,MARYANN | | PREVIOUS SALARY 904.00 | LAST RAISE DATE 02/14/01 | | 5 | SAVINGS | | | | | | | | | |
| 05 SALEM STREET #202 | | | | | | | 6 | CHECKING | | | | | | | | |
| 0BURN,MA | | PREVIOUS RATE REV FREQ | LAST REVIEW | | 7 | VAC ACCR | 1.54 | | | | | | | | |
| 064 | 01801 | | | | | | 8 | SICK | | | | | | | | |
| | | | | | | | 9 | PUCC | | | | | | | | |
| | | | | | | | 10 | HLTH INS | | | | | | | | |

**EXHIBIT 6**

Karin Ouellette
March 23, 2005

# ORIGINAL

| | |
|---|---|
| 1 | Volume:  1 |
| 2 | Pages:  1-67 |
| 3 | Exhibits: 1-7 |

4           UNITED STATES DISTRICT COURT

5            DISTRICT OF MASSACHUSETTS

6 - - - - - - - - - - - - - - - - - -

7 WILLIAM PARZIALE,

8     Plaintiff,

9 vs.

10 AMERICAN HERITAGE LIFE INSURANCE COMPANY,

11 A WHOLLY OWNED SUBSIDIARY OF THE

12 ALLSTATE CORPORATION

13     Defendant.

14 - - - - - - - - - - - - - - - - - -

15

16          DEPOSITION OF KARIN OUELLETTE

17

18            March 23, 2005

19             10:20 a.m.

20         Day, Berry & Howard LLP

21          260 Franklin Street

22         Boston, Massachusetts

23       Reporter:  Taryn M. Gutoff

24

Karin Ouellette
March 23, 2005

1  general, very vague.

2      Q.  Do you remember when those conversations

3  might have occurred?

4      A.  Probably over dinner.

5      Q.  Do you know what time frame or time period?

6      A.  Probably -- I'm going to guess from late

7  '90s going forward.

8      Q.  Did Ms. Veronesi ever say to you why she was

9  interested in life insurance?

10      A.  I think it was just kind of future planning

11  as -- again, as we all got older and more

12  responsible, closer to 30, we began really to look

13  at investing our 401(k)'s, "Do we need life

14  insurance?," those sort of things.

15      Q.  Are you familiar with the life insurance

16  policy that's in issue in this case?

17      A.  Yes, I am.

18      Q.  Did Ms. Veronesi ever speak with you about

19  that life insurance policy?

20      A.  Yes.

21      Q.  She did?  What was the substance of those

22  conversations?

23      A.  Just that she had gotten a policy.

24      Q.  Did she speak with you at all before she

KACZYNSKI REPORTING
617.426.6060

Karin Ouellette
March 23, 2005

1   purchased the policy?

2       A.   No.

3       Q.   And when you said that she had mentioned

4   that she had gotten a policy, what else did she

5   mention about it at that time?

6       A.   Nothing.   It just came up in conversation.

7   It was very brief.

8       Q.   Do you remember what else you were talking

9   about with her when that came up?

10      A.   No.

11      Q.   Do you remember what time period that might

12  have been?

13      A.   I'm guessing that it was probably in 2001.

14      Q.   Can you recall any more specifically than

15  that?

16      A.   No.

17      Q.   Would it have been --

18      A.   Actually, let me restate that.   It must have

19  been closer to June or July of 2001 because she had

20  gotten the policy already and she had mentioned that

21  she had taken out the policy.

22      Q.   And how do you know she had gotten a policy

23  in July?

24      A.   I have a copy of the policy.

Karin Ouellette
March 23, 2005

1    Q.   And you reviewed a copy of the policy before

2    coming here today?

3        A.   Yes.

4        Q.   During that time period -- July of 2001 --

5    did Ms. Veronesi ever mention to you that she had an

6    appointment to meet with an insurance agent to

7    discuss life insurance?

8        A.   I don't think so.

9        Q.   Have you ever heard of the name Robert

10   Ehrlich, E-H-R-L-I-C-H?

11       A.   Yes, I have.

12       Q.   And when did you hear of his name?

13       A.   He's the person who wrote the policy, is he

14   not?  Or he's the agent or whatever, the seller of

15   the policy.

16       Q.   And how do you know that?

17       A.   I have a copy of the policy.  I believe his

18   name is in there.

19       Q.   Had you heard his name before you saw it on

20   the policy?

21       A.   No.

22       Q.   So Ms. Veronesi never mentioned his name to

23   you?

24       A.   No.

**EXHIBIT 7**



# CERTIFICATION OF MEDICAL RECORD COPY

I, _Lori Jayne_____, am authorized to certify on behalf of
(Print Name)
**Lahey Clinic attached copy of the medical record of services rendered to:**

_Maryann Fink Veronesi_
(Name of Patient)

_2/2/69_
(Date of Birth)

_206-07-82_
(Lahey Clinic Patient Number)

**Lahey Clinic is a duly licensed health care facility.  Medical records are kept in the ordinary course of business.**

**I hereby certify that attached is a true and complete copy of the medical records kept by the Lahey Clinic, under Massachusetts General Law, Chapter III, Section 70.  These may be admissible as evidence under Massachusetts General Law, Chapter 233, Section 79G.**

**Signed under the pains and penalties of perjury this**
_15th____ **day of** _March_____, 2005

_Lori P. Jayne, RHIA_
(Signature)

ROTH 0002

**Respect • Caring • Teamwork • Excellence • Commitment to Personal Best**
41 Mall Road, Burlington, MA 01805

**LAHEY CLINIC**

| | | | | | |
|---|---|---|---|---|---|
| Name: FINK, MARYANN | Age: 31 | Sex: F | MRN: L2060782 | Visit #: 6106693 | Ins. Verified |
| Address: 305 SALEM STREET | DOB: 02/02/1969 | | | Date of Arrival: 12/17/2000 | Billing Code: |
| WOBURN, MA 0180 | FP: MAURI, ANTONIETTA | | | Time of Arrival: 03:12PM | ED 3 5 6 7 8 |
| H: 781-376-1767 | WOBURN, MA | | | Mode of Arrival: CAR | Med Rec'd |
| W: 781-899-1438 | Ph: 781-935-8859 | | | Injury Type: | Priority P3 |
| Reg By: REARDONM Loc: EMR | Fax: 781-938-0626 | | | Injury Date: | |
| Chief C/O: RT FLANK PAIN | | | | Ins: HMO BLUE NON-ENR | Time In Room |

RESULTS
- WBC 14.0
- HGB/HCT 39.4
- PLATS 231
- GLU 99
- BUN/CR 11.8
- NA 140
- K 4.0
- CL 105
- CO2 26
- AMY

U/A 750 WBC
750 RBC
Bacteria mm
ABG

CC: ® Flank Pain

HPI: 31 yo ♀ c̄ NO Sig Pmhx c/o ® Flank Pain. Pt was seen in
urgent care 12/13 for ® Flank pain U/A - ⊕ WBC ⊕ many Bacteria
Urine Cult was lost by Lab. Pt started on ? PCN + has been compliant
Pt notes ↑ Flank Pain Soreness Ø Sharp. ⊕ Nausea ⊕ vomiting yesterday
Pt reports cold sweats + Dizziness Minimal Pain relief c̄ Tylenol
1° ⊖ CP ⊖ SOB ⊖ HA ⊖ Diarrhea ⊕ Dzm normal today
Ø Dysuria ⊕ Frequency

PE A+O×3 in NAD

VS 98.3 88 16 132/70 100% RA

COR RRR

Lungs CTA (B)
Back ⊕ ® CVA tenderness
Abd ⊕ BS Soft, Tender RLQ (inguinal area)

→ Pyelonephritis

Meds: PCN
Mold:
Tylenol
PCN
All
NKDA
OTHER

ROTH 0006

| | | | | | |
|---|---|---|---|---|---|
| DISPOSITION: HOME  ADMIT  OBSERVATION  OTHER | | CONDITION ON DISCHARGE: STABLE | D/C TIME | | |

PATIENT INSTRUCTIONS ACI#           OTHER           PREPS

☐ RE-EXAM BY A PHYSICIAN IF YOU ARE NOT BETTER WITHIN        ☐ SOONER IF YOU ARE WORSE

NO WORK UNTIL
LIGHT DUTY DATE
FULL DUTY DATE

Return to Emergency Dept. if you develop increasing Abdominal/Flank
Pain, Persistent Nausea Vomiting - USE ALTERNATE FORM OF Birth Control until
Next period. TAKE LEVOFLOXACIN 500 mg once a day for total of 14 days
May TAKE Percocet 1 tablet every 6 hours as needed for pain - Do not drive

FOLLOW-UP: GIM        MD: Rehm        WHEN: 1 WK

X Maryann Fink

RN SIGN
RESIDENT MD SIGN
STAFF MD SIGN  MICHAEL S. EROOS, M.D.
EMERGENCY MEDICINE

SEND COPY TO PMD ☐   SEND DICTATED REPORT ☐
DATE OF VISIT: 12/17/2000
LC MRN#: L2060782

LAHEY CLINIC, Burlington, MA 01805
Form No. 11140 Rev. 3/99

Phone (781) 744-8

**EXHIBIT 8**

## GENERAL INTERNAL MEDICINE

FINK, MARYANN                      12/13/00                  LCMC#:   206 07 82

**ISSUE:** Dysuria.

**HISTORY OF PRESENT ILLNESS:** The patient is a 31-year-old female, who presents with a two day history of right sided flank discomfort of dysuria and frequency. She notes some urgency as well. The patient was in her normal state of health until yesterday morning when her symptoms began. She denies fever, nausea, or vomiting. She denies a history of bladder infections in the past.

**FAMILY HISTORY:** There is a family history of kidney stones in her mother.

**REVIEW OF SYSTEMS:** The patient is sexually active with one partner. There has been no recent change in sexual activity. She recently saw GYN for labial irritation, but no specific treatment was suggested.

**ALLERGIES:** The patient denies allergies to medicine.

**MEDICATIONS:** Her only current medication is oral contraceptives.

**PHYSICAL EXAMINATION:** The patient looks well. She is in no acute distress. The patient is afebrile. The lungs are clear. There is no CVA tenderness. The abdomen is soft and nontender. There is no suprapubic tenderness.

Her urine specimen is dipstick positive for white cells and red cells.

**IMPRESSION:** Probable cystitis.

**PLAN:** Bactrim DS one tablet b.i.d. is prescribed times five days. She will take ibuprofen for pain. She will force fluids, which she is already doing. If her symptoms do not resolve or if she develops fever, chills, nausea, or vomiting, then she is to contact Dr. Rehm.

