A

```
                                    Volume:    I
                                    Pages:     1 to 107
                                    Exhibits:  1 to 4


              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

     * * * * * * * * * * * * * * *
     WILLIAM PARZIALE,
                    Plaintiff,

          vs.                              Civil Action
                                           No. 04-11377-RBC
     AMERICAN HERITAGE LIFE INSURANCE
     COMPANY, A WHOLLY OWNED SUBSIDIARY
     OF THE ALLSTATE CORPORATION,
                    Defendant.
     * * * * * * * * * * * * * * *
```

            DEPOSITION OF ROBERT S. EHRLICH, a
witness called on behalf of the Defendant, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure before Cynthia A. Powers,
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the law offices of
Day, Berry & Howard LLP, 260 Franklin Street, Boston,
Massachusetts, on Tuesday, March 22, 2005, commencing
at 10:09 a.m.

                     * * * * *

                 KACZYNSKI REPORTING
              72 Chandler Street, Suite 3
               Boston, Massachusetts 02116
                    (617) 426-6060

31

1       A.      Yeah.

2       Q.      What kind of policies were they, do
3  you remember?

4       A.      Yes, they were accident disability
5  policies.

6       Q.      Do you recall for which insurer you
7  sold them the policy?

8       A.      That's what I'm trying to remember.
9  Union State, Jean Baptiste, J E A N, B A P T I S T E.
10 There was another one. It's out of Chicago. Maybe
11 it will come to me, maybe not. I can't remember.

12      Q.      Going back to the first case that you
13 talked about, the one that was in district court, do
14 you recall what the allegations in that case were?

15      A.      Yeah, yes. They said he had a prior
16 back injury.

17      Q.      Did you testify for the insured or for
18 the insurer?

19      A.      Insured.

20      Q.      What was the substance of your
21 testimony?

22      A.      I think I -- I'm thinking here, I
23 said. I don't think I filled out the application. I
24 think Jack, Jack did it, and maybe the back injury

1    wasn't listed on the application. Can I elaborate?
2         Q.   Well, when you say you didn't fill out
3    the application, was that unusual?
4         A.   No, I often did it. I had people
5    always fill out the applications. Couple of reasons.
6    One, there were a lot of private questions that they
7    may feel comfortable responding to. You know
8    yourself better than I know you, so you fill it out.
9    Also I would get letters from insurance companies.
10   Your handwriting is abominable. Either clean it up
11   or take time doing it. They couldn't read my
12   handwriting. I often had people fill out a
13   applications.
14        Q.   Would you always be present when they
15   were filled out?
16        A.   Mostly, yeah, I think I always was
17   there.
18        Q.   Can you recall any occasion when you
19   had an insured fill out the application without you
20   being present?
21        A.   No.
22        Q.   Are you currently employed?
23        A.   No, I'm retired.
24        Q.   When did you retire?

66

1    it was a hundred thousand, I don't know, whatever the
2    amount was.
3        Q.    But is it fair to say you wrote the
4    policy for the maximum that you could --
5        A.    Sure.
6        Q.    -- without having a physical required?
7        A.    Absolutely.
8        Q.    Do you have any reason to believe that
9    Ms. Veronesi would be rejected if she had a physical?
10       A.    No.  Did she have diabetes or anything
11   else?  I don't know.
12       Q.    I'll take you back to July 25, 2001.
13   Does that date have any significance to you?
14       A.    No.
15       Q.    If you take a look at the policy
16   application which has been marked Exhibit 1, does the
17   date July 25th have any significance to you?
18       A.    Yep, there it is.  That's the day,
19   that's the application, that's the date on the
20   application.
21       Q.    If that was the date on the
22   application, does that mean that's the date that you
23   would have met with Ms. Veronesi?
24       A.    Okay.  How much time do we have again?

67

1    Now you're talking about standard practices.
2    Applications are going to sit in my desk. How long?
3    Maybe a day, maybe two days, maybe three days, maybe
4    four days. I don't think it's going to stay there
5    longer than that. What do I do? Do I date
6    everything at the person's home? Often times I leave
7    it blank. Why? I'll date it the day I mail it. God
8    help me sometimes if they die in the interim, he
9    said. Did it happen often? Yeah, yeah.
10            Q.    You can recall an instance in which
11   you took an application and you held onto it for a
12   few days when you mailed and the applicant died in
13   the interim?
14            A.    No, nobody ever died. I was hoping
15   they wouldn't.
16            Q.    Well, I'll ask you this: Did you take
17   this application on July 25th, 2001?
18            A.    I don't know.
19            Q.    Do you have any --
20            A.    To be honest, honest, best of my
21   ability, I don't know, I don't remember.
22            Q.    Do you have any reason to believe that
23   you would have dated it a date differently than you
24   took the application?

