# United States District Court
# District of Massachusetts

WILLIAM PARZIALE,
      Plaintiff,

v.                      CIVIL ACTION NO. 04-11377-RBC[1]

AMERICAN HERITAGE LIFE
      INSURANCE COMPANY, A
      WHOLLY OWNED SUBSIDIARY
      OF THE ALLSTATE CORPORATION,
      Defendant.

## *MEMORANDUM AND ORDER*
## *ON PLAINTIFF WILLIAM PARZIALE'S*
## *MOTION FOR SUMMARY JUDGMENT*
## *(#20)*

COLLINGS, U.S.M.J.

### *I. Introduction*

In March of 2004, William Parziale (hereinafter "Parziale" or the

---

[1]    With the parties' consent this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. §636(c).

"Plaintiff") filed a civil action against The Allstate Corporation (hereinafter "Allstate") and American Heritage Life Insurance Company (hereinafter "AHLI" or the "Defendant"), a wholly owned subsidiary of Allstate, in the Massachusetts trial court.  As amended, the Plaintiff's complaint contains six counts alleging, respectively, breach of contract against AHLI and Allstate (Counts I and II), unfair and deceptive settlement practices against AHLI and Allstate in violation of Mass. Gen. L. c. 93A (Counts III and IV), and negligent infliction of emotional distress by both AHLI and Allstate (Counts V and VI).[2]  On June 17, 2004, AHLI and Allstate removed the case to federal court under 28 U.S.C. §§1441(a) and 1446 (#1), and filed an answer to the amended complaint (#5).[3]

Discovery was undertaken in the normal course and has been completed. On May 23, 2005, Parziale filed a motion for summary judgment (#20) along with a memorandum in support (#21) and a statement of material facts (#23). AHLI filed an opposition to the summary judgment motion on June 13, 2005 (#24), an affidavit in support of the opposition (#25) and a response to AHLI's statement of undisputed facts (#26).   The Plaintiff submitted a reply brief

---

[2]

A state court judge allowed a motion to amend the complaint in early April, 2004.

[3]

On January 27, 2005, the Court granted a motion to modify caption (#15) and ordered that Allstate be dropped as party to the litigation pursuant to Fed. R. Civ. P. 21, leaving AHLI as the sole defendant.

(#27) together with various exhibits and an affidavit (#28).  At this juncture the dispositive motion is poised for decision.

## II. The Facts

The facts as recited herein are culled from the amended complaint (#1), the Plaintiff's statement of material facts and exhibits attached thereto (#23), and the Defendant's response to the Plaintiff's statement of materials facts including the attached exhibits (#26).

Parziale is the named beneficiary of a $99,000 life insurance policy (hereinafter the "Policy") issued by AHLI to insure the life of Parziale's fiancee, the late Maryann Veronesi (hereinafter "Veronesi"). (#23, ¶1)[4] The exact date on which Veronesi completed the Policy application is uncertain, as is the date on which the Policy was "issued".  However, both parties agree that the Policy was effective as of July 25, 2001. (#23, ¶¶3, 4; #26, ¶1)

The parties dispute whether Robert Ehrlich (hereinafter "Ehrlich"), the independent insurance agent who solicited the Policy application, dated the Policy application on the precise day the application was mailed to the Defendant, and questions exist as to Ehrlich's recollection of when he dated the

---

[4]

Veronesi took out a disability insurance policy from the Defendant as well, but only the life insurance policy is at issue in this litigation.

Policy application.  (#23, ¶¶3, 4; #26, ¶3)  Ehrlich testified at his deposition

that applications would sometimes sit on his desk "[m]aybe a day, maybe two,

maybe three days, maybe four days" before he would mail the application to the

insurance company.  Moreover, Ehrlich frequently would date the application

himself on the day that he mailed it. (#26, Ex. 3 at p. 67)

It is also unclear to what extent Ehrlich explained any part of the Policy

application to Veronesi when she completed it, although Ehrlich apparently just

handed the application to Veronesi and asked her to fill it out.  (#23, ¶7; #26,

¶7)  It was Ehrlich's standard practice to have applicants fill out applications

themselves, although on occasion Ehrlich would do it.  (#23, ¶8; #26, ¶8)

The maximum policy coverage that the Defendant would grant an

applicant without a medical examination was $99,000. (#23, Ex. B)  The Policy

in question was issued without Veronesi undergoing a physical examination so

as to prevent denial of coverage and  minimize complications in the application

process.[5] (#23, Ex. B)

---

[5]

Ehrlich's deposition testimony reflects that it was his standard practice not to sell policies requiring
a physical examination based upon his negative experience in having done so on at least two occasions early
in his career as an insurance salesman.

