LEXSEE 1996 US DIST LEXIS 14942

**JOEL Z. EIGERMAN, Plaintiff, v. MT. AIRY INSURANCE COMPANY, Defendant.**

**Civ. Action No. 95-11303-NG**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1996 U.S. Dist. LEXIS 14942*

**August 30, 1996, Decided**

**PRIOR HISTORY:** [*1] 95-1795-E.

**DISPOSITION:** Summary judgment ALLOWED in favor of the PLAINTIFF as to COUNT I. Summary judgment ALLOWED in favor of the DEFENDANT as to COUNT II.

**COUNSEL:** For JOEL Z. EIGERMAN, Plaintiff: Walter H. Mayo, III, Casner & Edwards, Boston, MA.

For MT. AIRY INSURANCE COMPANY, Defendant: Jeffrey A. Goldwater, Robert A. Chaney, Bollinger, Ruberry & Garvey, Chicago, IL. Mark P. Harty, Scott D. Burke, Morrison, Mahoney & Miller, Boston, MA.

**JUDGES:** NANCY GERTNER, U.S.D.J.

**OPINIONBY:** NANCY GERTNER

**OPINION:**

**MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

August 30, 1996

**I. INTRODUCTION**

Plaintiff Joel Eigerman entered into the practice of law in a partnership with Jonathan Atwood in early 1993. Slightly over a year later, the partnership was dissolved, amid allegations and evidence of wrongdoing on the part of Mr. Atwood. n1

> n1 As a result of activities undertaken during his law practice, Atwood has been the target of federal criminal prosecution and disciplinary action. Following proceedings before the Massachusetts Board of Bar Overseers, Atwood was disbarred by order of the Massachusetts Supreme Judicial Court dated September 9, 1994.

On December 21, 1994, Atwood was indicted by a federal grand jury. Among the offenses charged in the indictment was the theft of the deposit check at issue here. Atwood pled guilty to federal charges on September 27, 1995 and was sentenced on December 1, 1995.

[*2]
Mr. Eigerman was left to pick up financial pieces of this brief association, including losses suffered by the partnership as a result of Atwood's misappropriation of a buyer's $54,000 deposit in anticipation of purchasing real estate from Atwood's clients. Eigerman asked the partnership's insurance carrier, defendant Mt. Airy Insurance Company, to cover the losses due to Atwood's theft of the deposit check. The insurance company refused, claiming the benefit of certain provisions in Atwood & Eigerman's policy.

The instant litigation ensued.

Plaintiff Eigerman claims that Mt. Airy's disclaimer of coverage amounts to a breach of contract (Count I) and an unfair business practice, in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A & 176D (Count II).

Defendant Mt. Airy argues the contrary, asserting that the relevant policy excludes losses which are the result of precisely the sort of conduct in question in this case.

Before this Court are cross-motions for summary judgment. The parties agree that the issues presented are issues of law to be resolved in the context of these motions.

For the reasons set forth below, **I ALLOW** summary judgment in favor of [*3] the **PLAINTIFF** as to **COUNT I** and **ALLOW** summary judgment in favor of the **DEFENDANT** as to **COUNT II**.

**II. BACKGROUND**

The partnership of Eigerman & Atwood began in or

about early 1993 and was dissolved in late March of 1994. Initially, the partnership purchased a lawyer's professional liability policy from Mt. Airy Insurance Company on or about March 15, 1993. The named insured on the policy was Atwood & Eigerman. The policy was renewed on March 15, 1994 and was in full force at all times relevant to this litigation.

In February of 1994, Atwood undertook representation of certain owners of commercial property in Massachusetts, assisting them in negotiating and executing a purchase and sale agreement for the sale of their property. Under the agreement, the potential purchaser was to put down a deposit of $60,000. The deposit was to be held in escrow by the broker assisting in the transaction. In actuality, the broker held $6,000 in escrow, and the buyer wrote a check out to his attorney for the remainder, $54,000, also to be held in escrow. Under the agreement, the escrowed funds belonged to the buyer until and unless the real estate deal was fully [*4] executed.

On March 17, 1994, Atwood's wrongdoing began. Without the knowledge of his client, Atwood agreed to hold the potential buyer's check of $54,000 in escrow. The check was never deposited into any partnership account. Instead, Atwood took the money and deposited it directly into his personal checking account, diverting the full $54,000 for his personal use.

The path the check took into Atwood's hands bears notice. The buyer's attorney originally had suggested that Atwood hold the deposit, despite the fact that under the purchase and sale agreement the broker was to hold the funds. For some reason, the buyer's attorney determined that it would be imprudent for the broker to serve as custodian of the full deposit. Initially, Atwood declined the request to serve as escrow agent. However, on March 17, 1994, Atwood changed his mind. He specifically requested the check, explaining that his clients were becoming "antsy" about the deal. The buyer's attorney endorsed her client's check, made out to her, over to Atwood.