John E. McCarthy, M.D.
N#
D: 12/13/00, R:   , T: 12/26/00

jem:nsmt:kas

PATIENT ID

**LAHEY CLINIC**

41 Mall Road • Burlington, MA 01805

**Progress Notes**

12145aa (REV. 8/98)

ROTH 0011

**Progress Notes**

**EXHIBIT 9**

Last ED _____
Visit _____

# LAHEY CLINIC
## EMERGENCY DEPARTMENT-PATIENT FLOW SHEET

Time: 1503 P 3
Classification

Name: _Fink, Mariah_ DOB: _____ LC# _2060182_

Triage Date: _12-17-00_ INFORMANT: ❏ Patient  ❏ Parent  ❏ Other ____ ❏ FiO2 ____

Chief Complaint/Observation: T: _98.3_ P: _88_ R: _16_ B/P: _132/110_ O₂ × 3  TRA ____  O2 SAT: _100_

(R) _flank pain rad → (R) groin. vomited 12/15_
_12/16 seen in urgent care on 12/13. ⊕ nausea_
_⊖ urinary sx's. last BM 1+1/2 normal_

Pre-Hospital Care: _____  RN Init. _DB_

| Patient Assessment | Yes | No | Comments | | Yes | No | Comments |
|---|---|---|---|---|---|---|---|
| Add'l transportation needs | | | | Physical impairment impacting ADLs | | | |
| Assistance at home needed | | | | Receiving home health care service | | | |
| Abuse/Domestic Violence | | | | Advance Directive | | | |
| Spiritual/Cultural Needs | | | | Barrier to learning | | | |

**Medical History**
❏ Asthma
❏ Diabetes
❏ Heart Disease
❏ Hypertension
❏ Seizure
❏ Cancer
❏ Pregnancy ___ mos
❏ Other _____

Tetanus: _____

LMP _8 days ago_

Allergies: _NKA_

Current Meds:
_PCN_
_motrin_
_BCP_

**Medications given in ED:**

| Time | Med/Dose/Route | Initial | Time | Med/Dose/Route | Initial |
|---|---|---|---|---|---|
| | _Percocet 1p ×1_ | | | | _pp_ |
| | _Toragan 500 mg IV ×1_ | | | | |
| 1820 | _Compazine 10mg IV_ | | | | |
| 1820 | _Demerol 25 IV ×1_ | | | | |

**Intake: IV Cath size: #22** Site: ⊕A/c    Output

| Time | Solution/Amt | Abs. cc | Time | Urine | NG | Other |
|---|---|---|---|---|---|---|
| 1700 | NS 100cc | Wide | | | | |
| 1820 | NS Bolus | 500 | | | | |
| | Abx | 100 | | (700) | | |

Ht. ____ Wt. ____  ❏ Actual  ❏ Stated  ❏ Estimated

| Time | Temp | Pulse | Rhythm | Resp | B/P | Pupils GCS | O2 Sat | Time | Assessment and Intervention |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 15:30 To Room 15 790 |
| | | | | | | | | | 15:35 Eval by Dr Lowit |
| | | | | | | | | | 1610 labs drawn + sent 790 |
| | | | | | | | | | Cx added to urine 790 |
| | | | | | | | | | 1700 eval by Dr |
| 1700 | 96 | | | 124/74 | | | | | 1715 IV insert. Medicated as directed |
| | | | | | | | | | 1740 Dry Heaves + c/o severe nausea which med caused the pn |
| | | | | | | | | | 1800 Medicated for nausea |
| | | | | | | | | | 1815 Now c/o R Kidney pain |
| | | | | | | | | | 1820 Medicated for pain & for the nausea |
| 1840 | 99.0 | 82 | Kg | 16 | 118/74 | | | | 1840 Feels Fine All discomfort gone |
| | | | | | | | | | IV pulled |

**Disposition of Valuables:**

| RN Initial | RN Signature | RN Initial | RN Signature |
|---|---|---|---|
| | | DB | _(signature)_ |
| | | JP | _(signature)_ |

ROTH 0008

Pathway Started  ❏ Yes  ❏ No
Discharge home ☑ Accompanied by _Boyfriend._
Discharge to Unit/Rm ____ Date/Time ____
Report given by ED RN ____ Report to RN ____
Reviewed orders ☑ Yes  O2 ❏ Yes  ❏ No
Instruction given by _(signature)_
Patient understood instructions ❏ Yes  ❏ No

11216 (2/99)

**EXHIBIT 10**

**Lahey Clinic**

**41 Mall Road
Burlington, MA 01805
(781)744-2117
(781)744-5771 Fax**

## DISCHARGE SUMMARY

**NAME:**            FINK, MARYANN
**LC#:**             2060782
**ADMISSION DATE:**  7/30/2001
**DISCHARGE DATE:**  7/31/2001

**ATTENDING PHYSICIAN:** CHRISTINE WILLIAMSON, MD

**HISTORY:** This is a 32-year-old woman who presented to the emergency room complaining of shortness of breath. She states 3 weeks ago she noticed a difficulty swallowing, but no pain. She recently had some left chest pain and her left arm started feeling heavy on Sunday, and this was coincident with hoarseness and some shortness of breath while walking. She had a chest x-ray ordered by her primary care physician last week, which would be mid July of this year, which showed some question of adenopathy in the chest, and in the emergency room on July 25, 2001, she was planning to have a CT scan of the chest to investigate this.

**PAST MEDICAL HISTORY:** Scant.

**PAST SURGICAL HISTORY:** Scant.

**ALLERGIES:** NO KNOWN.

**CURRENT MEDICATIONS:** None.

**REVIEW OF SYSTEMS:** Positive for fatigue. Negative for gastrointestinal symptoms, but is positive for nausea. Negative for psychological problems and negative for neurological problems.

**SOCIAL HISTORY:** She stopped smoking 5 months ago. She was a 16-pack-year smoker. She is single and has no children.

**PHYSICAL EXAMINATION:** Reveals a healthy-appearing young lady in no distress, with a hoarse voice. The quality of voice is excellent. There are no external scars, lesions, or masses. Facial strength is symmetric. Extraocular movements are full. The tympanic membranes are normal with good mobility. Nasal mucosa is not injected. Septum is midline. Turbinates are no swollen. Oropharynx shows symmetric palatal elevation with no lesions. An indirect laryngoscopy was impossible due to the setting and the fact that the patient was subjectively short of breath. She has no stridor. Neck is supple with no masses. There is a very prominent right thyroid lobe but no distinct nodularity. There is

ROTH 0679

Lahey Clinic

41 Mall Road
Burlington, MA 01805
(781)744-2117
(781)744-5771 Fax

## DISCHARGE SUMMARY

**NAME:**            FINK, MARYANN
**LC#:**             2060782
**ADMISSION DATE:**  7/30/2001
**DISCHARGE DATE:**  7/31/2001

some pain in the lower neck on palpation. Cranial nerve V is intact. Cranial nerve XI is intact. Evaluation of cranial nerve X is pending.

**IMPRESSION:** Hoarseness with chest pain in a young, previously healthy female with incomplete visualization of the larynx and vocal cords. The patient was planned to undergo a fiberoptic examination later on this day, on July 25, 2001.

**RESULTS OF FIBEROPTIC SCOPE:** No lesions in the endolarynx. The paraform sinuses are open and dry. There is a dense left vocal fold paralysis. The immediate subglottis appears clear. The right vocal fold is moving very well, with a very adequate posterior glottic chink. IMPRESSION: Left vocal fold paralysis and prominent right thyroid lobe.

**LABORATORY DATA:** Chest x-ray showed mediastinal adenopathy. Chest CT scan was performed, which showed hilar mass and enlarged hilar lymph nodes. Bone scan was performed; results are negative. On July 30, 2001, the patient underwent a bronchoscopy, mediastinoscopy by Christine Williamson, MD. The patient tolerated the procedure well.

**HOSPITAL COURSE:** She was transferred to the recovery room, awake, alert, and moving all four extremities. The patient was done quite late in the evening; therefore, she had not recovered from the anesthesia, and was discharged the following morning. She was alert and oriented times 3. Breath sounds clear to auscultation. Heart: Regular rate and rhythm. Abdomen: Benign. Incision clean, dry, and intact.

**FOLLOWUP INSTRUCTIONS:** The patient will follow up with Christine Williamson, MD in approximately 1-2 weeks to discuss final pathology results and further treatment.

_C. Williamson_

Lisa M. Moore, PA-C (Dictating) for
CHRISTINE WILLIAMSON, MD (Attending)

DOD: 7/31/01 MW662/1819001/2298427

ROTH 0680

**EXHIBIT 11**

# Lahey CLINIC    **AMBULATORY ORDER FORM**

Record here, if taken:
HT.
WT.

BURLINGTON
ANK ☐    CANCELLED ☐

```
***** MANAGED CARE ***********
* HMO BLUE ENR (FFS)              *
*                                 *
* NEW PATIENT? Y                  *
*******************************
```

BP
TPR
4WEST/ 7
PAZIRANDEH MD(RES),SAS

L2060782 AGE:  32
DOB: 02/02/1969
MS  FINK,MARYANN
2 BANKS STREET
WOBURN,MA          01801
781-376-1767
APPT# 7221801
PCP:                  S/O
REHM,JENNIFER
41 MALL ROAD
BURLINGTON,MA      01805
781-744-8025

GIM
06/15/2001 02:45PM
LAST APPT WITH
PROVIDER:

REFMD FOR THIS APPT:
REHM,JENNIFER
41 MALL ROAD
BURLINGTON,MA          01805
781-744-8025
OTHER REFERRING MD:

REASON FOR APPOINTMENT:  NP FALLING ASLEEP AT WHEEL          SOURCE:PHYSICIAN REFER

FOLLOW-UP VISITS:  MD TO CONTACT PCP FOR APPROVAL
SPECIALIST CONSULT BUR:  MD TO CONTACT PCP FOR APPROVAL
TESTING DIAGNOSTIC/PRE-OP REFERRAL NOT REQUIRED
ADMITS OR AMB SURGERY:  MD TO CONTACT FOR APPROVAL, THEN COMPLETE HADF FORM
MENTAL HEALTH:  NOT LAHEY PSYCH
TO VIEW EXISTING REFERRALS, CHECK IDX

*NKDA*
*meds·BCP·*

☐ KEEP CHART TODAY    ☐ REQ. CHART AFTER FUTURE TST/CON    ☐ SEND CHART BACK

CHIEF COMPLAINT:

NO ORDERS ☐    IF NO ORDERS,
REASON FOR VISIT:

| PHYSICIAN REASON FOR ORDERS. (PROBLEM, SYMPTOM, IMPRESSION) | ✓ | DIAGNOSTIC TESTS CONSULTATIONS, APPOINTMENTS | URGENT/IMPORTANT/S-STANDARD/R-REGERY/L-LETTER | TIME-FRAME REQUESTED AND/OR THERAPEUTIC MEASURES |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  | ROTH 0014 |

13025 (REV. 10/00)

**EXHIBIT 12**

PAGE

# GENERAL INTERNAL MEDICINE

FINK, MARIANNE                    07/12/01                    LCMC#:  206 07 82

The patient is 32 years old and is seen and examined with Dr. Bilello.
She was previously followed by Dr. Rehm.  She has a 3 week history of
several symptoms. She's noted increased daytime somnolence and has
fallen asleep in traffic. She does have a history of loud snoring
which is unchanged.  She also notes difficulty swallowing with food
sticking and regurgitation.  She has had a dull aching in the left
upper chest which is tender. Additionally she has had a sore throat
and earache without fever, sweats or weight loss.