1    Q.   When you say early morning, what do
2  you mean by that?
3    A.   Five, six, seven, eight a.m.
4    Q.   Did you ever meet anyone at those
5  times?
6    A.   Oh, yes. I go down there, I get Big
7  Dig guys.
8    Q.   Did you ever make calls to people's
9  homes at night?
10   A.   Oh, yeah, yes. You mean phone calls
11 or visits?
12   Q.   Visits?
13   A.   Oh, sure.
14   Q.   Was that common?
15   A.   Oh, yes.
16   Q.   Was that the majority of the
17 appointments you had?
18   A.   No. Most of the time I would try to
19 see them early in the afternoon. Why? Could we go
20 off the record for a second? All right, I'll tell
21 you. One eye is this way and the other eye, I have
22 trouble driving, and it's getting worse, and it was
23 bad then.
24   Q.   It's easier for you to drive in the

71

```
1    daylight?
2         A.    Yes.  What do they call it where they
3    are covering the eye?
4              MR. McCARTHY:  Glaucoma.
5         A.    Yes, I have that.  And there's another
6    thing.  There's a film over the eye.
7         Q.    Would you have had other calls on July
8    25th?
9         A.    Gee, I hope I would have.  It would
10   have been nice to have somewhere to go either before
11   or after this, but I don't remember.  I honestly
12   don't.
13        Q.    You stated earlier to the best of your
14   memory you met with Ms. Veronesi sometime in the
15   afternoon toward the evening; is that correct?
16        A.    I think, yeah, it would have been
17   within that time frame.
18        Q.    Do you recall if you went anywhere
19   after you met with --
20        A.    I'm hoping I did.  I don't remember.
21        Q.    You don't recall?
22        A.    No.
23        Q.    And you don't recall whether you met
24   anyone before then?
```

```
 1              A.    Yes.
 2              Q.    Now, if I could point you to questions
 3    one and two on that page?
 4              A.    Mm-hmm.
 5              Q.    It says, question number one says, You
 6    verbally advised me that you took Ms. Veronesi's
 7    application after 7 p.m. on July 25, 2001.
 8              A.    Right.
 9              Q.    Does that change your answer that you
10    gave earlier about what time you met with
11    Ms. Veronesi?
12              A.    Yeah, it does change the answer.
13              Q.    How is that?
14              A.    I'm not sure.  Now, they asked me
15    these questions, when was it, September 18, 2002.
16    I'm just out of the hospital.  I just had, you know,
17    stomach cancer, a month in chemo now.  If you think I
18    can actually remember, absolutely not.  Seven
19    o'clock, could have been five o'clock.  Was it the
20    25th?  I don't know.  And that's the best and the
21    honest answer, the most honest answer I can give you.
22              Q.    Is it your testimony that you took
23    this application at 7 p.m.?
24              A.    No, I don't know what time I took the
```

75

```
 1    application.
 2              Q.   When you stated earlier it was in the
 3    afternoon?
 4              A.   Yeah, I'm sure it was the afternoon,
 5    but what time exactly I don't know.
 6              Q.   Would you say that seven o'clock is in
 7    the afternoon?
 8              A.   That's night.
 9              Q.   So when you say you're sure it was in
10    the afternoon, how is it that you're sure it was in
11    the afternoon?
12              A.   I don't think I had anything to do
13    that day.  It would have been the afternoon.  What
14    time?  Anywhere, maybe five-ish.
15              Q.   Who didn't have anything to do that
16    day?
17              A.   I didn't.
18              Q.   You didn't?
19              A.   I don't think I did.  It was probably
20    a day like every other day.
21              Q.   Did it seem unusual at all to you that
22    Ms. Veronesi was at home at three o'clock in the
23    afternoon?
24              A.   Was she at home at three?
```

1   Q.   You don't remember?

2   A.   No. It's my handwriting, I think.
3   Yeah, it's my handwriting.

4   Q.   If I could point you to question
5   number one --

6   A.   Mm-hmm.

7   Q.   -- toward the bottom. It says, Were
8   the questions asked and were the answers recorded
9   exactly as the insured responded, and what is your
10  answer there?

11  A.   Yeah, I asked the questions, I have
12  recorded them as answered. You know something, I
13  didn't take out the application to look at it. I
14  didn't recognize that she had written this in her own
15  handwriting until I got your subpoena. I had to dig
16  through records and I found it.

17  Q.   What records did you look through?

18  A.   The application, the records -- oh,
19  all the applications I may have from people. When
20  they asked me this question here, yeah, I answered.
21  What am I going to do, tell them that I had the
22  applicants fill out the application in their own
23  handwriting? I could have said ask the questions,
24  let it go with that. I wasn't sure that I asked and

86

1  wrote it or she wrote it.
2      Q.  Was it typical that the applicants
3  would fill out the applications themselves?
4      A.  Absolutely.  I got lots of those.
5      Q.  How did you explain this application
6  to Ms. Veronesi?  We're going back to Exhibit 1
7  again.  How did you explain how to fill this out?
8      A.  Here, fill it out.  You know yourself
9  better than I do.  I would standardly say that to
10 everybody.
11     Q.  You didn't explain anything more
12 specifically than that?
13     A.  No.  The questions are, you got
14 diabetes, you can ask me what do I do then.  Then I
15 might tell you, maybe I would tell the applicant fill
16 it out, who's your doctor, what's the last time you
17 saw the doctors, have you been hospitalized, what's
18 the condition you were hospitalized for.  If somebody
19 doesn't have anything, they check off no, no, no.
20     Q.  Did Ms. Veronesi ask you any questions
21 about this application?
22     A.  God knows.  Who knows.
23     Q.  I'll direct your attention to question
24 14 on page two?