Prior to completing the Policy application on or around July 25, 2001, Veronesi sought medical care from various medical professionals. (#26, ¶¶39, 40, 41)  Veronesi went to the emergency room at the Lahey Clinic on December 13, 2000, complaining of right flank pain, dizziness, cold sweats, and urinary frequency.  (#26, ¶39 and Ex. 7)  Dr. John McCarthy, the doctor treating Veronesi during her December 13th visit, indicated within his progress notes that the prognosis was "probable cystitis." (#26, ¶39 and Ex. 8)  On December 17, 2000, Veronesi went back to the emergency room at the Lahey Clinic, this time complaining of right flank pain and vomiting. (#26, ¶39 and Ex. 9)

Approximately six months later on June 15, 2001, Veronesi contacted or was referred to Dr. Pazirandeh at Lahey Clinic for "falling asleep at the wheel," although there is no record of any associated visit or follow-up, or any indication that Veronesi ever spoke with Dr. Pazirandeh directly. (#26, ¶40 and Ex. 11)

Complaining of fatigue, chest pain, swallowing difficulties, and regurgitation, Veronesi visited the office of Dr. Rothchild on July 12, 2001. (#26, ¶41 and Ex. 12)  During the visit, Veronesi consented to a blood test that included an HIV screening. (#26, ¶41 and Exs. 13, 14, 15)  The following day, July 13, 2001, Veronesi had an x-ray taken, with the results indicating "... (1)

5

no acute abnormality (2) slight AP window fullness, most likely a normal variant, prominent pulmonary artery. However, CT is recommended to exclude the possibility of adenopathy." (#26, ¶41 and Ex. 16)

In the late afternoon/early evening of July 25, 2001 - the same day the Policy became effective - Veronesi was admitted to the emergency room at Lahey Clinic, complaining of breathing difficulty and hoarseness. (#26, ¶43 and Ex. 18)  A CT scan of Veronesi's neck and chest performed on July 25, 2001 revealed the presence of a mediastinal mass. (#23, ¶30 and Exs. N, O)  Veronesi sought a second opinion from Massachusetts General Hospital on August 21, 2001, where her diagnosis was non-small cell lung cancer. (#23, Ex. R)

Veronesi was employed as a full-time office manager at a construction company and worked forty hours per week until February 26, 2002. (#23, ¶9)  On February 27, 2002, Veronesi was admitted to Lahey Clinic Medical Center, where the admitting diagnosis was pneumonia. (#23, ¶10 and Ex. D)  Veronesi died on March 4, 2002. (#23, Ex. F)

On that same day, March 4, 2002, the Plaintiff notified the Defendant by telephone of Veronesi's passing. (#23, ¶14)  On or about March 14, 2002, Parziale submitted a written Claimant's Statement in support of his claim under the Policy. (#26, ¶49 and Ex. 21)    Not all of the doctors who had treated

6

Veronesi during the past five years were listed on the Claimant's Statement (#26, ¶50 and Ex. 21) although it appears that Parziale had accompanied Veronesi to a number of medical appointments in 2000-2001. (#26, ¶50 and Exs. 9, 22, 23)

The Defendant was responsive to Parziale's inquiries during the course of the claim investigation with representatives speaking to him on the telephone several times. (#26, ¶51 and Ex. 17)  AHLI sent the Plaintiff a number of letters, i.e., on May 7, November 1, and December 4, 2002, to keep him updated on the status of his claim. (#26, ¶51 and Exs. 24, 25, 26)  In the May 7th letter, the Defendant requested that the Plaintiff obtain a medical record release from Veronesi's executrix to facilitate collection of Veronesi's full medical record and support the Defendant's evaluation of Parziale's claim. (#26, Ex. 24)

In the November 1, 2002 letter, AHLI stated there would be a delay in processing the Plaintiff's claim because the Defendant was not yet in receipt of Dr. Rothchild's medical records although a request had been mailed for them. (#26, Ex. 25)  Following a December 4, 2002 telephone conversation between the Plaintiff and a member of AHLI's claims department, the Defendant acknowledged in a letter of even date that the claim would remain in a "pending" status until AHLI was in receipt of all required medical records so as

to enable the Defendant to "... make a fair and informed decision." (#26, Ex. 26)   The Defendant wrote a letter dated December 10, 2002 to the executrix of Veronesi's estate, Karen Ouellette (hereinafter "Ouellette"), requesting an updated authorization for release of additional medical records. (#26, Ex. 27) It was not until after December 10, 2002 that the Defendant received Veronesi's complete medical records, including those of Dr. Rothchild. (#26, ¶51)