Notwithstanding Atwood's representation about his client's state of mind, Atwood's clients were neither informed about the deposit nor even consulted about whether [*5] Atwood should serve as the escrow agent.

On or about April 13, 1994, after allegations of misconduct had surfaced and in the course of dissolving the partnership, Eigerman discovered the existence of the deposit check and Atwood's diversion of it. Eigerman immediately informed his insurance agent and Mt. Airy that he would be liable to make up the $54,000 sum, and that he would look to Mr. Airy to make him whole.

On June 1, 1994, the purchase and sale agreement lapsed. Having extended the agreement before, Atwood's clients decided not to pursue the deal. The buyer's attorney requested that Eigerman return her client's funds. Eigerman approached his insurer. Mt. Airy initially did not respond. In order to satisfy his obligations to the buyer, Eigerman took out a loan, secured by a second mortgage on his home. He paid the amount owed out of his personal funds. On September 20, 1994, Eigerman's counsel made a demand for coverage under M.G.L. c. 93A and c. 176D. On October 18, 1994, the defendant denied coverage.

III. DISCUSSION

Massachusetts law governs the court's inquiry in this case. See *High Voltage Engineering Corp. v. Federal Ins. Co., 981 F.2d 596, 600 (1st Cir.* [*6] *1992).*

The insurance policy Mt. Airy provided to Atwood & Eigerman generally promises the law firm coverage for losses to the partnership resulting from "any act, error, omission or personal injury arising out of professional services rendered or which should have been rendered by the Insured or by any person for whose acts, errors, omissions or personal injuries the Insured is legally liable..." Lawyers Professional Liability Insurance Policy, at I.

Coverage, however, is modified by a number of provisions which carve out circumstances under which the insured's losses are disclaimed under the policy.

There is no dispute that Atwood's misappropriation of $54,000 falls within the general promise of coverage. See *GRE Ins. Group v. Metropolitan Boston Housing Partnership, Inc., 61 F.3d 79, 81 (1st Cir. 1995).* n2 It is the scope, intersection and — ultimately — applicability of the exclusions that are disputed. Under state law, the insurer bears the burden of proving that any exclusion applies and that its denial of coverage is warranted. Id.; see also *Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 321, 568 N.E.2d 631 (1991).*

> n2 The plaintiff bears the initial burden of proving that his or her claim falls under the general provision of coverage. There is no dispute that the plaintiff's burden has been satisfied in this case. *GRE Ins. Group, 61 F.3d at 81.*

[*7]

### A. Breach of Contract

### 1. Principles of Interpretation

It is well settled that disputed terms in insurance policies present questions of law susceptible to resolution on summary judgment. *High Voltage Engineering, 981 F.2d at 598;* see *Alan Corp. v. International Surplus Lines Ins. Co., 823 F. Supp. 33, 38 (D. Mass. 1993),* aff'd, *22 F.3d*

*339 (1st Cir. 1994); Jefferson Ins. Co. of New York v. City of Holyoke, 23 Mass. App. Ct. 472, 474, 503 N.E.2d 474,* rev. denied, *399 Mass. 1104, 506 N.E.2d 146 (1987).*

The rules governing a court's consideration of terms in insurance policies are no different from the rules governing contract interpretation generally. *Cardin v. Royal Life Ins. Co. of America, 394 Mass. 450, 453, 476 N.E.2d 200 (1985); Commerce Ins. Co. v. Koch, 25 Mass. App. Ct. 383, 384, 522 N.E.2d 979 (1988).* Massachusetts law, "the first approach ... must be ... to inquire what the simplified, conversational language of the policy would mean to a reader applying normal reasoning or analysis." *Commerce Ins., 25 Mass. App. Ct. at 384;* see also *GRE Ins. Group, 61 F.3d at 81.* Where a policy's provisions are "plainly and definitely expressed [*8] in appropriate language," they "'must be enforced in accordance with [their] terms.'" *High Voltage Engineering Co., 981 F.2d at 600,* quoting *Stankus v. New York Life Ins. Co., 312 Mass. 366, 369, 44 N.E.2d 687 (1942).* n3

> n3 The notion of context is not unimportant. As a Massachusetts court has noted, "Words that are clear and unambiguous, by themselves, may be ambiguous when read in the context of the entire insurance contract, or as applied to the subject matter." *Jefferson Ins. Co., 23 Mass. App. Ct. at 475.*

However, where a policy is determined to have ambiguous terms — including terms which might appear clear but, when read together, create ambiguity — the ambiguity may not redound to the benefit of the insurer. n4 It is well settled that "doubts as to the intended meaning of the words must be resolved against the insurer and in favor of the insured." *High Voltage Engineering Corp., 981 F.2d at 600* (citations omitted).