PAST MEDICAL HISTORY:  Negative.

MEDICATIONS:  Oral contraceptives.

Smoking: 14 pack years quit 4 months ago.

SOCIAL HISTORY:  Works full time and is taking an accounting course.

PHYSICAL EXAM:  She's a well appearing female in no acute distress.
Oropharynx clear.   Neck, 2+ anterior cervical nodes and 1+ multiple
right posterior cervical nodes.  Chest clear to percussion and
auscultation.  Tenderness in the upper anterior left chest.  Cardiac
normal S1 and S2.  No gallop, murmur or rub.  Abdomen slight tenderness
over the xiphoid.  No hepatosplenomegaly or mass noted.

ASSESSMENT:  Fatigue, adenopathy and left chest pain.  Would consider
various infections including hepatitis, HIV, and mono.

PLAN:  Check CBC, SGOT, heterophile and HIV today.  Based on results
would also consider proceeding with an upper GI or barium swallow.

                              Joseph Rothchild, M.D.
                              N#
                              D:  07/12/01, R:   , T: 07/19/01
JR:nsmt:mrp

**Progress Notes**

Lahey Clinic Medical Center • 41 Mall Road, Burlington, MA 01805 • 781-744-5100

PATIENT ID

**LAHEY CLINIC**

41 Mall Road • Burlington, MA 01805

# Progress Notes

12145aa (REV. 8/98)

ROTH 0046

**EXHIBIT 13**

# Lahey CLINIC

## AMBULATORY ORDER FORM

```
URLINGTON

   ANK ☐    CANCELLED ☐

2060782 AGE:  32
OB: 02/02/1969
S  FINK,MARYANN
 BANKS STREET
OBURN,MA         01801
81-376-1767
PPT# 7323810
CP:                      S/O
FHM,JENNIFER
1 MALL ROAD
URLINGTON,MA     01805
81-744-8025
```

```
***** MANAGED CARE ***********
* HMO BLUE ENR (FFS)          *
*                             *
* NEW PATIENT? Y              *
*****************************
```

REFMD FOR THIS APPT:

OTHER REFERRING MD:

```
Record here, if taken:
HT.
WT.
BP
TPR
4FAST/ 5
BILELLO MD (RES),VINCE
GIM
07/12/2001 02:45PM
LAST APPT WITH
PROVIDER:
```

**REASON FOR APPOINTMENT:** FATIGUE/PE                SOURCE:PATIENT REFERRA

OLLOW-UP VISITS:  MD TO CONTACT PCP FOR APPROVAL
PECIALIST CONSULT BUR:  MD TO CONTACT PCP FOR APPROVAL
ESTING DIAGNOSTIC/PRE-OP REFERRAL NOT REQUIRED
DMITS OR AMB SURGERY:  MD TO CONTACT FOR APPROVAL, THEN COMPLETE HADF FORM
ENTAL HEALTH:  NOT LAHEY PSYCH
O VIEW EXISTING REFERRALS, CHECK IDX

☐ KEEP CHART TODAY    ☐ REQ. CHART AFTER FUTURE TST/CON    ☐ SEND CHART BACK

CHIEF COMPLAINT:

NO ORDERS ☐    IF NO ORDERS,
              REASON FOR VISIT:

| PHYSICIAN REASON FOR ORDERS. (PROBLEM, SYMPTOM, IMPRESSION) | ✓ | DIAGNOSTIC TESTS CONSULTATIONS, APPOINTMENTS | U-URGENT J-URGENT S-STANDARD R-REVIEW L-LETTER | TIME-FRAME REQUESTED AND/OR THERAPEUTIC MEASURES |
|---|---|---|---|---|
| Chest pain | | CXR PA & Lat - 1hr | | Today |
| | | return w/ film to Rothschild/Bilell | | |
| RPF 7.12.01 | | CBC w/ differential | | STAT |
| | | Heterophile  AST/ALT | | |
| | | PSA , HIV antibody | | |
| | | BILRR / RICHD | | |

ROTH 0044

13025 (REV. 10/00)

**EXHIBIT 14**



## CONSENT TO HUMAN IMMUNODEFICIENCY VIRUS (HIV)
## LABORATORY TEST

I, _Maryann Fink_ , agree to have the Lahey Clinic perform a blood test or tests to determine whether I have a virus called human immunodeficiency virus (HIV) or antibodies to the HIV virus in my blood. A sample of my blood will be drawn and sent to the laboratory to determine whether the HIV virus or HIV antibodies are present. There are no significant medical side effects or medical risks associated with drawing blood for a laboratory test.

1.  I understand that this testing is entirely voluntary.

2.  This testing is done to determine whether I have been exposed to the HIV virus. HIV causes a disease known as Acquired Immune Deficiency Syndrome (AIDS) which greatly reduces the body's ability to withstand certain diseases and infections.

3.  If this test shows that I have been infected with HIV, that does **not** mean that I have AIDS. A determination that a patient has AIDS cannot be made unless a patient is found to have a number of other clinical and laboratory findings.

4.  I understand that this testing consists of one or more separate tests, a screening test and additional confirmatory tests. The test is positive **only** if the screening **and** confirmatory tests are positive, and only then will I be informed that it is positive. Confirmatory tests are not needed if the screening test is negative.

5.  I understand that under certain circumstances the results of the test may be negative, but the patient nonetheless has been infected with HIV virus. I understand that although laboratory testing is generally accurate, it is not perfect.

6.  I understand that information and counseling on HIV and AIDS are available to me if I request them.

7.  I understand that the result of this test shall be placed in my medical record as are the results of other laboratory tests, and that my health care provider is authorized to inform other members of the clinic staff of the result of this test as she/he deems necessary for my medical care.

Having read the above, and having been told by my health care provider that, in his/her opinion, this testing is advisable, I hereby consent to and request the HIV test and the drawing of whatever blood is necessary for its performance.

Name of Patient: _Maryann Fink_          Clinic number: _____

Patient signature: _Maryann Fink_          Date: _7/11/01_

Complete only if patient is an unemancipated minor or otherwise unable to consent:

Person consenting for patient: _____

Relationship: _____          Date: _____

Witness: _____

Patient ID

```
07/12/2001 L2060782 02/02/1969 32
FINK,MARYANN          GIM   I3ILRR
2 BANKS STREET        4EAST/ 5
WOBURN,MA             01801 A#:7323810
```

**EXHIBIT 15**

LAHEY CLINIC
DEPARTMENT OF LABORATORY MEDICINE
BURLINGTON, MA 01805

NAME: **FINK,MARYANN**
PT PHONE: (781)376-1767
DOB: 02/02/1969      AGE: 32Y      SEX: F


COLL: 07/12/2001 17:00    REC: 07/12/2001 17:02    PHYS: ROTHCHILD,JOSEPH

PROFILE 1

| | | | |
|---|---|---|---|
| WBC | 7.5 | [4.1-10.9] | K/uL |
| RBC | 4.14 | [4.00-5.00] | M/uL |
| HEMOGLOBIN | 13.1 | [12.0-16.0] | G/DL |
| HEMATOCRIT | 38.4 | [36.0-50.0] | % |
| MCV | 93 | [80-99] | FL |
| PLATELET COUNT | 257 | [150-350] | K/uL |
| RDW | 12.3 | [<14.5] | % |

WBC DIFFERENTIAL

| | | | |
|---|---|---|---|
| WBC | 7.5 | [4.1-10.9] | K/uL |
| POLYS | 45 | [40-85] | % |
| LYMPHOCYTE | 46 | [18-47] | % |
| MONOCYTE | 5 | [0-13] | % |
| EOSINOPHIL | 3 | [0-4] | % |
| BASOPHIL | 1 | [0-2] | % |
| MORPH | NORMAL | | |


COLL: 07/12/2001 17:00    REC: 07/12/2001 17:02    PHYS: ROTHCHILD,JOSEPH

| | | | |
|---|---|---|---|
| AST (SGOT) | 19 | [11-40] | IU/L |
| ALT (SGPT) | 15 | [4-35] | IU/L |
| FREE THYROXINE | 0.8 | [0.7-1.7] | NG/DL |
| TSH | ***9.20** | [0.30-4.5] | uIU/ML |


COLL: 07/12/2001 17:00    REC: 07/12/2001 17:02    PHYS: ROTHCHILD,JOSEPH

| | | |
|---|---|---|
| HETEROPHILE SCRN | NEG | [NEG] |
| HIV ANTIBODY | NEG | [NEG] |


ROTH 0199

NAME: FINK,MARYANN
H#: 2060782

PAGE. 1

FINAL EVENT REPORT

GENERAL INTERNAL MEDICINE 5

LAHEY BURLINGTON          END OF REPORT

**EXHIBIT 16**

```
LAHEY CLINIC - BUR                 MRN:        00000206-07-82
DIAGNOSTIC RADIOLOGY               NAME:       FINK,MARYANN
REQUISITION #: M965236             LOCATION:   OPD GIM
------------------------------     --------------------------------
ORDERING MD: ROTHCHILD,JOSEPH      PERFORMED: 07/13/01 08:30
                                   RESULTED:  07/16/01 14:27
============================= ORDER REASON =============================
                    CHEST PAIN

===================         L CHEST, PA + LATERAL         ===================
FINAL:
     CLINICAL HISTORY: 32 YEAR OLD WITH CHEST PAIN.
     FINDINGS: PA AND LATERAL VIEWS WERE OBTAINED.  THERE IS SLIGHT
     FULLNESS IN THE AP WINDOW REGION WHICH MOST LIKELY REPRESENTS A
     PROMINENT  PULMONARY ARTERY BUT COULD REPRESENT ADENOPATHY.
     THE LUNGS ARE CLEAR.  NO OTHER HILAR OR MEDIASTINAL ADENOPATHY,
     EFFUSION, PNEUMOTHORAX, OR ACUTE OSSEOUS OR SOFT TISSUE
     ABNORMALITY.
     IMPRESSION:
     1)   NO ACUTE ABNORMALITY.
     2)   SLIGHT AP WINDOW FULLNESS, MOST LIKELY A NORMAL VARIANT,
          PROMINENT PULMONARY ARTERY.  HOWEVER, CT IS RECOMMENDED TO
          EXCLUDE THE POSSIBILITY OF ADENOPATHY, IF NO OLD FILMS ARE
          AVAILABLE FOR COMPARISON (NONE CURRENTLY AVAILABLE).
     3)   THE FINDINGS WERE READ ON A STAT BASIS AS REQUESTED.
----------------------------------------------------------------------
STAFF PHYSICIAN: ARNDT III,WILLIAM
```