In letters dated March 7, 2003 to both the Plaintiff and Ouellette, the Defendant acknowledged receipt of the medical records that were "pivotal" in the adjudication of the claim for proceeds under the Policy. (#23, Exs. H, T) Specifically the Defendant stated that it had determined Veronesi had made "material misrepresentations" in her application by failing to respond "yes" to questions asking the applicant (1) whether she had been examined at a hospital or other medical facility within the last five years, and (2) whether she had been advised to have or contemplated having any diagnostic test, treatment, or surgery. (#23, Exs. H, T)   AHLI concluded that Veronesi's policy never would have been issued if it had been informed of Veronesi's complete medical history when she completed the application. (#23, Exs. H, T)   As a consequence, the Defendant declined payment of Parziale's claim, rescinded the policy, and agreed to refund all premium payments to Veronesi's estate. (#23, Exs. H, T)

8

The current suit ensued.

### III. The Summary Judgment Standard

Summary judgment purports "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 12 (1 Cir., 2003) (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1 Cir., 1990) (quoting Fed. R. Civ. P. 56 Advisory Committee's note)). The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003). After the moving party has met its burden, "the burden shifts to the summary judgment target [the non-moving party] to demonstrate that a trial-worthy issue exists." *Mulvihill,* 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1 Cir., 2000)).

When considering whether to grant summary judgment, the Court must determine whether:

> ...the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the Court must "scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." *Mulvihill,* 335 F.3d at 19 (citing *Morris v. Gov't Dev. Bank of Puerto Rico,* 27 F.3d 746, 748 (1 Cir., 1994)); *see also Podiatrist Ass'n, Inc.,* 332 F.3d at 13; *Pure Distributors, Inc. v. Baker,* 285 F.3d 150, 152 (1 Cir., 2002); *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 19 (1 Cir., 2002) (citing *Dynamic Image Techns., Inc. v. United States,* 221 F.3d 34, 39 (1 Cir., 2000)); *Kearney v. Town of Wareham,* 316 F.3d 18, 22 (1 Cir., 2002).

Despite this "notoriously liberal" standard, *Mulvihill,* 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat." *Kearney,* 316 F.3d at 22. A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Furthermore, a genuine issue of material fact cannot merely rest upon "spongy rhetoric" but rather requires substantive proof. *Mulvihill,* 335 F.3d at 19 (citing *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1

Cir., 1991), *cert. denied,* 504 U.S. 985 (1992) (explaining that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams")).  Thus, in deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22 (citing *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.),* 960 F.2d 200, 204 (1 Cir., 1992)*; Suarez,* 229 F.3d at 53 (citing *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1 Cir., 1995)). In circumstances where submitting the issue in dispute to the jury amounts to "nothing more than an invitation to speculate," summary judgment is appropriate.  *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 9 (1 Cir., 2000) (quoting *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 467-68 (1 Cir., 1996)).  In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22.

The focus at the summary judgment phase "'should be on the ultimate

issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact..'." *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430-31 (1 Cir., 2000)); *see also Leahy v. Raytheon Co.,* 315 F.3d 11, 16-17 (1 Cir., 2002); *Suarez,* 229 F.3d at 53. The party objecting to summary judgment may not merely rest upon the statements put forth in its own pleadings. *See Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 26 (1 Cir., 2002) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1 Cir., 1994) (a party objecting to summary judgment fails to put forth a genuine issue of material fact merely by filing an affidavit contradicting unambiguous answers contained in a prior deposition)). Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV.  Discussion

Parziale argues he is entitled to summary judgment because the factual

record does not enable AHLI to satisfy its statutory burden of proof that Veronesi's statements in the Policy application were wilfully false, fraudulent, or misleading, thereby precluding the Defendant from denying the Plaintiff's claim.  The Defendant on the other hand asserts that summary judgment is improper in light of genuine issues of material fact with respect to the veracity and wilfulness of Veronesi's responses to the questions in the Policy application.