> n4 "An ambiguity exists...when the language contained therein is susceptible of more than one meaning. It must be shown that reasonably intelligent persons would differ as to which one of two or more meanings is a proper one." *Jefferson Ins. Co., 23 Mass. App. Ct. at 474 – 475* (citations omitted).

[*9]

This interpretive rule is given particular force where an insurer seeks to exclude specific conduct from its general promise of coverage. Such exclusions are subject to strict construction, with any ambiguity resolved in favor of the insured. n5 *Andover Newton Theological School, Inc. v. Continental Casualty Co., 930 F.2d 89, 93 (1st Cir. 1991)* (citations omitted); see also *High Voltage, 981 F.2d at 600.*

> n5 "Insurers are required to express exclusions clearly, specifically, and unequivocally." *KDT Industries, Inc. v. Home Ins. Co., 603 F. Supp. 861, 867 (D. Mass. 1985);* see also *Duggan v. Travelers Indemnity Co., 383 F.2d 871, 876 (1st Cir. 1967).*

Simply put, the cornerstone of a court's inquiry is "'what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" *GRE Ins. Group, 61 F.3d at 81* (quoting *Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 849, 616 N.E.2d 68 (1993).*

With these general principles in mind, I address [*10] the arguments of the parties.

**2. The Policy Exclusions**

The defendant relies on either of two policy exclusions for its denial of coverage. The provisions state that the policy does not apply to:

> (K) any claim arising out of conversion, misappropriation or improper commingling of client funds;
>
> (L) any claim arising out of any Insured's gaining in fact any personal profit or advantage to which any Insured was not legally entitled. n6

> n6 The plaintiff's complaint and supporting memoranda all assert that this provision applies as follows, to "any claim arising out of *the* Insured's gaining in fact any personal profit or advantage to which *the* Insured was not legally entitled." In fact, the italicized language was replaced by an endorsement with the "any" Insured language. The plaintiff does not effectively argue against the force of the endorsement. Accordingly, for the purposes of this summary judgment decision, my analysis assumes the vitality of the endorsement language.

The [*11] plaintiff denies that either of these provisions applies. He draws the court's attention to a third exclusion, Exclusion (A), which states that the insurance policy does not apply to:

> (A) any claim that results in final adjudication against any Insured that an Insured has committed any criminal, dishonest, fraudulent or malicious acts, errors, omissions or personal injuries.

... This Exclusion does not apply to any Insured who is not so adjudged to have committed such act error, omission or personal injury. This policy shall then pay only in excess of the deductible and in excess of the full extent of the available capital and assets of any Insured who was so adjudged to have committed such act error, omission or personal injury. Any personal assets of such Insured recovered by the Named Insured shall inure, to the extent of the amount paid by this policy, to the benefit of the Company [emphasis added].

I shall consider the applicability of each provision relied upon by Mt. Airy in turn.

### a. The "Client Funds" Exclusion

Defendant argues that its denial of Eigerman's claim is appropriate under Exclusion K to the policy, which provides that Mt. [*12] Airy will decline to cover claims resulting from the "conversion, misappropriation or improper commingling of client funds." The defendant makes a simple argument: Atwood took the $54,000 on behalf of his client. The funds were therefore "client funds," which he afterwards misappropriated and converted to his personal use.

Against this reading, the plaintiff contends that the money involved cannot be characterized as "client funds," as the term is ordinarily used in the legal profession. First, Eigerman argues that the funds were not the client's by right, since the client was the *seller*, and the funds in question were held in escrow and returnable on demand by the *buyer*. Second, he contends that the mere fact that the attorney held the funds no way transforms their character.

I begin by examining the ordinary meaning of "client funds," as the term is used in the legal profession.