ROTH 0219

**EXHIBIT 17**

```
1                                    Volume:    I
                                     Pages:     1 to 157
2                                    Exhibits:  1 to 10

3

4                UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
5
     * * * * * * * * * * * * * * * *
6    WILLIAM PARZIALE,
                         Plaintiff,
7
          vs.                              Civil Action
8                                      No. 04-11377-RBC
     AMERICAN HERITAGE LIFE INSURANCE
9    COMPANY, A WHOLLY OWNED SUBSIDARY
     OF THE ALLSTATE CORPORATION,
10                       Defendant.
     * * * * * * * * * * * * * * * *
11

12

13

14                DEPOSITION OF WILLIAM P. PARZIALE, a
     witness called on behalf of the Defendant, taken
15   pursuant to the applicable provisions of the Federal
     Rules of Civil Procedure before Cynthia A. Powers,
16   Shorthand Reporter and Notary Public in and for the
     Commonwealth of Massachusetts, at the law offices of
17   Day, Berry & Howard LLP, 260 Franklin Street, Boston,
     Massachusetts, on Wednesday, March 9, 2005,
18   commencing at 10:51 p.m.

19

20                      * * * * *

21

22

23              KACZYNSKI REPORTING
            72 Chandler Street, Suite 3
24          Boston, Massachusetts 02116
                 (617) 426-6060
```

37

1    A.    Yeah.

2    Q.    And it was about a year after that

3  when you met MaryAnn Veronesi?

4    A.    Less than a year, '99.

5    Q.    When did you begin a romantic

6  relationship with MaryAnn Veronesi?

7    A.    Immediately.

8    Q.    That same day?

9    A.    Explain your romantic, what do you

10  mean by romantic?

11    Q.    You described your acquaintance at

12  Joe's American Bar and Grill.  Do you recall about

13  how much time after that you saw her again?

14    A.    Two days after, two-day rule.

15    Q.    When did you and MaryAnn Veronesi

16  begin living together?

17    A.    2000.

18    Q.    What was the address at which you

19  lived together in 2000?

20    A.    305 Salem Street, Woburn, Mass.

21    Q.    This was an apartment that you rented?

22    A.    She owned.

23    Q.    It was an apartment?

24    A.    Condo.

38

1          Q.     Where did you live after the address

2     at the 305 Salem Street condo?

3          A.     After?  Two Banks Street, Woburn,

4     Mass.

5          Q.     When did you become engaged to MaryAnn

6     Veronesi?

7          A.     2001.

8          Q.     Do you recall the date?

9          A.     September.

10          Q.     Do you recall the day in September?

11          A.     No.

12          Q.     Was it before or after the 9/11

13     attacks?

14          A.     It was before.  I'm sorry, it's 2000,

15     not 2001.

16          Q.     So you became engaged to MaryAnn

17     Veronesi in September of 2000?

18          A.     Yes.

19          Q.     Was this before or after you moved in

20     with Ms. Veronesi?

21          A.     This was after.

22          Q.     Do you remember the month that you

23     moved into the condo at 305 Salem Street?

24          A.     No, I don't.

40

1          A.     Caribbean.

2          Q.     Do you know what island?

3          A.     No, I don't remember.

4          Q.     You never married MaryAnn Veronesi?

5          A.     No.

6          Q.     When did you acquire the home at Two

7    Banks Street?

8          A.     When did I acquire it?

9          Q.     When did you buy it?

10         A.     I don't remember.

11         Q.     Would it have been in 2001?

12         A.     Yes, it was.  It would have been 2001.

13         Q.     Was it wintertime?

14         A.     Toward the end of winter.

15         Q.     When did MaryAnn Veronesi acquire an

16   interest in that home?

17         A.     Let me back up.  It was February of --

18   that was 2002, we acquired the home toward the end of

19   the winter.

20         Q.     Are you quite certain that it was in

21   2002?

22         A.     Not really, but -- no, that was 2001.

23         Q.     And how do you know that it was in

24   2001?

51

1    testimony that you didn't have any knowledge of her

2    owning any other property other than the home at Two

3    Banks Street that you two bought together --

4            A.    Correct.

5            Q.    -- after she sold her condo?

6            A.    Correct.

7            Q.    What was MaryAnn Veronesi's health

8    like at the time you bought this home together at Two

9    Banks Street?

10           A.    Excellent.

11           Q.    When you say excellent, what do you

12   mean by that?

13           A.    Her and I would work out five days a

14   week.

15           Q.    Where did you work out?

16           A.    Gold's Gym.

17           Q.    What location?

18           A.    Woburn.

19           Q.    What types of exercises would she do

20   there?

21           A.    She would be on the ellipse machine.

22           Q.    What type of a machine is that?

23           A.    It's like a StairMaster.

24           Q.    About how long would she stay there?

58

1          A.    Yes.

2          Q.    She didn't complain of any symptoms of

3     any kind before then?

4          A.    No.

5                (Marked Exhibit 2; Medical record)

6          Q.    Take as much time as you need to read

7     this exhibit which has been marked as Exhibit 2.

8          A.    Yes.

9          Q.    You've had a chance to look at this?

10         A.    Yes.

11         Q.    Does this change your answer as to

12    whether MaryAnn Veronesi might have seen a doctor

13    before July 25th 2001?

14         A.    As I said, I don't remember.

15         Q.    Do you see in the upper right corner

16    of this document --

17         A.    Yes.

18         Q.    -- a date?

19         A.    Yes.

20         Q.    What does that date say?

21         A.    Says 7/13/01.

22         Q.    And the upper left corner do you see

23    what it says there?

24         A.    Yes.

59

1          Q.    What does it say?

2          A.    Lahey Clinic, Burlington, diagnostic

3     radiology.

4          Q.    And do you see in the middle of the

5     page where it says final, could you just read what it

6     says in that first line there?

7          A.    Thirty-two year old with chest pains.

8          Q.    It's your testimony that nothing in

9     this document changes your testimony that you've

10    already given?

11         A.    She did not tell me anything about her

12    seeing this doctor, so I don't know.  I don't

13    remember.

14         Q.    Did she ever complain to you about

15    chest pain?

16         A.    No.

17         Q.    Did she ever mention chest pain?

18         A.    Nope.

19         Q.    She never mentioned to you that she

20    might have had an X-ray sometime around July 12,

21    2001?

22         A.    No.

23         Q.    She never mentioned to you that she

24    went to the Lahey Clinic?

62

1    A. Explain what you mean by long time.

2    Q. Was it two months after you met her?

3    A. Of what?

4    Q. Since you met her, how much time had

5 passed since you met her before you moved in

6 together, was it two months?

7    A. No.

8    Q. Was it longer than that?

9    A. Yes.

10    Q. Was it five months?

11    A. I don't remember.

12    Q. So more than two months but probably

13 less than five months, would it be fair to say that?

14    A. I don't know.  I don't know.

15    Q. More than two months, we'll just leave

16 it at that.

17    Did you have a close relationship with

18 MaryAnn Veronesi?  Did you -- let me rephrase.

19    Could you describe what your

20 relationship was like?

21    A. Fun, loving, compassionate -- any

22 relationship that anybody else would have with their

23 significant other.

24    Q. Were you open with one another?

64

1      didn't discuss it was because it just didn't come up?

2              A.      Correct.

3              Q.      Did you often discuss, for example,

4      your, when you got home at night what you had done

5      that day?

6              A.      No, in a way, not in depth.  It wasn't

7      in-depth discussion.  It was more like dinner talk,

8      something like that.

9              Q.      Are you finished?

10             A.      Yeah.

11             Q.      If you had done something out of the

12     ordinary that day, would that be something that you

13     would discuss?

14             A.      Yeah.

15             Q.      What did you like to do together for

16     fun?

17             A.      We hiked, we worked out together, we

18     took vacations.  Like I said, anything anybody else

19     would do with their soul mate.  We were each other's

20     soul mate.  We loved each other.  You know, dinner

21     and anything else that couples would do.

22             Q.      Where did you go on vacation, do you

23     have any memories?

24             A.      Aruba.

76

1          A.     No.

2          Q.     After work?

3          A.     Most, yes.

4          Q.     After dinner?

5          A.     Yeah, mostly.

6          Q.     You would drive there together to the

7    gym together?

8          A.     Yeah, or we would meet, varies.

9          Q.     Did Ms. Veronesi go to the emergency

10   room on July 25th?

11         A.     Yes.

12         Q.     Did you go with her to the emergency

13   room?

14         A.     No, I met her there actually.  She was

15   there and then I came afterward.

16         Q.     And what hospital was this emergency

17   room at?

18         A.     Burlington.

19         Q.     In Burlington?

20         A.     Yes.

21         Q.     Do you remember what hospital?

22         A.     Lahey Clinic.

23         Q.     Did Ms. Veronesi drive herself to the

24   emergency room?

78

1    you know, she went to -- I didn't see her and she

2    wasn't -- she said she was going to the hospital and

3    I said okay, and I haven't talked to her and then I

4    called and I was looking to find out what was going

5    on.

6          Q.    So she had mentioned to you earlier in

7    a previous phone conversation that she would be going

8    to the hospital; is that right?

9          A.    No, that ain't what you asked me.  You

10   asked me if I talked to her previous from that, but I

11   said yes, but it wasn't, Are you going to the

12   hospital.

13         Q.    Was it a face-to-face conversation you

14   had previously?

15         A.    Yes.

16         Q.    Where was that conversation?

17         A.    At the house.

18         Q.    What time of day was that?

19         A.    Oh, about I would say middle of the

20   day.  I don't remember the exact time.