 Additionally the Defendant argues that because the Plaintiff's exhibits were initially submitted without an affidavit to authenticate them under Fed. R. Civ. P. Rule 56, they should be stricken from the record and the Court foreclosed from considering  them in deciding the summary judgment motion.

### A.  Admissibility of Documents and Exhibits

Documents supporting or opposing summary judgment must be properly authenticated to be admissible at the summary judgment stage.  *Carmona v. Toledo*, 215 F.3d 124, 131 (1 Cir., 2000) (citing Fed. R. Civ. P. Rule 56(c), (e)). "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff*, 355 F. Supp.2d 578, 582 (D. Mass., 2005) (striking all exhibits submitted without affidavits that were not self-authenticating); *see also Great Northern Insurance Co. v. Paino Assoc.*, 364

F. Supp.2d 7, 25 (D. Mass., 2005) (quoting with approval *Robinson*, 355 F. Supp.2d at 582). "To be admissible [at the summary judgment stage], documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) ..." 10A Wright, Miller, & Kane, *Federal Practice and Procedure* §2722 (3d ed. 1998). Unless a document is self-authenticating under Fed. R. Evid. Rule 902[6], the usual practice is to ".... authenticate it through an affidavit of a witness who would be qualified to authenticate the exhibit at trial." *Robinson*, 355 F. Supp. 2d at 582.

As the Defendant points out, Parziale initially failed to authenticate any of the exhibits filed and relied upon in his motion for summary judgment. (#23)  Moreover, none of the proffered documents are self-authenticating under Rule 902, Fed. R. Evid.  While these observations may be correct, AHLI itself has submitted authenticated versions of many - but not all - of the same documents that the Plaintiff failed to authenticate.  Further, in apparent recognition of the validity of the Defendant's argument, Parziale submitted with

---

[6]

Rule 902 excludes the following documents from the normal requirements of extrinsic evidence of authenticity prior to admissibility: domestic public documents under seal, domestic public documents not under seal, foreign public documents, certified copies of public records, official publications, newspapers and periodicals, trade inscriptions, acknowledged documents, commercial paper and related documents, Congressional Acts, certified domestic records of regularly conducted activity, and certified foreign records of regularly conducted activity.

his reply brief an affidavit with various exhibits thereby providing the requisite authentication for those documents.  Consequently, the Court shall consider all of the now duly authenticated exhibits in ruling on the dispositive motion.

### B.  Substantive Merits of Summary Judgment Motion

Even assuming all the exhibits submitted by the Plaintiff are authenticated in compliance with Rule 56(c), genuine issues of material fact exist as to whether Veronesi wilfully made false, fraudulent, or misleading representations on the Policy application regarding (1) what her history of medical treatment in the previous five years was, and (2) whether she ever had been advised of or contemplated undergoing diagnostic tests, treatment, or surgery.   As a consequence, Parziale's motion for summary judgment shall be denied.

### i. Applicable Statutory Law

Although not directly discussed by the parties, this case raises a question with respect to which of two sections of Mass. Gen. L. c. 175 concerning statements and misrepresentations on insurance forms is applicable, §124[7] or

---

[7]

In relevant part, General Laws c. 175, § 124 provides:

> In any claim arising under a policy issued in the commonwealth by any life company, *without previous medical examination* ... the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from providing as a defense to such claim that said statements were *wilfully false, fraudulent, or misleading*. [emphasis

§186.[8]  The decision in *Robinson v. Prudential Ins. Co. of America*, 56 Mass. App.

Ct. 244, 776 N.E.2d 458 (2002) is particularly instructive.  In explaining the

underlying rationale for §124, the *Robinson* court noted that "[a]s seen from its

legislative history, the purpose of §124 is to impose a higher burden of proof on

an insurer when it contests a life insurance policy issued without a medical

examination than when it contests a life insurance policy issued after a medical

examination." *Robinson*, 56 Mass. App. Ct. at 246, 776 N.E.2d at 460 (citing

*Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 623, 682 N.E.2d 624 (1997));

*see also Torres v. Fidelity and Guaranty Life Ins. Co.*, 34 Mass. App. Ct. 376, 611

N.E.2d 733, 735 (1993)(noting legislative history behind statutory enactment,

legislative intent, and distinctions between §§124 and 186).  The *Robinson* court

clearly distinguished between the two statutory provisions based on whether the

policy was issued without a previous medical examination:

> [i]f there is an examination, §186 applies, and an

---

supplied]

[8]

General Laws c. 175, § 186 provides:

> No oral or written misrepresentation or warranty made in the negotiation
> of a policy of insurance by the insured or in his behalf shall be deemed
> material or defeat or avoid the policy or prevent its attaching *unless such
> misrepresentation or warranty is made with actual intent or deceive*, or unless
> the matter misrepresented or made a warranty increased cost of loss.
> [emphasis supplied]

> insurer need only show that the misrepresentation was made with an "actual intent to deceive" or that the misrepresentation "increased the risk of loss." If a policy is issued without a medical examination, the insurer must show that the "statements were wilfully false, fraudulent or misleading."