The phrase regularly appears in Massachusetts cases discussing the state's disciplinary rules governing the attorneys' conduct. n7 E.g., *Matter of Tobin, Sr., 417 Mass. 81, 88 n.7, 628 N.E.2d 1268 (1993); Matter of Luongo, 416 Mass. 308, 312, 621 N.E.2d 681 (1993); Matter of Garabedian,* [*13] *415 Mass. 77, 81, 612 N.E.2d 1133 (1993); Matter of Carrigan, 414 Mass. 368, 372, 609 N.E.2d 442 (1993); Matter of Driscoll, 410 Mass. 695, 575 N.E.2d 46 (1991).* As Massachusetts courts use the term, it ordinarily refers to "funds of clients paid to a lawyer or law firm," as defined in Disciplinary Rule 9-102(A). n8 Whether the term could have broader meaning — extending to any funds at all related to the representation of a client n9 — is, at best, an open question. This ambiguity cannot redound to the benefit of the insurer.

n7 Massachusetts' disciplinary rules spell out in some detail the way the funds belonging to clients and paid over to attorneys should be treated: Attorneys are required to preserve the identity of such funds, Mass. S.J.C. Rule 3:07; Canon 9, DR 9-102(A), as appearing in *382 Mass. 795 (1981),* to segregate the funds into identifiable bank accounts, *Rules of the Supreme Judicial Court, 382 Mass. 698, 795 (1981),* DR 9-102(A), and to notify clients of receipt of their funds, among other things. *Id. at 796,* DR-102(B)(1).

n8 In *Driscoll, 410 Mass. at 695 - 696,* for instance, the SJC examined an attorney's misappropriation and commingling of client funds, where the funds so labeled were in the attorney's custody in connection with various real estate transactions. The court did not question the appropriateness of the funds' designation as "client funds." In each instance, the funds actually belonged to the client when they were deposited into the "client funds" accounts. For instance, in one case, the clients were sellers who deposited the proceeds of the sale with the attorney so that he could disburse the funds; in two other cases, the clients were buyers and the funds represented their deposits on real estate they intended to purchase. Id.

[*14]

n9 Cf. *In re Confidential, 664 A.2d 364, 366 - 367 (D.C. 1995).*

The defendant nonetheless argues that two factual points put the funds in question within the meaning of "client funds": First, Mt. Airy contends that since the provision declines to use the possessive, referring to "client funds" instead of "clients' funds," the meaning of the phrase should be broader and include any funds held by an attorney in connection with the representation of a client; n10 second, the insurer argues that since the funds were "intended for release to his client upon completion of the transaction," they were to become his client's funds and therefore should be treated as "client funds" within the ordinary meaning of that term.

n10 Defendant broadly asserts that the "exclusion has no limitation based on in what capacity the funds were held..." Defendant's Memorandum in Support of Summary Judgment at 3 n. 3. The defendant misses the point: if the term itself is defined and limited by its ordinary use in the legal profession, the exclusion provision, unless it expressly indicates a broader reading, is bound by the

limits of ordinary usage.

[*15]

The first argument merits little attention: As a practical matter, Massachusetts courts use the term "client funds" and "clients' funds" interchangeably. See, e.g., *Garabedian, 415 Mass. at 81; Matter of Elias, 418 Mass. 723, 725, 640 N.E.2d 776 (1994)*.

As to the second point, the legal status of the funds supports the plaintiff's argument — not the defendant's. "An escrow is created when one party to a transaction delivers a sum to a third party, the escrow agent, for him or her to hold until the performance of a condition and then to deliver to the other party of the transaction." *Frontier Enterprises, Inc. v. Anchor Co. of Marblehead, Inc., 404 Mass. 506, 510, 536 N.E.2d 352 (1989)*. Hence, the character of the funds determines the duties of the escrow agent.

Where the escrow agent holding a buyer's deposit is the seller's attorney, the obligations of that attorney, qua escrow agent, exist independently of obligations to his or her client, since the client-seller merely has a contingent interest in the escrowed funds. Accord *Frontier Enterprises, 404 Mass. at 511*. n11 That is, when serving as an escrow holder of funds that do not belong to his or her [*16] client but to a third party, the attorney's treatment of the funds is governed by the terms of the escrow agreement and his obligations to the non-client. *Id. at 512;* see also, e.g., *Matter of Discipline of Two Attorneys, 421 Mass. 619, 627 - 628, 660 N.E.2d 1093 (1996);* n12 *General Exchange Ins. Corp. v. Driscoll, 315 Mass. 360, 365, 52 N.E.2d 970 (1944);* cf. *Blue Cross of Massachusetts, Inc. v. Travaline, 398 Mass. 582, 589 - 590, 499 N.E.2d 1195 (1986)*.

n11 In Frontier Enterprises, the SJC acknowledged that where an attorney holds funds for a seller and the seller's interest in the funds are "conditioned upon the performance of some act or other happening of some event," *Frontier Enterprises, Inc., 404 Mass. at 510,* the attorney acts as an escrow agent — not as the seller's attorney — with independent obligations to the non-client-buyer. In that case, "because the attorney held the funds unconditionally," id., the SJC found that the attorney was acting in his capacity as the seller's attorney.