21         Q.    So you had a face-to-face conversation

22   with Ms. Veronesi in the middle of the day?

23         A.    On the 25th.

24         Q.    Why were you at home in the middle of

79

1     the day?

2            A.    Well, what do you consider the middle

3     of the day, explain.

4            Q.    Well, I'll ask you what do you mean by

5     the middle of the day, what do you mean by that?

6            A.    Around 3:30 on, around that time.

7            Q.    Okay, I'll ask you again.  Why were

8     you speaking, why were you at home during that time,

9     three in the afternoon?

10           A.    Well, that was the day that Mr.

11    Erhlich came over.

12           Q.    Okay.  I'll ask you more about that in

13    a minute.

14                 At what point did Ms. Veronesi decide

15    she needed to go to the emergency room?

16           A.    I don't know.

17           Q.    Is that after Mr. Erhlich left?

18           A.    An hour after Mr. Erhlich left or

19    what, I mean?

20           Q.    Was it before Mr. Erhlich arrived?

21           A.    No.

22           Q.    Why did Ms. Veronesi decide she needed

23    to go to the emergency room?

24           A.    She said she still got the flu and she

106

1    Mr. Ehrlich?

2              A.    I don't recall.

3              Q.    Do you remember when you spoke to

4    Mr. Ehrlich about your own insurance needs?

5              A.    No, I don't remember.

6              Q.    Would it have been several months

7    before he came to your home to talk to Ms. Veronesi?

8              A.    I don't know.

9              Q.    Was it the same time?

10             A.    No.

11             Q.    So it's your testimony that when

12   Mr. Ehrlich came to your home he wasn't speaking to

13   you about any insurance; he was just speaking to

14   Ms. Veronesi?

15             A.    Correct.

16             Q.    What room of the house were they

17   talking about this together, Ms. Veronesi and

18   Mr. Ehrlich?

19             A.    Kitchen.

20             Q.    So they were at the kitchen table; is

21   that right?

22             A.    Correct.

23             Q.    You testified earlier that you were

24   present when Mr. Ehrlich was there at the beginning

116

1    So no, I didn't -- I knew she was ill, but for

2    someone to be terminally ill and still work eight

3    hours a day and do their taxes knowing that they have

4    a week left, no, I don't.

5         Q.    When did you first contact American

6    Heritage about this policy?

7         A.    I don't remember.

8               (Marked Exhibit 6; Death Claim

9               Notification by Phone Call)

10        Q.    I'm showing the witness what's been

11   marked Exhibit 6.  It's entitled, Death Claim

12   Notification by Phone Call.  It's dated March 4,

13   2002.  Take as much time as you need to look this

14   over.

15        A.    Mm-hmm.

16        Q.    You've had a chance to look this over?

17        A.    Yeah.

18        Q.    Is it fair to say that you contacted

19   American Heritage on March 4, 2002 about this policy

20   to make a claim?

21        A.    Yes.

22        Q.    What day did Ms. Veronesi die?

23        A.    March 4, 2002.

24

117

1      (Marked Exhibit 7; Claimant's

2      Statement dated March 14, 2002)

3    Q.  I've shown the witness what's been

4 marked Exhibit 7.  It's entitled, Claim Form --

5    A.  Mm-hmm.

6    Q.  -- dated March 14, 2002.  Have you had

7 a chance to look this over?

8    A.  Yes.

9    Q.  Have you seen this document before?

10    A.  Yes.

11    Q.  And what is it?

12    A.  It's a claimant's statement.

13    Q.  How do you recognize this document?

14    A.  I don't recall.  I think it was mailed

15 to me.

16    Q.  Is this the document that you sent to

17 American Heritage to make a claim under the policy in

18 this case?

19    A.  Yes.

20    Q.  Did you send anything else with your

21 claim form other than this document?

22    A.  I don't recall, possibly a death

23 certificate.

24    Q.  Do you see on the right-hand side of

119

1          A.    He was with Dr. Compagna in the

2    intensive care unit.

3          Q.    You testified earlier that you have

4    drove Ms. Veronesi to some chemotherapy appointments;

5    is that correct?

6          A.    Correct.

7          Q.    Are these the doctors that supplied

8    those services?

9          A.    No.

10          Q.    And why didn't you list those doctors

11    here?

12          A.    Didn't cross my mind.  Same thing,

13    like I notice place of death says Stoughton and not

14    Burlington.  I was distraught.

15          Q.    Do you see on the left-hand side under

16    part A where it says, what was the cause of death and

17    you wrote pneumonia; is that correct?

18          A.    That's what the doctor said that the

19    cause of death was at the time in the ICU unit.

20                (Marked Exhibit 8; Death Certificate)

21          Q.    I've shown the witness what's been

22    marked as Exhibit 8.  It's a death certificate issued

23    by the Town of Burlington.

24          A.    Yes.

124

1          A.    Because, like you stated, there is no

2    misrepresentation being here and they unfairly paid

3    the claim.

4          Q.    I don't believe I stated there was no

5    misrepresentation here.  The record should be clear

6    that.

7                Other than this letter, have you had

8    other contact with American Heritage Life?

9          A.    I don't recall, possibly.

10         Q.    Did you speak to anyone on the phone?

11         A.    Yes.

12         Q.    Did you speak to someone on the phone

13    more than once?

14         A.    Yes.

15         Q.    Was it a man or a woman?

16         A.    A woman.

17         Q.    Did you speak to any male employees of

18    American Heritage?

19         A.    No, I did not.

20         Q.    Was it the same woman every time you

21    called?

22         A.    Yes.

23         Q.    Do you remember that person's title?

24         A.    No, I don't.

126

```
 1    would like, what do you hope to receive?

 2              A.    What the benefit states, what the

 3    policy states.

 4              Q.    And what is that exactly?

 5              A.    What the claim is.

 6              Q.    Do you know how much that's for?

 7              A.    Ninety-nine thousand or --

 8              Q.    Are you seeking any other damages in

 9    this lawsuit?

10              A.    I haven't discussed that much with my

11    attorney yet.

12              Q.    Have you made claims for emotional

13    distress?

14              A.    Did I make claims of emotional

15    distress?

16              Q.    Yes.

17              A.    I don't think so.

18              Q.    Is it your testimony that you're not

19    claiming emotional distress in this lawsuit?

20              A.    At this time, there could be possibly

21    a little emotional distress because this is bringing

22    up a lot of bad memories right now.

23              Q.    What symptoms of emotional distress

24    have you experienced?
```

127

```
 1              A.    What symptoms of emotional --
 2       disbelief.
 3              Q.    Anything else?
 4              A.    No, not that I can think of.
 5              Q.    So it's your testimony that the only
 6       symptoms of emotional distress that you've
 7       experienced is disbelief; is that correct?
 8              A.    Yes.
 9              Q.    Is it fair to say that you've never
10       seen any doctors, psychiatrists, or psychotherapists
11       for emotional distress?
12              A.    Correct.
13              Q.    And that you've never taken any
14       medications for emotional distress?
15              A.    Correct.
16              Q.    When did you first think of bringing
17       this lawsuit?
18              A.    I don't remember when I --
19              Q.    Have you ever discussed this lawsuit
20       with anyone other than your attorney?
21              A.    No.
22              Q.    Do you have any statements of anyone
23       that you have recorded about this lawsuit?
24              A.    No.
```

**EXHIBIT 18**

.

LAHEY CLINIC

| Name: FINK, MARYANN | Age: 32 | Sex: F | MRN: L2060782 | Visit #: 309109 | Ins. Verified |
| Address: 2 BANKS STREET | DOB: 02/02/1969 | | Date of Arrival: 07/25/2001 | Med Rec Ord: |
| WOBURN, MA 01801 | PCP: REHM, JENNIFER | | Time of Arrival: 05:14PM | |
| H 781-376-1767 | BURLINGTON, MA | Ph: 781-744-8025 | Mode of Arrival: CAR | 5:23 |
| W 781-899-1438 | | | Injury Type: | |
| Reg By: TAYLORM    LOC: EMR | | Fax: 781-744-5236 | Injury Date: | Priority |
| Chief C/O: DIFF. BREATHING, CHEST PAI | | INS: HMO BLUE ENR (FFS) | | Time In Room |

RESULTS

Difficulty breathing 38 7300
Breath x 3 m. c/p    at dr
started 3 m ctw —
worse last few day    HGB/HCT
Hes cost her voice    PLATS
Cin't breath out    SHx    W
No sore throat no us    NA    wek
us prtc —    night
Cin't c/p    CO2
BUN/CR    wg
GLU    Bil neg
CA
FHx    AMY

CT hila adenopathy    ABG

EKG
XRAY
ENT —    OTHER
refer dict
Ø vc paralysis
need cxr, met profile,
Lym filter, CT Base of skull → chest

See Master    d/w attending —
✓ CT by ent res. prior to d/c.
R.Dolan

Mediastinal
Tumor    ROTH 0021

| DISPOSITION | HOME | ADMIT | OBSERVATION | OTHER ____ | CONDITION ON DISCHARGE | D/C TIME 2215 |

PATIENT INSTRUCTIONS ACI#    OTHER    PREPS
I spoke with Dr Weiner    NO WORK UNTIL
LIGHT DUTY DATE
FULL DUTY DATE

☐ RE-EXAM BY A PHYSICIAN IF YOU ARE NOT BETTER WITHIN    @ 9:30 AM    SOONER IF YOU ARE WORSE
FOLLOW-UP: Call 781 744 8400 (Gloria, Cathy)

| I UNDERSTAND THE INSTRUCTIONS AND AGREE WITH THE DISCHARGE PLAN | RN SIGN | SEND COPY TO PMD ☐    SEND DICTATED REPORT ☐ |
| X Maryann Fink | RESIDENT MD SIGN | DATE OF VISIT 07/25/2001 |
| | STAFF MD SIGN | LC MRN: L2060782 |

LAHEY CLINIC, Burlington, MA 01805    Phone (781) 744-8100
Form No. 11140 Rev. 2/01

**EXHIBIT 19**

# Consultation Form

LAHEY CLIN
BURLINGTON, MA

| Patient Name | | Unit Number | Date |
|---|---|---|---|
| To Doctor and/or Service | | Notified | |
| | | Date | Time | Init. |

**Reason for Request:**

Hoarseness / up

_____ , M.D.
SIGNATURE

**Date:**    **Response: Patient seen at the request of**    **for**

32 y.o. 3 wks ago → swallowing difficulties
w/ dysphagia — Ø pain — ⊕ chest pain &
left arm heavy since Sunday — pressure
++ SOB when walking — exe test wk —
? mediastinal adenopathy — hoarseness since
Sunday —

PmHx — Ø                    ROS ⊕ fatigue
PSHx — Ø                    ⊖ GI + nausea
All — Ø                     psych ⊖
Meds — Ø                    neuro ⊖
Soc: d/c tobacco 5 mos ago
     1 ppd x 16 yrs
     unmarried / Ø kids

Physical Exam → Dictated

SIGN AND DATE ALL ENTRIES ☐    CONTINUED ON REVERSE
12148  3/96

PATIENT I.D.

fink

L2060782
FINK, MARYANN
07/25/01  05:14PM
FMR    H7309109

ROTH 0022

**EXHIBIT 20**

## EMERGENCY MEDICINE

FINK, MARYANN                    07/25/01                    LC#:   206 07 82


**CHIEF COMPLAINT:**  Hoarseness with chest pain.

**HISTORY OF PRESENT ILLNESS:**  This 32 year old woman has noted some difficulty swallowing and breathing for the last few weeks with some chest pain also at that time.  She has become more hoarse and her symptoms have been worse for the last few days.  She has lost her voice.  She has some trouble coughing and says she can't really breathe out very well.