*Robinson*, 56 Mass. App. Ct. at 246, 776 N.E.2d at 460.

"Section 124, adopted fourteen years after the adoption of G. L. c. 175, §186, imposes a heavier burden on the insurer when it contests a life insurance policy issued without a medical examination." *Protective*, 425 Mass. at 623, 682 N.E.2d at 630 (citing *Torres*, 34 Mass. App. Ct. at 377-378, 611 N.E.2d 773). In light of the parties' agreement that issuance of the Policy was not contingent on Veronesi undergoing a medical examination, §124 is the statutory authority relevant to this case and the "intent to deceive" requirement under §186 does not apply. Thus, to contest the Policy successfully under §124, the Defendant is faced with a heightened burden of proof under which Veronesi's application statements must be proven to be "wilfully false, fraudulent, or misleading." Parziale argues that AHLI will be unable to satisfy this higher burden at trial based on the existing factual record, thereby justifying summary judgment in his favor as a matter of law.

*ii. The Breach of Contract Claim*

The Plaintiff makes much of a purported lack of evidence in the summary judgment record regarding whether Veronesi believed, or had reason to believe, that she had anything other than mononucleosis when she completed the Policy application. (#21, p. 6; #27, p. 6). However, the cases upon which the Plaintiff relies in advancing his argument concern interpretation of §186, not §124. Moreover, those decisions can best be seen as advocating against adjudication of the dispute at the summary judgment stage. *See Davidson v. Massachusetts Casualty Ins. Co.*, 325 Mass. 115, 116, 89 N.E.2d 201, 202 (1949) (The "intent to deceive" standard only applies to situations involving an alleged violation of §186)[9]; *Rappe v. Metropolitan Life Ins. Co.*, 322 Mass. 438, 440, 77 N.E.2d 641, 642 (1948) (In describing the burden of proof on the defendant insurer under §186, the Massachusetts Supreme Judicial Court stated "... the burden of proof was upon the defendant to establish its defense, and however clear it might be that a false representation was made, the defense could become complete only upon proof either that the representation was made 'with actual intent to deceive' or that the 'matter misrepresented increased

---

[9] *Davidson* also involved exceptions alleged by the defendant to a *jury verdict* in favor of the plaintiff, where the defendant failed to sustain the burden of the affirmative defenses under §186 *at trial*.

the risk of loss.'")[10].  The Massachusetts Appeals Court has concluded that, under §124, "... the question whether a defendant insurer has met its burden of proving the statements 'wilfully false, fraudulent, or misleading' is *not to be determined on summary judgment*." *Robinson*, 56 Mass. App. Ct. at 251, 776 N.E.2d at 464 (emphasis supplied).  Rather, this determination "... is a jury question." *Robinson*, 56 Mass. App. Ct. at 251, 776 N.E.2d at 464.  Generally speaking, "[i]n cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate." *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809, 575 N.E.2d 1107, 1110 (Mass. 1991)(citations omitted).  In such cases, "'[m]uch depends on the credibility of the witnesses testifying as to their own states of mind.  In these circumstances, the jury should be given an opportunity to observe the demeanor, during direct

---

[10]

The Court also observed that

> No doubt these somewhat complicated applications for life insurance are frequently filled out by a person other than the insured himself – possibly by an eager agent.  An incorrect statement does not necessarily indicate actual intent to deceive.  And it cannot be said as matter of law that a misrepresentation that an applicant has not, within five years, consulted or been treated by a hospital or a physician increased the risk of loss.  Quite the contrary might be true.  *It follows that the case was still a jury case.*

*Rappe*, 322 Mass. at 440, 77 N.E.2d at 642 (emphasis supplied).

and cross-examination, of the witnesses whose state of mind are at issue.'"[11]

*Flesner*, 410 Mass. at 809, 575 N.E.2d at 1110 (quoting *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5 Cir., 1970)).