n12 The Matter of Two Attorneys case is instructive. There, the SJC considered the disciplinary action brought against two attorneys who had represented both the purchaser of real estate and the judgment creditor of the seller. At the real estate closing, the attorneys agreed to serve as escrow holders, recording necessary documents and dispensing the net proceeds to the non-client-seller. However, instead of simply paying over the funds, the attorneys used the opportunity to advance the interests of the judgment creditor, paying him from the sale proceeds before giving the money to the seller. The question for the Court, among other things, was whether this conduct violated the state disciplinary rules insofar as it was "prejudicial to the administration of justice." See DR-1-102(A)(5). The Court concluded that the attorneys' conduct as escrow holders did not violate the rule, although it was a breach of their fiduciary duties to the non-client-seller. The SJC noted: "The facts of a particular situation will be important in deciding the nature of an escrow holder's duties to the parties to the escrow." *Matter of Two Attorneys, 421 Mass. at 627*. However, where "the attorneys' breach of duty as escrow holder...caused no harm to any client," id., the Court, as to this point, did not find a breach of the disciplinary rules governing the attorneys' obligations qua attorneys, to their clients.

[*17]

In this case, Atwood's obligations as escrow agent were to the non-client, potential purchasers of his clients' real estate. Moreover, since the funds did not belong to his clients and his clients never directed him to take control of them, it would stretch the meaning of the term "client funds," at the very least as it is used in the case law, to so characterize the escrowed funds in Atwood's possession.

I decline to reach that far, particularly when the issue before me is the interpretation of a disputed term of an insurance policy. Accordingly, I find that Mt. Airy's reliance on Exclusion (K) was unwarranted.

**b. Exclusion (L): No Coverage for Misconduct Resulting in Gain**

Mt. Airy also based its decision on Exclusion (L) of the insurance policy, which excludes from coverage "any claim arising out of any Insured's gaining in fact any personal profit or advantage to which any Insured was not legally entitled." See Policy, 1Y Endorsement, Exclusions (L). It is undisputed that Atwood, a partner of Atwood & Eigerman, engaged in misconduct during the course of his representation of clients, that he — and he alone — profited from his misconduct and that he was not "legally [*18] entitled" to the benefit as that term is understood in Exclusion (L). Defendant argues that these bare facts permit its reliance on Exclusion (L) to deny coverage to Eigerman.

Plaintiff disagrees, contending that there is more than

one way of reading Exclusion (L), particularly in the context of the insurance policy as a whole. Specifically, he contends that Exclusion (A) contradicts Exclusion (L), leaving an insured unclear about Exclusion (L)'s scope, a confusion, again, that must be resolved against the insurer. Therefore, Eigerman argues, Exclusion (L) may not be enforced.

For the reasons detailed below, I agree with the plaintiff that the drafters of this insurance policy created confusion with respect to the relevant scope of Exclusion (L). They therefore cannot take advantage of Exclusion (L) and leave the innocent insured, Eigerman, unprotected in terms of the losses he has suffered due to Atwood's adjudicated wrongdoing.

### (1) Application of Exclusions (L)

In the first instance, it is not entirely clear that Exclusion (L) applies. I turn to the meaning of the term "any Insured." The policy defines "Insured," in relevant part, as:

> (A) the Named Insured as [*19] stated in the Declarations and any predecessor firm thereof;
>
> (B) any lawyer ... who was or is a partner ... of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured or any predecessor firm thereof...

Atwood is not a named insured. The policy was taken out in the name of the partnership, Atwood & Eigerman. n13 Any determination that Atwood is an "Insured" must therefore meet the standards set out in section (B). n14 Under that section, Atwood is considered an Insured only with respect to "professional services rendered on behalf of the Named Insured."

> n13 The defendant in its papers refers to the policy held by "Atwood and Eigerman," as though the named insureds were Atwood and Eigerman as individuals. That is not the case. The policy was in the law firm's name, Atwood & Eigerman, thereby making relevant section (B) of the definition.
>
> n14 Indeed, the distinction between "any Insured" and "the Insured" — debated in the parties' papers and relevant in other contexts, is of no moment here. In both cases, the term "Insured," refers to the term as specifically defined in the policy. That definitional section takes particular account of the conduct of partners of a law firm, where the firm itself is the named Insured.

[*20]

As noted above, there is some uncertainty as to whether Atwood's acts could be described as "professional services rendered on behalf of" Atwood & Eigerman. Atwood stole the check. His clients did not even know about his intention to take possession of it, let alone request that he do so as part of his representation of them. The funds never touched the firm's accounts.

Consequently, it is not at all settled that Exclusion (L) or Exclusion (A) has force. n15 Since courts have held that where "there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it," *Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700, 555 N.E.2d 576 (1990),* I could end my inquiry here and find in favor of the plaintiff.