**REVIEW OF SYSTEMS:**  No fevers, no chills, no weight loss.  No definite malaise.  No PND, palpitations, syncope.  No definite wheeze.  No hemoptysis.  Her chest pain is slightly pleuritic.  No abdominal pain, no nausea, vomiting, no loose stools, no black bowel movements, no blood in the stool.  No hematuria, dysuria, frequency.  No easy bruising or bleeding.  No back pain, joint pains, arthralgias, no headaches, visual problems, speech problems.  No diabetes.

**PAST MEDICAL HISTORY:**  None.

**CURRENT MEDICATIONS:**  Birth control pills.

**ALLERGIES:**  None.

**SOCIAL HISTORY:**   Quit smoking a few months ago.  Rare drinker.

**FAMILY HISTORY:**  Negative for Hodgkin's disease or other lymphoma.

**PHYSICAL EXAMINATION:**  The patient is alert, appropriate with good color and is in no respiratory distress.  The patient is hoarse.  She is nontoxic and afebrile.  Her 02 saturation is 98%.  Head and neck examination - patent airway, anicteric sclerae, normal visual fields, supple neck, no adenopathy.  Thyroid feels normal.  Chest actually is clear.  No stridor.  Heart sounds regular.  Abdomen is benign without hepatosplenomegaly.  Back - unremarkable.  Extremities - unremarkable.  Neurological examination - nonfocal.

**LABORATORY INVESTIGATIONS:**  CBC and metabolic profile are normal.  CT scan shows hilar mass with anterior mediastinal mass.

**ASSESSMENT:**  This patient has a recurrent nerve compression with left paralyzed vocal cord confirmed by ENT in the Emergency Room.  This is all secondary to the mass in her chest which is also compressing the left pulmonary artery.  The differential diagnosis includes lymphoma which Hodgkin's is likely the most common in this age group.  Her care was discussed in detail with the hematology service.  The patient will be seen tomorrow for beginning of a workup which may well involve a Chamberlain procedure.

FINK, MARYANN                          07/25/01           LC#:   206 07 82
                                                                 Page 2


The patient was quite upset as was her significant other and at least one half hour was spent discussing the differential diagnosis, treatment and options with the patient and her significant other.


                                        Tristram C. Dammin, M.D.

tcd:nsmt:jfh
D:  07/26/01
T:  07/28/01


MR COPY

ROTH 0043

.

**EXHIBIT 21**

CLAIM FORM
1-800-348-4489
8:15 A.M. to 4:30 P.M.
Eastern Standard Time
Toll Free Claims Number

**AMERICAN HERITAGE LIFE**
A member of the Allstate Group
1776 American Heritage Life Drive
Jacksonville, Florida 32224

MAR 1 4 2002

RECEIVED CLAIM DEPT.

MAR 1 5 2002

CLAIMANT'S STATEMENT

| PART A | | CLAIMS DEPT. B |
|---|---|---|

**PART A**

1. FULL NAME OF DECEASED INSURED
VERONESI          MARY ANN
(Last)          (First)          (Middle)

2. Legal residence at time of death
2 BANKS STREET WOBURN MA 01801
(Street)          (City)    (State)    (Zip)

3. Date of birth*  2    2    1968
(Month)  (Day)  (Year)

4. a. Male _____ Female ✓  b. Marital status DIVORCE

5. Date of death  3    4    2002
(Month)   (Day)    (Year)

Place of death  STOUGHTON MA
(City)          (State)

What was the cause of death? PNEUMONIA

When did deceased first complain of, or give other indications of his/her last illness?
DATE  2/26/02

When did deceased first consult a physician for his/her last illness?
DATE  2/26/02

On what date did deceased last attend his/her usual work?
DATE  2/26/02

**COMPLETE THIS PORTION FOR:**

A. Policies in force less than TWO years or REINSTATED within TWO years of death,  OR

B. Accidental Death, Homicide, Suicide, Self-inflicted Injuries and Unusual Deaths.  (SEE REVERSE SIDE)

1. Full name and address of deceased Insured's personal physician:
_____
_____

2. Full name and address of any other doctors who treated the deceased Insured during the last 5 years:
DR ANTHONY G CAMPAGNA
LAHEY CLINIC BURLINGTON MA
DR. THOMAS A ELY
41 MAILROAD BURLINGTON MA

3. Full name, address and telephone number of the deceased Insured's Employer:
CONNAUGHTON CONSTRUCTION
564 MAIN STREET      781 899-1438
WALTHAM MA.      01801 (781) 376-1767

4. Deceased's Driver's License # S15954153
State of Issue  MASSACHUSETTS

| PART C | ABOUT THE PERSON MAKING THE CLAIM |
|---|---|

Your full name  PARZIALE          WILLIAM          PAUL
(Last)          (First)          (Middle)

Your Social Security No.  023 54 3490          3. Your date of birth  4/26/62

Your residence/address  2 BANKS STREET          Zip code  01801

Your relationship to the deceased  FIANCE          Your phone # 781-376-1767
WK# 603 898 1880

The undersigned hereby makes claim to said insurance issued by this Company and agrees that the written statements and affidavits of all the physicians who attended or treated the insured, and all other papers called for by the instructions hereon, shall constitute and they are hereby made a part of these proofs of Death, and further agrees that the furnishing of this form, or of any other forms supplemental thereto, by said Company shall not constitute nor be considered an admission by the Company that there was any insurance in force on the life in question, nor a waiver of any of the Company's rights or defenses.

**AUTHORIZATION**

AHL 00250

I hereby authorize any hospital, practitioner, clinic, or other medically related facility, pharmacy, insurance company or government agency or other person who has attended the deceased to disclose or furnish to American Heritage Life Insurance Company, its subsidiaries or representatives, any and all medical information with respect to any illness or injury the Insured may have suffered including but not limited to mental illness, drug/alcohol abuse, HIV or AIDS related conditions; or other information requested including but not limited to medical history, consultations, prescriptions, diagnosis and treatment; or any information regarding benefits provided, together with copies of all other medical records that may be requested.  The information provided to American Heritage Life Insurance Company, its subsidiaries or representatives is to be used solely for purposes of evaluating a claim.  A photostatic copy of this Authorization is to be considered as valid as the original and shall remain valid from the date signed for the term of the policy for a claim for health benefits and for the duration of the claim for a claim for other benefits.  You or your representative may receive a copy of this Authorization by writing to American Heritage Life Insurance Company, 1776 American Heritage Life Drive, Jacksonville, FL 32224, and supplying policy number(s) and Insured's name.

**EXHIBIT 22**

PAGE

FINK, MARYANN                    07/26/01          LHMC#:  206 07 82
                                                           Page 2

diabetes, although she does have an elevated TSH of 9.2, with a free thyroxine of .8.
Hematology: no history of anemia or bleeding disorders.

PHYSICAL EXAMINATION: Blood pressure is 120/78, pulse is 64. She is a well
appearing white female, who does have some evidence of exophthalmos. Radial pulses are
symmetrical. Head, neck, eyes, ears, nose and throat: PERRLA. Her throat is clear. Her
tympanic membranes are clear. She has no clubbing, cyanosis, edema, jaundice, or JVD.
Her neck is soft. She has no thyroid enlargement. She has some shotty slightly swollen
lymph nodes in the anterior cervical chain bilaterally. She has some slight axillary
lymphadenopathy, although these are shotty and deep nodes. Her carotids are equal with no
bruits. Respiratory examination reveals normal inspiratory and expiratory breath sounds, no
wheezes, rhonchi or rales. Room air saturation is 100%. Cardiac: no palpable thrill,
normal S1 and S2. I cannot hear a heart murmur. She has no gallops or murmurs.
Symmetrical dorsalis pedis pulses bilaterally. No ankle edema. Abdomen is soft, non-
tender, she has no hepatic enlargement, no splenic enlargement. She has no abdominal
tenderness, no bruits, and normal bowel sounds. Back and extremities are normal.
Neurologic: she is oriented to time place and person with appropriate affect and normal
motor and sensory testing.

LABORATORY STUDIES: White count was 7,500, hematocrit 38.4, hemoglobin 13.1,
normal differential. She has a platelet count of 257,000. Her AST is 19, ALT 15, HIV
antibody negative, heterophile screen is negative. As noted, TSH is 9.2, and free thyroxine
.8. Sodium 140, potassium 3.6, chloride 109, CO2 29, BUN 13, creatinine .8, blood sugar
118, calcium 9.7.

CLINICAL IMPRESSIONS:
1.    Mediastinal lymphadenopathy: Differential includes sarcoid, TB, viral or bacterial
      infection, lymphoma, possible metastatic lung malignancy.
2.    History of smoking 14 pack year history.

ASSESSMENT AND DISCUSSION: I have had a long discussion with the patient and her
boyfriend regarding the findings on her CAT scan, which I reviewed with her. I have
advised mediastinoscopy. I do not think the cervical lymph nodes are large enough to biopsy
and would leave her with a more significant scar. I think mediastinoscopy is most
appropriate as this is where most of her lymphadenopathy resides. I will palpate the cervical
nodes through the mediastinoscopy incision and will see if we can access the superficial node
through that incision.

Progress Notes

Lahey Clinic Medical Center • 41 Mall Road, Burlington, MA 01805 • 781-744-5100

**LAHEY CLINIC**

41 Mall Road  •  Burlington, MA 01805

# Progress Notes

12145aa (REV. 8/98)

PATIENT ID

ROTH 0095

**EXHIBIT 23**

RADIATION THERAPY NOTE

FINK, MARYANN                          08/23/01          LCMC#:   206 07 82
                                                                  Page 2

CURRENT MEDICATIONS:  None.