Based on the foregoing, questions regarding the "wilfulness" of Veronesi's responses to the Policy application are matters properly reserved for the jury's consideration and are not amenable to being decided at the summary judgment stage. For example, a genuine issue of material fact exists as to whether Veronesi's response to Question 14, Part 2(a) on the Policy application was "wilfully false, fraudulent, or misleading." Veronesi responded in the negative to this part of the application, which asks "[h]as any person to be insured been examined or treated at a hospital or other medical facility (within the last 5 years) or are they currently under the care of a doctor?" (#23, Ex. I). However, Veronesi's medical records indicate that she visited various medical professionals at the Lahey Clinic on December 13 and 17, 2000, and July 12, 2001, where she complained of various conditions (#26, Ex. 7, 8, 9, and 12). The apparent contradiction between these three visits and Veronesi's negative response to Question 14, Part 2(a) presents a question of material fact as to

---

[11] A determination of Veronesi's intent when completing the policy application is complicated by the fact that she is no longer alive to testify as to her mental state at that time.

whether Veronesi's statements on the application regarding her prior treatment at medical facilities potentially were wilfully false or fraudulent.   Further, in light of the July 12, 2001 clinic visit just under two weeks before the July 25, 2001 clinic visit and completion of her Policy application,  it is not clear as a matter of law that Veronesi's representations on her application form were not intended to mislead AHLI as to the true nature of her health and to induce AHLI to approve the application.

In refuting the possibility that Veronesi's application responses were "wilfully false, fraudulent, or misleading," the Plaintiff asserts that Veronesi "... was in a quandary [about] having to decide what sort of 'non-medical information' [was] being sought ... and what information ... should be excluded" based on a "patently ambiguous" question.  Veronesi, according to Parziale, provided her responses "... based upon her understanding of the questions and her belief as to her state of health as it was at the time." (#27, pp. 4, 6).  In the Plaintiff's view these purportedly good-faith representations in the midst of confusion preclude the possibility that Veronesi's responses were "wilfully false, fraudulent, or misleading."  These contentions, of course, only underscore that genuine issues of fact remain to be determined by a jury.  It is not certain as a matter of law that the responses on the Policy application were

not "wilful" or deliberate under §124.  Whether they were is a question of fact properly reserved for the jury's consideration.

Similarly, a genuine issue of material fact exists as to the wilful character of Veronesi's response to Question 14, Part 2(b) of the Policy application. Veronesi also responded "no" to this question,  which asks "[h]as any person to be insured been advised to have or contemplate having any diagnostic test, treatment, or surgery?".  (#23, Ex. I)  However, Veronesi's medical records indicate, and both parties agree, that Veronesi was advised to undergo and consented to various tests as a result of the July 12, 2002 Lahey Clinic visit, including a chest x-ray and blood tests.  Veronesi also underwent an HIV screening test. (#26, Ex. 14)  On their face, these prior tests appear to contradict the assertion that Veronesi had never been advised of the need to have a diagnostic test.

A question of material fact also arises as to Veronesi's possible knowledge of the need for a CT scan during her medical treatment prior to completion of the Policy application.  In a September 29, 2004 letter,  Dr. Rothchild - Veronesi's attending doctor during Veronesi's July 12, 2001 visit to the Lahey Clinic - noted the following:

[Veronesi] had been seen by myself and my resident,

22

Vincent Biello, on July 12, 2001. I was able to find an order for a thoracic CT scan written by Dr. Biello. This was presumably prior to the emergency room visit, but unfortunately the order was undated. I presume that Dr. Biello had spoken with her about her need for a CT scan, but I have no documentation of this. The likelihood is that she was aware that she needed a CT scan, and aware that there was a

> diagnosis of adenopathy in the chest. I myself did not
> speak with her regarding a possible diagnosis, other
> than discussing a possible infection on July 12, 2001.

Statement of Material Facts #23, Ex. O.

The Plaintiff argues that Dr. Rothchild's records fail to indicate a specific date

on which the thoracic CT scan was ordered, and that Dr. Rothchild "presumes"

a conversation occurred between the resident Dr. Biello and Veronesi regarding

the CT scan. Despite a lack of dated, documentary evidence that Veronesi was

explicitly told to undergo a CT scan, however, the possibility of Veronesi having

been advised of the need for this diagnostic test is echoed in the discharge

summary written by Dr. Christine Williamson, who had performed various

investigatory procedures on Veronesi just five days after her July 25, 2001

emergency room visit. In describing Veronesi's medical history, Dr. Willamson

noted:

> ... [Veronesi] had a chest x-ray ordered by her primary
> care physician last week, which would be mid July of
> this year, which showed some question of adenopathy
> in the chest, and in the emergency room on July 25,
> 2001, *she was planning to have a CT scan of the chest to
> investigate this.* [emphasis supplied]

Defendant American Heritage Life Insurance Company's Response #26, Ex. 10.