> n15 It is worth noting that some exclusions focus on the agent of the wrongdoing, such as Exclusions (A) and (L), while others, Exclusion (K), for instance, apply without regard for who commits the wrongdoing, indicating that the institution as a whole will be responsible for the commingling of client funds whether accomplished by an "Insured" or not.

[*21]

Assuming, arguendo, that Atwood is an "Insured," and that Exclusion (L) applies on its face, the provision has to be read in the context of the policy as a whole and particularly along side Exclusion (A).

### (2) Intersection of Exclusions (A) and (L)

Under Exclusion (A), the insurer disclaims coverage with respect to losses from conduct "that results in a final adjudication that an Insured has committed any criminal, dishonest, fraudulent or malicious, acts errors, omissions or personal injuries." See Policy, 1Y Endorsement, Exclusions (A). On its face, this provision is consistent with Exclusion (L); both exclude from coverage acts involving deceit and fraud.

However, in Exclusion (A), the insurance company carves out an exception to the exception: It expressly promises to cover losses to an innocent Insured arising out of any adjudged wrongdoing of another Insured. The provision states: "This Exclusion [(A)] does not apply to any Insured who is not so adjudged to have committed such act, error, omission or personal injury. This policy shall then pay only in excess of the deductible and in excess of the full extent of the available capital and assets of any Insured [*22] who was adjudged to have commit-

ted such act..." Id. [emphasis added]. The promise is not equivocal.

It is not disputed that Eigerman falls within the express promise of coverage of (A). Atwood's conduct resulted in a "final adjudication" that he committed the misconduct described in Exclusion (A). Two fora have so judged him: the Massachusetts Board of Bar Overseers and the Federal District Court in the District of Massachusetts. Eigerman took no part in the wrongdoing, neither in terms of direct facilitation nor in terms of the use of partnership resources. n16 Fitting the requirements of Exclusion (A)'s second paragraph, Eigerman would reasonably expect that the direct promise of payment — in excess of the deductible and minus available assets of the wrongdoer — would have been fulfilled. n17

> n16 For instance, no accounts of the partnership were used to facilitate Atwood's theft of the $54,000.
>
> n17 Although the defendant does not concede this point, in the face of plaintiff Eigerman's assertion that Exclusion (A) applies to Atwood, Mt. Airy never denies its applicability but merely states that it did not rely on Exclusion (A).

[*23]

Mt. Airy seeks to side-step the force of Exclusion (A) and its affirmative promise of coverage by stating that it did not rely on the exclusion when denying coverage.

Its assertion is not enough. Assuming that both provisions are triggered in this case, the conflict between Exclusion (A) and Exclusion (L) cannot be so easily handled. Where a provision affirmatively acknowledges the insurance company's obligation to provide coverage for an insured, as it does here, the insurer is not free simply to ignore it.

The defendant disagrees, citing to a Massachusetts case in which two exclusions, ostensibly in conflict, were harmonized, resulting in a denial of coverage to the plaintiff. *Bond Bros., Inc. v. Robinson, 393 Mass. 546, 550, 471 N.E.2d 1332 (1984)*. In Bond Bros., a subcontractor sought coverage for his liability to a general contractor under his comprehensive general liability policy. The Supreme Judicial Court considered the interplay of two policy exclusions. The subcontractor argued that, read together, the two provisions created ambiguity with respect to the extent of coverage. The first exclusion expressly eliminated coverage for a particular type of loss, property [*24] damage, caused by "faulty workmanship thereon by or on behalf of the insured." The second exclusion provided that coverage does not apply "to liability assumed by the insured under any contract or agreement except an incidental contract." However, that exclusion contained a further limitation. It stated: "This exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner." Id. The subcontractor argued that the limitation on the second exclusion was meaningless if the first exclusion was given full force. Accordingly, the subcontractor contended that the limitation should also be read into the first exclusion.

The SJC disagreed. It rejected the insured's argument based on the language of the contract in question, as well as the reasonable expectations of participants in this industry. n18 Moreover, the Court concluded that no one in the industry would have reasonably believed that the second provision, which was a boilerplate general exclusion, somehow affirmatively assured coverage.

> n18 Measuring the meaning of terms in an insurance contract against the "reasonable expectations" of the insured, while never expressly adopted by the SJC, has long provided an alternative basis to support a court's holding. E.g., *Home Indemnity Ins. Co. v. Merchants Dist. Inc., 396 Mass. 103, 106, 483 N.E.2d 1099 (1985); Bond Bros. v. Robinson, 393 Mass. 546, 551, 471 N.E.2d 1332 (1984); Mitcheson v. Izdepski, 32 Mass. App. Ct. 903, 906, 585 N.E.2d 743 (1992); Commerce Ins. Co. v. Koch, 25 Mass. App. Ct. 383, 388 & n.11, 522 N.E.2d 979 (1987)*.