ALLERGIES:  No known allergies.

SOCIAL HISTORY:  She has a history of smoking tobacco.  She smoked for approximately
16 years one pack per day.  She quit smoking March 2001.  She is a social drinker.  She
currently purchased a new house with her boyfriend, and works as an office manager.

FAMILY HISTORY:  Her father died of lung cancer at the age of 62.  Her mother is alive
and has chronic obstructive pulmonary disease.  Both her parents smoked as she grew up.
She has a brother and a sister who are both healthy.

PHYSICAL EXAMINATION:  This is a very healthy, pleasant female in no acute distress.
She is examined in full in the presence of Dr. Girshovich.  HEENT examination:  Head
normocephalic, atraumatic.  EOMs intact.  Pupils are equally round and reactive to light and
accommodation.  Neck is supple.  There are several shotty nodes palpated along the posterior
cervical region that are approximately .5 cm in dimension.  There is right sided thyromegaly.
There is a small incision noted at the angle of Louis.  It is clean, dry and intact.  There are
no signs of infection.  Lymphatic scan reveals no supraclavicular, infraclavicular, axillary or
inguinal lymphadenopathy.  Heart is regular rate and rhythm with a grade II murmur.  Lungs
are clear to auscultation bilaterally.  Abdomen is soft and nontender and nondistended with
no organomegaly.  Extremities are without clubbing, cyanosis or edema.  Skin shows no
signs of unusual lesions or moles.  Musculoskeletal strength is +5/5 in upper and lower
extremities bilaterally.  There is no tenderness to palpation of the spinous processes.

IMPRESSION AND PLAN:  Ms. Fink is a 32 year old female presenting with newly
diagnosed large cell carcinoma of unknown primary which is most likely lung cancer stage
IIIB.  The risks and benefits of radiation therapy and the role of radiation therapy was clearly
explained to Ms. Fink and her boyfriend.  We would like to initiate radiation therapy with
chemotherapy and will discuss this with Dr. Charles White of Medical Oncology.  She is
scheduled to meet with Dr. White today following this appointment, and we will schedule an
appointment to meet with her again at 10:30 8/27/01.

**EXHIBIT 24**



## Allstate.
### FINANCIAL

*Workplace Division*

May 7, 2002

Mr William P Parziale
2 Banks Street
Woburn MA 01801

RE:    MaryAnn Veronesi
Policy: 95071110
Claim: 02-V-03

Dear Mr Parziale:

This letter follows our recent telephone conversation where we explained our need for Ms Veronesi's medical records from her July 2001 emergency room treatment.

In our conversation you requested that we proceed with the denial of this claim. However, at this time we will be unable to comply with your request, as we do not currently have sufficient information to made an informed decision.

The policy application for Ms Veronesi in the amount of $99,000.00 was taken out on July 25, 2001. We also have received documentation showing that Ms Veronesi was treated at a medical facility on or before the same date. This policy does contain an Incontestability clause, which states "The Company may not contest this policy after it has been in force during the lifetime of the Insured for two years from the Issue Date, except for failure to pay premiums."

It is important that we review Ms Veronesi's complete medical records. In order to do this we will need to request additional medical information. However, Massachusetts State law requires that medical facilities are not to release medical records without "a copy of appointment papers of the administrator or executor of the deceased's estate." We would sincerely appreciate your obtaining this document and sending it to us at your earliest convenience.

Upon receipt of the above information, we will give your claim our immediate attention. Thank you.

Sincerely,

Susannah Marchy
Individual Claims Dept

American Heritage Life Insurance Company
1776 American Heritage Life Drive   Jacksonville, Florida 32224-6688   Phone 904.992.1776

AHL 00118

**EXHIBIT 25**



# **Allstate.**
## FINANCIAL
*Workplace Division*

November 1, 2002

William Parziali
2 Banks Street
Woburn MA  01801

RE:  Mary Ann Veronesi
     Policy # 90 9507.1110
     Claim # 02-V-03

Dear Mr Parziali:

There will be a delay in the processing of this claim.  We have **ALREADY MAILED** a request for the additional information indicated below:

A copy of the Medical records from Dr Rothschild

Our Legal department has declined the request to furnish you with any of our records concerning this matter.

Please rest assured that upon receipt of the above information, we will give this claim our immediate attention.

Sincerely,

Susannah Marchy
Claims Examiner
Life Claims Department

AHL 00083

**EXHIBIT 26**



**Allstate.**
FINANCIAL

*Workplace Division*

December 4, 2002

Mr William Parziale
2 Banks Street
Woburn MA 01801

Re: MaryAnn Veronesi
Policy #: 95071110
Claim #: 02-V-03

Dear Mr Parziale:

This letter will acknowledge your request for status of the claim for the above policy.

As we discussed on the telephone on December 4, 2002, American Heritage Life is still in the process of obtaining additional medical records. Until we are satisfied that we have all the information that is needed to make a fair and informed decision, the claim will remain in the pending status.

You will be notified by mail when a decision has been reached. Until that time, please feel free to contact us at any time with any questions or concerns that you may have.

As you know, our toll free number is 1-800-348-4489, or you may reach me on my direct number: 904-992-1776 x 4399.

Sincerely,

Susannah Marchy
Individual Claims Department

**American Heritage Life Insurance Company**
1776 American Heritage Life Drive   Jacksonville, Florida  32224-6688   Phone 904.992.1776

AHL 00082

**EXHIBIT 27**



# Allstate.
## FINANCIAL
*Workplace Division*

December 10, 2002

Ms Karin Ouellette
296 Richardson St
Uxbridge MA  01569

Re: Mary Ann Veronesi
Policy #: 95071110
Claim #: 02-V-03

Dear Ms Ouellette:

We are writing to you at this time to again request your assistance in obtaining medical records for our insured, Mary Ann Veronesi (Fink).

In April you sent an authorization to Lahey Clinic advising them to release records to American Heritage Life, which they did.  We now need additional records and the authorization from April has expired.  They are telling us that we will need a new one.

I've enclosed a copy of the previous statement you prepared.  If you would do this for us, we will be most appreciative.  A return envelope is enclosed for your convenience in replying.   Also, Lahey Clinic said to mention Chart #2060782, and the records are in the name of Mary Ann Fink.

If you have any questions, please do not hesitate to let us know.  Our toll free number is 1-800-348-4489.

Sincerely,

Susannah Marchy
Individual Claims Department

AHL 00085

**EXHIBIT 28**



# Allstate.
## FINANCIAL

*Workplace Division*

March 7, 2003

Karin Ouellette, Executrix
Estate of Maryann Fink Veronesi
296 Richardson Street
Uxbridge, MA 01569

RE:    Maryann Veronesi
       Policy: 90-95071110
       Claim: 02-V-03

Dear Ms. Ouellette:

We wish to thank you for all your cooperation in forwarding the appropriate
authorizations to medical facilities so that we could receive copies of Ms. Veronesi's
medical records.

The most recent authorization that you supplied enabled us to receive medical records
from Dr. Rothchild at Lahey Clinic. These records have become pivotal in our
adjudication of a claim for proceeds against Policy 90-95071110, owned by Maryann
Veronesi, insuring her life.

Ms. Veronesi's July 25, 2001 application for coverage asked the following question under
#14, Part 2:
"Has any person to be insured:
a.   been examined or treated at a hospital or other medical facility (within last 5 years) or
     are they currently under the care of a doctor?
b.   been advised to have or contemplate having any diagnostic test, treatment or
     surgery?"

These questions were answered "No" by Ms. Veronesi. However, medical records from
Lahey Clinic document that Ms. Veronesi saw Dr. Rothchild on July 12, 2001
complaining of various symptoms she had developed over the prior three weeks.
Because of the symptomology, a chest x-ray was performed on July 13, 2001. Based on
the results of the chest x-ray, the medical records document that a CT scan was
recommended and then scheduled.

**American Heritage Life Insurance Company**
1776 American Heritage Life Drive   Jacksonville, Florida  32224-6688   Phone 904.992.1776

AHL 00089

Therefore, on July 25, 2001, the application signature date, Ms. Veronesi had been examined and treated at a medical facility and was under the care of a doctor. She had also been advised to have a diagnostic test (CT scan). Accordingly, her response to Question # 14, Part 2, a and b should have been "yes."

Our Underwriting Department has reviewed these records and advised that had they been correctly informed by Ms. Veronesi of her history at the time she applied for coverage, July 25, 2001, Policy 90-95071110 would not have been issued.

Because Ms. Veronesi made material misrepresentations in her application for coverage, the policy has been rescinded. A refund of all premiums will be sent to the Estate under separate cover.

We reserve the right to make a decision on this claim and future claims under the policy, on the basis of any provision in the policy whether or not we have identified it in this letter. If you have any questions regarding this information, please do not hesitate to let us know.


Sincerely,


Susannah Marchy
Individual Claims Department

**EXHIBIT 29**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: <u>04-11377-RBC</u>

| | |
|---|---|
| WILLIAM PARZIALE,<br>     PLAINTIFF,<br><br>v.<br><br>THE ALLSTATE CORPORATION A/K/A<br>ALLSTATE WORKPLACE DIVISION<br>("ALLSTATE) AND AMERICAN<br>HERITAGE LIFE INSURANCE<br>COMPANY, A WHOLLY OWNED<br>SUBSIDIARY OF THE ALLSTATE<br>CORPORATION,<br>     DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## GENERAL OBJECTIONS

Plaintiff objects to these interrogatories on the grounds that they seek to discover information which is not relevant to the instant litigation, and unlikely to lead to the discovery of admissible evidence.

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

## INTERROGATORY NO. 1

Identify any and all names and/or aliases that you have ever used or are currently using.

## ANSWER NO. 1

My legal name is William Parziale. I am also called Bill or Billy.

## INTERROGATORY NO. 2

Identify any and all Social Security numbers that you have ever used or are currently using.

## ANSWER NO. 2

My social security number is 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.

## INTERROGATORY NO. 3

Identify any and all communications between you and any hospital, physician, psychiatrist, psychologist, therapist, social worker, nurse, counselor or other health or mental care provider regarding any treatment or service provided to Ms. Veronesi, including in your answer the name of the person with whom you communicated, the date of the communication, the location of the communication, and the subject of the communication.

## ANSWER NO. 3

I accompanied MaryAnn Veronesi to the emergency room at Lahey Clinic on July 25, 2001. I chatted with a number of hospital personnel that night while we waited for Maryann to be examined, but I have no memory of any specific conversations.