It is unclear based on the existing factual record whether Dr. Williamson's

opinion regarding Veronesi's planned CT scan was based on a direct conversation she had with Veronesi, or perhaps was instead Dr. Williamson's independent review of Veronesi's medical record and history.   It is also uncertain whether Dr. Williamson's statements potentially reflect Veronesi's "plans" as of July 25, 2001, or as of a prior undetermined date.   In short, medical documents and notes by various medical professionals attending to Veronesi prior to her completion of the Policy application raise a genuine issue of material fact as to whether she was advised of, completed, or contemplated having diagnostic tests, thereby calling into question the validity or possible fraudulent character of her response to Question 14, Part 2(b).

### iii. The 93A Claim

Although Parziale requests "fees and costs associated to (sic) bringing this action as well as treble damages, pursuant to M.G.L. c. 93A" (#20 at p. 2) in the text of his motion for summary judgment, the Plaintiff makes no mention at all of the chapter 93A claim in his supporting memorandum.   In these circumstances it will be assumed that the entry of judgment as a matter of law is sought, although the discussion concerning this claim shall be brief.

Parziale contends that he is entitled to multiple damages for unfair and

deceptive settlement practices under Mass. Gen. L. c. 93A.[12]    Specifically it is

alleged that AHLI made "no reasonable offer of settlement" following receipt of

a requisite 93A demand letter dated June 10, 2003 despite having "ample

evidence" within its own case file that, as of April 26, 2002, the Plaintiff's claim

should be paid.  However, it is a genuine issue of material fact whether AHLI

was "reasonably clear" as to its liability regarding the Plaintiff's claim.

To succeed on a claim that an insurance company violated Mass. Gen. L.

c. 176D – and in turn c. 93A – a plaintiff:

> must prove that the company 'failed to effectuate [a]
> prompt, fair and equitable settlement of [a] claim [ ] in
> which liability has become reasonably clear.'  Mass.
> Gen. L. c. 176D, §3(9)(f).  In order to determine
> whether a defendant's liability is 'reasonably clear,' one
> must employ an objective test which 'calls upon the
> fact finder to determine whether a reasonable person,
> with knowledge of the relevant facts and law, would
> probably have concluded, for good reason, that the
> insurer was liable to the plaintiff.'  *Demeo v. State Farm
> Mut. Auto. Ins. Co.*, 649 N.E.2d 803, 804 (Mass. App.

---

[12]

   Massachusetts General Laws chapter 93A, §2(a) states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Massachusetts General Law chapter 176D, §3 prohibits "unfair and deceptive acts or practices in the business of insurance," including, in subsection (9)(f), the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."  The Supreme Judicial Court has stated that "'the former statute incorporates the latter, and [accordingly] an insurer that has violated G.L. c.176D, § 3(9)(f), by failing to "effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," by definition, has violated the prohibition in G.L. c. 93A, § 2, against the commission of unfair or deceptive acts or practices.'" *Bobick v. U.S. Fidelity and Guaranty Co.*, 439 Mass. 652, 659, 790 N.E.12d 653, 658 (2003) (quoting *Hopkins v. Liberty Mutual Ins. Co.*, 750 N.E.2d 943 (2001)).

> Ct. 1995).  However, if a reasonable person would
> conclude that the chances were approximately equal
> that the defendant would be found not liable, liability
> is not reasonably clear.  *Demeo*, 649 N.E.2d at 805.

*Hochen v. Bobst Group*, 198 F.R.D. 11, 17 (D. Mass., 2000), *aff'd sub nom Nyer v. Winterthur Intern.*, 290 F.3d 11 (1 Cir., 2002).

"'[L]iability under c. 176D and c. 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy' ... A plausible, reasoned legal position that may ultimately turn out to be mistaken - or simply ... unsuccessful - is outside the scope of punitive aspects of the combined application of c. 93A and c. 176D." *M. Dematteo Const. Co. v. Century Indemnity Co.*, 182 F. Supp.2d 146, 164 (D. Mass., 2001) (quoting *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343, 631 N.E.2d 75 (1994)(further citations omitted)).