[*25]

This case is not like Bond Bros. Neither the language of the Mt. Airy policy nor the reasonable expectations of the parties suggests the result in that case. As noted above, Exclusion (A) of the Mt. Airy's policy does not merely define the limits of that particular exclusion concerning an insured adjudicated guilty of fraudulent behavior, as does the relevant provision in Bond Bros.. It also affirmatively sets forth the obligations of Mt. Airy with respect to defense of claims and payment of losses on the part of the innocent insured. Moreover, it would not be unreasonable for lawyers to assume that they would be covered were they innocent of misconduct, at least in excess of the policy deductible and whatever amounts not covered by the assets of the guilty insured.

In fact, Mt. Airy's interpretation would nullify exclusion (A), a result not favored as a matter of law. Exclusion (A) applies to a subset of misconduct within Exclusion (L)'s general scope. That is, Exclusion (L) can be read, in relevant part, to apply to dishonesty, deceit and fraud,

whether or not the misconduct has been adjudicated; Exclusion (A) only applies to the same conduct where there has been a formal [*26] adjudication with respect to the wrongdoing. Were Exclusion (L) to be read as defendant suggests — applying even to situations in which there had been an adjudication of wrongdoing — it would swallow up Exclusion (A), making the latter meaningless within the four corners of the contract.

It is well established that "'an interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable.'" *Worcester Mutual Ins. Co. v. Marnell, 398 Mass. 240, 245, 496 N.E.2d 158 (1986),* quoting Sherman v. Employers; *Liab. Assurance Corp., 343 Mass. 354, 357, 178 N.E.2d 864 (1961);* accord *United States v. Flores, 968 F.2d 1366, 1371 (1st Cir. 1992)*("Courts should not lightly read entire clauses out of statutes, but should, to the exact contrary, attempt to give meaning to each word and phrase.")

Indeed, there is a reasonable way of reading Exclusions (L) and (A) in tandem: Exclusion (L) indicates that the insurance company will not pay on a claim arising out of any insured's misconduct from which he or she derived an illegal personal profit. Reasonably, this exclusion can be read to reflect a [*27] concern that dishonest and illegal acts not be rewarded in any way. Exclusion (A), consistent with this reading, indicates that an innocent insured will be reimbursed only where it is clear that another insured is the wrongdoer; in such a case, reimbursement is only to the extent not covered by the assets of the guilty insured. This provision reflects the same basic concern of Exclusion (L): that the wrongdoer is not let off the hook. n19

> n19 This reading of the two exclusions makes sense as a matter of policy. By making the distinction between wrongdoing that has been so judged and wrongdoing that has not, the insurance company emphasizes that it does not want the responsibility of apportioning blame between or among insureds in the ordinary Exclusion (L) case. However, if an innocent insured reveals the wrongdoing, and there is a formal adjudication as to it, the insurance company will recompense the innocent party.
>
> Such are the facts before me. This case provides a compelling case for this reading of the two exclusions and of their limits.

[*28]

In short, given the variety of these interpretations, Exclusion (A) and Exclusion (L) are, at the very minimum, ambiguous. The ambiguities surrounding the relevant terms in the insurance policy cannot result in a benefit to Mt. Airy.

**Accordingly, I enter summary judgment in favor of the plaintiff as to Count I, the breach of contract claim.**

**B. M.G.L. c. 93A, 176D (Count II)**

Plaintiff claims he is entitled to multiple damages under M.G.L. c. 93A and c. 176D, because the defendant violated state insurance practices law, acting in bad faith by willfully and knowingly resisting prompt and equitable settlement of his claims. *M.G.L. c. 176D, § 3*; n20 see also *M.G.L. c. 93A, § 9(1)*. n21

> n20 *M.G.L. c. 176D, § 3*, states in relevant part:
>
> > "The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance: ...
> > (9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions: ...(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) Compelling insureds to institute litigation to recover the amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by insureds..." Id.

[*29]

> n21 Under *M.G.L. c. 93A, §§ 9(3)*, 11, where the court finds that the defendant's practice or act was "a willful or knowing violation" of Section 2, the plaintiff shall be entitled to multiple (not more than treble and not less than double) damages and reasonable attorneys' fees plus costs. See, e.g., *Anthony Pier Four, Inc. v. HBC Associates, et al., 411 Mass. 451, 475, 583 N.E.2d 806 (1991); Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 779-780, 489 N.E.2d 185 (1986); Computer Sys. Eng'g., Inc. v. Qantel Corp., 740 F.2d 59, 68 (1st Cir. 1984)*. The Supreme Judicial Court has stated that "callous and intentional violations" of Chapter 93A merit multiple damages, *Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 627, 382 N.E.2d 1065 (1978),* while cautioning against an award of multiple damages where

the conduct gives rise to "relatively innocent violations." *International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 854, 443 N.E.2d 1308 (1983)*.