## INTERROGATORY NO. 4

Identify any and all communications between you and any employee, agent, servant, representative, or any other person acting, or purporting to act on behalf of AHL, including, but not limited to, any interviews, meetings, conferences, telephone calls or conversations concerning any aspects of any applications for insurance coverage, claims made on any policy issued by AHL and/or denials of coverage on any policy issued by AHL; in responding to this interrogatory, state the date, the name of the person with whom you communicated, and the subject of the communication.

## ANSWER NO. 4

Robert Ehrlich, acting as an agent for AHL sold Maryann the subject life insurance policy on July 25, 2001. I was present during the application process, but have no specific memory of any conversations.

## INTERROGATORY NO. 5

State the basis for your contention in the Complaint that "[n]o reasonable offer of settlement has been made" by AHL.

## ANSWER NO. 5

My attorney sent a 30-day demand letter, pursuant to MGL 93A, to AHL. The only response from AHL was to deny liability. No offer of settlement was made.

## INTERROGATORY NO. 6

Identify any and all applications for insurance you submitted to any insurer seeking to insure Ms. Veronesi, including in your answer the date of the application, the insurer seeking to insure Ms. Veronesi, including in your answer the date of the application, the insurer, the type of coverage, the effective dates of such coverage, the policy number the amount of coverage, whether any claim was ever submitted, whether the claim was approved or denied, and the amount of any benefit paid.

**ANSWER NO. 6**

None.

**INTERROGATORY NO. 7**

Identify any and all insurance policies insuring Ms. Veronesi of which you are now or ever were the beneficiary, including in your answer the effective dates of coverage, the insurer, the policy number, the amount of coverage, the type of coverage, whether any claim was ever submitted, whether the claim was approved or denied, and the amount of any benefit paid.

**ANSWER NO. 7**

To my knowledge, Ms. Veronesi named me as a beneficiary on one life insurance policy. That is the policy at issue in this lawsuit, issued by AHL in the amount of $99,000. The policy number was 95071110 with coverage beginning 7/25/01. I submitted a claim which was subsequently denied. I have received no benefit.

**INTERROGATORY NO. 8**

Identify any and all claims for insurance benefits that you have submitted from 1994 to the present, including in your answer the name of the insured, the insurer, the policy number, the amount of coverage, the type of coverage, whether the claim was approved or denied, and the amount of any benefit paid.

**ANSWER NO. 8**

Over the past 10 years, I have submitted claims to Berkshire Life (disability policy), and Royal Sun Alliance (Workers Compensation carrier for Radisson Hotels) for periods of disability. In 1994, I was involved in an automobile accident. My car was totaled. I have no memory of who my insurer was or what the insurer paid for this loss. In May of 2003 my Audi was stolen. The insurer, Plymouth Rock, paid to replace my vehicle.

**INTERROGATORY NO. 9**

Identify any and all of Ms. Veronesi's accounts, contracts, investments, trusts, or policies of which you were or are the beneficiary, including, but not limited to, 401(k) accounts, savings accounts, checking accounts, money market accounts, brokerage and/or investment accounts, retirement accounts, IRAs pensions and profit-sharing plans; in responding to this interrogatory, state the name of the person or entity issuing or holding such account or assets, the amount of such account or assets, and whether any disbursement has been made to you.

**ANSWER NO. 9**

I am the beneficiary of one life insurance policy, namely the AHL policy that is the subject of the instant litigation.

## INTERROGATORY NO. 10

Identify any and all of Ms. Veronesi's real and/or personal property, whether tangible or intangible, that you obtained or was conveyed to you incident to Ms. Veronesi's death, including, but not limited to, property which was conveyed to you pursuant to the terms of Ms. Veronesi's Last Will and Testament.

## ANSWER NO. 10

Maryann Veronesi and I owned a home located at 2 Banks Street, Woburn, MA. We owned the home as joint tenants with the right of survivorship.

## INTERROGATORY NO. 11

Identify any and all communications between you and Karin Oullette, Executrix of the Estate of Ms. Veronesi, including, but not limited to any interviews, meetings, conferences, telephone calls, correspondence or conversations.

## ANSWER NO. 11

Karin Oullette was a dear friend to Maryann. We have had many conversations of which I have no substantive memory. With regard to any conversations my attorney may have had with Ms Oullette, Plaintiff objects to this interrogatory on the grounds that it seeks to discover information obtained in anticipation of litigation or as trial preparation.

## INTERROGATORY NO. 12

Identify your current and/or previous spouse(s), including in your answer such spouse's name, date of marriage, and date of divorce or annulment, if applicable.

## ANSWER NO. 12

Rosemary Magro and I were married on August 20, 1983 and divorced on August 20, 2001

## INTERROGATORY NO. 13

Identify any and all employment positions or employment contracts you have held since 1994, including in your answer the name of the employer, the date(s) during which you worked for such employer, job description, compensation and other benefits, and the circumstances of your separation from any such employment.

**ANSWER NO. 13**

Plaintiff objects to this interrogatory on the grounds that it seeks to discover information which is not relevant to the instant litigation and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection, Plaintiff states, I am uncertain of the specific dates of employment, but the following is a list of his employers since 1994.

Previous employers:
1. Seeley Stevens Engineering, Boston, MA
2. Ammana & Whitney, Boston, MA
3. Louis Berger Engineering, Needham, MA
4. Diop Engineering, Salem, MA
5. Pro Source Engineering, Woburn, MA
6. Radisson Hotel, Woburn, MA

Current employer:
7. MBCR, Somerville, MA

**INTERROGATORY NO. 14**

State whether you have ever been a party to any legal proceeding, whether criminal or civil, either before or after filing this action; if yes, identify the opposing parties, the nature of the cause of action, the court or agency in which the cause of action was filed, and the disposition of the case.

**ANSWER NO. 14**

I divorced my ex-wife, Rosemary Magro (Parziale) on August 20, 2001, at the Middlesex County Probate and Family Court. Since that time, Ms. Magro and I have returned to court on numerous occasions to resolve issues relating to the care and support of our minor children. Ms. Magro also has an active restraining order against me. It is on file in the Woburn District Court.

On or about August 10, 2003 I was involved in a workplace accident. Royal Sun Alliance, the workers compensation carrier, initially denied my claim. I filed a claim with the Department of Industrial Accidents. The insurer paid benefits and medicals until I was able to re-enter the workforce.

**INTERROGATORY NO. 15**

State whether you have ever been indicted or charged with any criminal or civil offense; if yes, state the nature of the offense, the date of the offense, the jurisdiction in which the offense was prosecuted, and whether judgment entered against you, or a guilty plea was entered, and if a judgment entered against you, state the terms of such judgment

**ANSWER NO. 15**

As previously stated, my ex-wife has an active restraining order against me from the Woburn District Court.

**INTERROGATORY NO. 16**

Identify each and every address at which you have maintained a residence from 1994 to the present, including in your answer the street name and number, city and state.

**ANSWER NO. 16**

- 26 Briarwood Road, Woburn, MA
- 45 Delano Avenue, Revere, MA
- 305 Salem Street, Woburn, MA
- 2 Banks Street, Woburn, MA
- 23 New Castle Drive, Apt. 7, Nashua, NH
- 18 Park Drive, Woburn, MA

**INTERROGATORY NO. 17**

Identify any interest you have or have ever had in any real property , whether held jointly or individually, from 1994 to the present, including in your answer the street name and number, city and state where such property is located, and the date(s) during which you held such interest.

**ANSWER NO. 17**

- 2 Banks Street, Woburn, MA: This property was owned Ms. Veronesi and I as joint tenants with the right of survivorship.
- 26 Briarwood Road, Woburn, MA: I own this property jointly with Rosemary Magro. However, I have no equitable interest in this property. As a condition of our divorce, I have signed over my interest in the home to Rosemary.
- 5111 Amulet Drive, #207, Newport Ritchie, FL: I own this condominium.

**INTERROGATORY NO. 18**

Identify any interest in any motor vehicle, boat, off-road or recreational vehicle that you have had from 1994 to the present, including in your answer make, model, year, and the date of transfer of any such interest.

**ANSWER NO. 18**

Currently own:
- 1992 Honda Civic (this vehicle is driven by my daughter Ashley and is principally garaged at her mother's [Rosemary Magro] home).
- 2004 Avalanche
- 1992 Cadillac Sedan Deville (registered and principally garaged in Florida)
- 1997 Quest (Ms. Magro took this vehicle when we divorced. I believe that she still has this vehicle in her possession).

Previously owned:
- 1997 Ford Explorer
- 2000 Cadillac El Dorado
- 1998 Audi A6
- 1998 Jeep Laredo
- 1992 Cadillac Sedan Deville
- 1992 Pontiac Bonneville

## INTERROGATORY NO. 19

Identify any interest in any business or legal entity that you now have, or have ever had, whether jointly or individually, from 1994 to the present

## ANSWER NO. 19

Plaintiff objects to this interrogatory on the grounds that it seeks to discover information which is not relevant to the instant litigation and which is not reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO.20

State the basis for your contention in the Complaint that you have "suffer[ed} emotional distress" as a result of the allegations contained in the Complaint.

## ANSWER NO. 20

Plaintiff objects to this interrogatory on the grounds that it seeks to discover mental impressions and legal conclusions of counsel.

## INTERROGATORY NO. 21

Identify all physicians, psychiatrists, therapists, social workers, nurses, counselors, or health care or mental health care providers from whom you have ever sought or received any diagnosis, treatment or other service related to any physical and/or mental distress arising out of the allegations in the Complaint.

## ANSWER NO. 21

Plaintiff objects to this interrogatory on the grounds that it seeks to discover information which is not relevant to the instant litigation, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory on the grounds that this information is protected by privilege.

## INTERROGATORY NO. 22

Identify each document to which you made reference and the name and address of each person with whom you spoke with regard to the preparation of your answers to these Interrogatories.

## ANSWER NO. 22

Plaintiff objects to this interrogatory on the grounds that it seeks to discover information which is not relevant to the instant litigation, and unlikely to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory on the grounds that it seeks to obtain information obtained in anticipation of litigation or as trial preparation. Not withstanding and without waiving this objection, I completed these Interrogatory answers with the assistance of counsel.

SIGNED UNDER THE PAINS & PENALTIES OF PERJURY, THIS 21st DAY OF JANUARY, 2005.

WILLIAM PARZIALE

As to objections:

Patricia Michaels (BBO#642945)
10 Tremont St., 4th Floor
Boston, MA 02108
(617) 227-1550
(617) 227-1545 fax