The factual record includes no definitive evidence that AHLI's denial of the Plaintiff's claim resulted from bad faith or unfair settlement practices as defined under c. 176D or c. 93A.  The correspondence and contacts between the parties reveals that  Parziale telephoned AHLI on the date of Veronesi's death - March 4, 2002 - to notify the insurer that she had passed away.  Shortly thereafter, the Plaintiff submitted a written claim for the proceeds of the policy

on or about March 14, 2002. In April of 2002, Veronesi's executrix provided AHLI with the required authorization for release of some of Veronesi's medical records to facilitate the processing of the Plaintiff's claim. Following at least one telephone conversation between Parziale and a member of AHLI's Individual Claims Department, the Plaintiff received a May 7, 2002 letter from AHLI requesting a signed authorization from the executrix for the release of additional medical records, without which the Defendant purportedly could not make an informed decision regarding the claim.[13]

A letter dated November 1, 2002 from AHLI to the Plaintiff indicates that AHLI was not yet in receipt of certain medical records, resulting in further delay in the processing of the Plaintiff's claim. A December 4, 2002 telephone conversation in which Parziale apparently inquired with respect to the status of his claim resulted in another letter from AHLI to the Plaintiff dated that the same day in which AHLI stated it was awaiting additional medical records so that a "fair and informed decision" could be made on the claim. In the December 4, 2002 letter, AHLI also advised the Plaintiff that his claim would remain in a "pending" status until AHLI had received the requisite records. On

---

[13] Specifically AHLI requested medical records from Veronesi's July 2002 emergency room treatment.

28

December 10, 2002, AHLI sent a letter to the executrix of Veronesi's estate asking for her assistance in obtaining the medical records, informing her of the expiration of the prior April 2002 release authorization, and requesting a updated authorization. In this letter, the AHLI representative enclosed a return envelope and provided additional claim-related information to aid the executrix in obtaining the release.

In a March 7, 2003 letter to the executrix, AHLI noted receipt of the additional sought-after medical records which AHLI considered "pivotal in adjudication of the claim ..." The March 7, 2003 letter further outlined the reasons underlying AHLI's decision to rescind the Policy and deny the Plaintiff's claims, including the alleged misrepresentations on the Policy application under Question #14, Part 2, and AHLI's determination that the Policy would never have been issued to Veronesi if Veronesi had disclosed the additional medical information when completing the application. The Plaintiff served a 93A demand letter on AHLI on June 10, 2003.

The delay in resolving Parziale's claim revolved around the apparent difficulties in obtaining the requested medical documents. AHLI does not appear to have "stonewalled" the Plaintiff in light of the written and telephone correspondence between the parties. AHLI's internal notes in the claim file are

equally unavailing to support the Plaintiff's argument of unfair settlement practices. The provided notes are apparently incomplete, and reflect internal deliberations regarding the validity of the claim and AHLI's requests for additional medical documents to evaluate the claim adequately. Although the last entry in the handwritten notes apparently includes the text " ... I believe we should pay this ....", the rest of the note is not provided to the Court, other handwritten entries reflect hesitation and the need for "reconsideration" of the claim. It is not clear there are not other entries unavailable to the Court which would shed light on the Defendant's internal decisionmaking process leading to rejection of the Plaintiff's claim. The Defendant's internal claim notes fail to indicate conclusively that AHLI's ultimate decision to reject the claim occurred after a prior determination by AHLI of definitive liability.

In sum, the factual record does not compel the conclusion that AHLI's liability was reasonably clear prior to receipt of the requested medical documents or that the delay in processing the claim amounted to unfair and deceptive settlement practices under c. 93A or c. 176D. Consequently, summary judgment as to the Plaintiff's 93A claim is improper.

*vii.  Negligent Infliction of Emotional Distress Claim*

Parziale seeks damages for negligent infliction of emotional distress. However, no mention of the emotional distress claim is made in the summary judgment motion and so the entry of judgment as a matter of law is unwarranted.[14]

### V. Conclusion

For the reasons stated, it is ORDERED that Plaintiff William Parziale's Motion For Summary Judgment(#20) be, and the same hereby is, DENIED.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 30, 2006.

---

[14]

The Defendant notes that the only purported symptom of the Plaintiff's emotional distress was "disbelief" that his claim was denied.  Further, there is nothing in the factual record to indicate the Plaintiff received any treatment for alleged emotional distress.

31