Eigerman argues that since liability for his claim was "reasonably clear," it was a violation of both Section [*30] 3(9)(f) and (g) for Mt. Airy to refuse to offer an equitable settlement of this claim and to require that he institute this litigation to recover under his policy.

Defendant Mt. Airy disputes this characterization of its conduct. I agree.

M.G.L. c. 93A and 176D are designed to protect insured individuals against an insurer's unfair or deceptive business practices. See *Doe v. Liberty Mutual Ins. Co., 423 Mass. 366, 372, 667 N.E.2d 1149 (1996); Polaroid Corp. V. Travelers Indemnity Co., 414 Mass. 747, 610 N.E.2d 912 (1993); Boston Symphony Orchestra, Inc. v. Commercial Union Insurance Co., 406 Mass. 7, 14, 545 N.E.2d 1156 (1989)*. Where an insurer unreasonably delays in its coverage decision, it may find itself liable under M.G.L. c. 176D. Unreasonable disclaimers of coverage, where it is "reasonably clear" that coverage should be forthcoming, likewise, result in liability. That said, an insurer will not be found to have engaged in unfair business practices where its actions were done in good faith and where it "relied upon a plausible, although ultimately incorrect, interpretation of its policy." *Boston Symphony Orchestra, 414 Mass. at 15*. n22

> n22 The standard of reasonableness by which an insurer's conduct is judged, notably, switches perspective from that demanded under a contract theory of liability. Here it is the perspective of the reasonable insurer that the court must assume. See *Hartford Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 121, 628 N.E.2d 14 (1994)*(holding insurer to an objective duty of reasonableness and good faith under M.G.L. cc. 93A and 176D); *Polaroid Corp. v. Travelers Indemnity Co., 414 Mass. 747, 753, 610 N.E.2d 912 (1993)*(where an insurer "could reasonably have concluded that ... claims [were] not within the scope of its coverage," even if that assumption is "ultimately determined to be wrong," the fact that the insurer was incorrect does not support liability under Chapter 93A); *Pandey v. Paul Revere Ins. Co., 34 Mass. App. Ct. 919, 921, 609 N.E.2d 98,* rev. denied, *415 Mass. 1102 (1993)*(insurer which in good faith denies claim of coverage is unlikely to have committed a violation of M.G.L. c. 93A); see also *Pediatricians, Inc. v. Provident life and Accident Insurance Co., 965 F.2d 1164, 1173 (1st Cir. 1992)*.

[*31]

Turning to the case before me, as for the allegations that Mt. Airy resisted coming to a conclusion with respect to coverage, the plaintiff concedes that no formal demand was made, as required under M.G.L. c. 93A, until September 20, 1994. The denial came 28 days later, within the 30 days required under the statute. The plaintiff's claims of stonewalling therefore are without merit.

As to whether liability was "reasonably clear" and the insurer acted in bad faith by denying coverage, I find that Mt. Airy's failure to compensate Eigerman for the losses he suffered was not a violation of M.G.L. c. 176D.

Mt. Airy did not stonewall, nor did it flagrantly violate established interpretations of its policy provisions. It simply erred; Mt. Airy wrote an ambiguous contract upon which an objectively reasonable insured would, as Eigerman did, rely for coverage in circumstances such as those faced by the plaintiff.

I do not find evidence of bad faith in Mt. Airy's error and therefore decline to impose damages under M.G.L. c. 93A and 176D.

### IV. CONCLUSION

For the foregoing reasons, I **ALLOW** summary judgment in favor of the **PLAINTIFF** as to **COUNT I** and **ALLOW** [*32] summary judgment in favor of the **DEFENDANT** as to **COUNT II**.

SO ORDERED.
Dated: August 30, 1996

**NANCY GERTNER, U.S.D.J.**

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

The parties in this case have each filed a motion for summary judgment: Plaintiff Joel Z. Eigerman's Motion [docket # 8]; and Defendant Mt. Airy Insurance Company's Motion [docket # 6]. For the reasons set forth in the accompanying Memorandum, summary judgment is **ALLOWED** in favor of the **PLAINTIFF** as to **COUNT I**. Summary judgment is **ALLOWED** in favor of the **DEFENDANT** as to COUNT II.

SO ORDERED.
Dated: August 30, 1996

**NANCY GERTNER, U.S.D.J.**