LEXSEE 2006 US DIST LEXIS 30596

RLI INSURANCE COMPANY v. WOOD RECYCLING, INC. v. INTERNATIONAL INSURANCE GROUP, LTD.

CIVIL ACTION NO. 03-10196-RWZ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2006 U.S. Dist. LEXIS 30596

March 30, 2006, Decided

**PRIOR HISTORY:** *RLI Ins. Co. v. Wood Recycling, Inc.,* 2004 U.S. Dist. LEXIS 16805 (D. Mass., Aug. 16, 2004)

**COUNSEL:** [*1] For RLI Insurance Company, Counter Defendant: Mark D. Cahill, Choate, Hall & Stewart, Boston, MA.

For Wood Recycling, Inc., Defendant: Richard P. Campbell, Campbell, Campbell, Edwards & Conroy, PC, Boston, MA.

For International Insurance, Group, LTD, Counter Claimant: Richard E. Heifetz, Tucker, Heifetz & Saltzman, Boston, MA.

For Wood Recycling, Inc., ThirdParty Plaintiff: Adam A. Larson. Campbell, Campbell, Edwards & Conroy, PC, Boston, MA.

For International Insurance, ThirdParty Defendant: William P McGovern, Jr, Tucker, Heifetz & Saltzman, Boston, MA.

For RLI Insurance Company, Counter Defendant: Michael P. Mullins, Choate, Hall & Stewart, Boston, MA.

For RLI Insurance Company, Plaintiff: Thomas B. Orlando, Matthew S. Ponzi, Foran Glennon Palandech & Ponzi PC, Chicago, IL.

**JUDGES:** RYA W. ZOBEL, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** RYA W. ZOBEL

**OPINION:**

MEMORANDUM OF DECISION

March 30, 2006

ZOBEL, D.J.

In the summer of 2001, defendant Wood Recycling, Inc. ("Wood") decided to find a new insurer for its waste management and recycling facilities, located in various Massachusetts towns. It eventually purchased a policy from plaintiff RLI Insurance Company [*2] ("RLI"), effective August 1, 2001 through August 31, 2002, through the brokerage services of third-party defendant International Insurance Group, Ltd. ("IIG"). Under its previous insurance policies, Wood had paid significantly higher premiums; for example, in 2000, Wood paid a premium that was more than twice the premium it eventually paid RLI, and that insurer was planning to increase Wood's premium in 2001 by over forty percent.

On July 26, 2002, Wood reported a fire in a debris pile at its Southbridge facility. The fire was not extinguished until August 2. From August 2 through August 12, the facility remained closed, by order of the fire chief. Wood was then allowed to reopen the Southbridge site, but the town ordered Wood to eliminate the remaining burnt debris within a certain amount of time. When Wood failed to do so, the town issued an order prohibiting Wood from accepting new construction and debris ("C&D") material until the burnt debris was gone. This prohibition remained in effect from October 21 to December 12, 2002, though during the interim, the town twice modified the order to allow Wood to accept a limited amount of C&D material to aid in the processing of burnt debris. [*3] n1 Wood sought business interruption coverage under the policy from July 26, the date of the fire, until the end of 2002 (Wood Answer P 30). RLI denied the claim.

n1 It was apparently more effective to mix C&D material and burnt debris, rather than processing burnt debris alone. (See Walters Aff., Exs. 29-30).

In January 2003, RLI filed suit, seeking declaratory relief denying or, in the alternative, limiting Wood's coverage. Wood answered and counterclaimed; it also filed

a third-party complaint against IIG, arguing that if the policy did not cover its losses, IIG was liable. IIG answered Wood's complaint and also filed a direct claim, subsequently amended, against RLI. RLI, in turn, counterclaimed against IIG.

In an order dated August 16, 2004, I disposed of the parties' initial round of summary judgment motions, granting in part and denying in part Wood's motion, denying RLI's motion, and granting IIG's motion. See *RLI Ins. Co. v. Wood Recycling, Inc., 2004 U.S. Dist. LEXIS 16805, No. 03-10196, 2004 WL 1895132 (D. Mass. Aug. 16, 2004)* [*4] . Although the summary judgment order dismissed the third-party complaint against IIG, Wood was subsequently allowed to refile against IIG. (See Docket # 103). Currently pending are several evidentiary motions as well as a second round of summary judgment motions from all parties on various portions of their claims and counterclaims.

**RLI's Motion for Leave to File a Rebuttal Affidavit (# 123)**

The motion is denied as moot, since the underlying motion to compel was granted in part and denied in part on June 24, 2005.

**RLI's Motion for Partial Summary Judgment as to Wood's Counterclaim and RLI's Complaint (# 144)**

RLI moves for partial summary judgment on Counts II (misrepresentation), III (fraud), IV (negligent supervision), and V (Chapters 93A and 176D) of Wood's counterclaim. It also seeks summary judgment on its underlying declaratory action, as to its liability during the period October 21, 2002 to December 12, 2002.

I. Counts II and III (Misrepresentation and Fraud)

Counts II and III of Wood's counterclaim are properly addressed together. Count II alleges misrepresentation, without specifying whether the misrepresentation [*5] was negligent or fraudulent. The language used in Count II, however, reveals that it is a claim for fraudulent misrepresentation. Count II accuses RLI of making false representations "for the purpose of inducing Wood Recycling to rely upon them." (Wood's Counterclaim P 38). Inducement is an element of fraudulent, but not negligent, misrepresentation. Compare *Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001)*, with *Sahin v. Sahin, 435 Mass. 396, 402 n.9, 758 N.E.2d 132 (2001)*. Moreover, both parties treat Counts II and III together. I shall therefore do the same.

A plaintiff claiming fraudulent misrepresentation must prove that defendant (1) made a false misrepresentation of a material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act thereon, (4) that the plaintiff relied on the misrepresentation as true, and (5) that the plaintiff acted upon the misrepresentation to his or her detriment. See *Sahin, 435 Mass. at 402 n.9*. The misrepresentations alleged in Counts II n2 and III are: (1) RLI's representations in its marketing materials as to its underwriters' abilities and authority, and its insurance [*6] products, (2) RLI's and LaPierre's representations that RLI would provide coverage to Wood; and (3) RLI's statements as to its investigation of the Southbridge claim. The motion is allowed on both counts.

> n2 As RLI notes, Count II is hardly a "model of clarity," as Wood has entirely failed to identify any particular misrepresentations. The alleged misrepresentations are therefore based on my review of the entire counterclaim.

A. Underwriters' Abilities and Marketing Materials

This category of statements includes RLI's representations that its underwriters were "flexible" and "knowledgeable," that they were "able to design coverages to meet the specific needs of the individual situation," and that each underwriter had "binding authority" and was a "seasoned professional." As for LaPierre's authority as an underwriter, there is no dispute that he did possess and did exercise binding authority. (RLI's Loc. R. 56.1 Statement ("Statement") P 30; Wood's Counterclaim P 13; Wood's Statement P 30). As for statements [*7] regarding the skill and quality of RLI's underwriters and its products, these representations largely fall into the category of non-actionable opinion. See *Cummings, 244 F.3d at 21-22*. In any event, Wood's summary judgment papers do not even attempt to establish the elements of fraud as to these statements; any claim based on them is therefore waived. See *Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 2006 WL 696649, at * 2 (1st Cir. 2006)*.

B. LaPierre's and RLI's Representations Concerning Coverage

Wood contends that LaPierre falsely represented to IIG employees that RLI would provide business interruption coverage specifically for Wood's Southbridge operations. (See Wood's Opp. 15 (arguing that defendant "lied to Wood and IIG by saying that Wood was covered and that RLI would pay Wood in the event its business at Southbridge was interrupted")). Wood cannot sustain a fraud claim as to this alleged statement for multiple reasons.

First, Wood proffers scant evidence that LaPierre ever made such a representation. Nicholas Sciotto, an IIG em-

ployee, says that LaPierre made such a statement, but Wood offers no other direct [*8] evidence. (Walters Aff., Ex. 5, P 9; Larson Aff., Ex. F, at 90-93). It is not clear that a reasonable jury could find that LaPierre made the statement based only on this "meager" proof. *Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 8 (1st Cir. 2000)* (plaintiffs failed to prove that they were fired based on political party where they offered only single affidavit stating that affiant had heard mayor say he would fire those with certain political affiliation).

Second, even assuming that LaPierre made such a representation, Wood still has not made out a fraud claim. Wood accuses LaPierre of saying that RLI would provide business interruption coverage at Southbridge when he actually knew that RLI would not provide such coverage. This parallels the claim made in Count III–that when RLI agreed to provide coverage to Wood, it committed fraud because it knew at the time that it would not provide coverage for Southbridge and that it would "interpret the policy in such a manner as to render . . . coverage illusory." (Wood Counterclaim PP 41-51). In essence, Wood alleges that both LaPierre and RLI misrepresented their present intentions as to future conduct.

Misrepresenting [*9] present intentions as to future conduct may form the basis of a fraud action. *Zhang v. MIT, 46 Mass. App. Ct. 597, 605, 708 N.E.2d 128 (1999)*. To prevail, however, a plaintiff must adduce evidence that the defendant knew the statement was false when he made it. *Cummings, 244 F.3d at 22*. In the context of present intentions as to future conduct, the plaintiff must show that the defendant knew–at the time he made the statements–that he did not intend to act as he said he would act in the future. The plaintiff must do more than simply show that the defendant eventually did not act as he said he would act.

For example, in Zhang, the plaintiff claimed that her employer had committed fraud when, during her job interview, he stated that her appointment would be renewed each year as long as funding was available. As proof, the plaintiff pointed to the fact that at some later date, her appointment was not renewed, even though funding was available. This evidence, standing alone, was deemed insufficient. Citing the *Restatement (Second) of Torts, § 530(1)*, the court noted that "the intention of the promisor not to perform an . . . agreement [*10] cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." *Zhang, 46 Mass. App. Ct. at 605* (internal quotation marks omitted). Here, Wood has proffered no evidence that, at the time LaPierre or RLI made the alleged misrepresentations, they intended not to provide coverage in the future. Instead, Wood points only to the fact that RLI eventually interpreted the policy in such a manner so as to support a denial of coverage. As in *Zhang*, this proof of nonperformance is insufficient, and Wood therefore cannot establish fraud.

C. The Investigation

Wood contends that RLI misrepresented the nature of its investigation of the Southbridge claim. The allegation appears to be that RLI told Wood it was investigating the claim, but, according to Wood, it actually was not. Wood offers no evidence other than (1) the fact that RLI did not change its mind about coverage over the course of the investigation, and (2) RLI did not change the language it used in its various letters to RLI. Such evidence [*11] is plainly insufficient to sustain a fraud claim.

III. Count IV (Negligent Supervision)

Wood argues that RLI breached its duty to supervise its underwriters and that, as a result, LaPierre engaged in inappropriate conduct that RLI could have prevented. The claim is hard to make out. Wood apparently contends that LaPierre made certain promises regarding coverage, but then drafted policies in a manner permitting RLI to offer interpretations that contradicted LaPierre's promises. As an initial matter, it is far — fetched for Wood to base a claim on the fact that its policies were drafted in a manner that allowed for more than one interpretation; the vast field of insurance litigation is proof enough that virtually any policy is open to some interpretive quibble. In any event, Wood's claim fails because Massachusetts courts require plaintiffs claiming negligent supervision to show "that the employer knew, or should have known, that the offending employee had a proclivity to commit the complained-of acts, and that the employer nevertheless failed to take corrective action." *Vicarelli v. Business Int'l, Inc., 973 F. Supp. 241, 246 (D. Mass. 1997)*. Wood offers [*12] no evidence indicating that RLI "knew or should have known" that LaPierre had a "proclivity" to make certain promises to prospective insureds and then to draft ambiguous policies that would later cause problems for the insureds. Accordingly, RLI is entitled to summary judgment.

IV. Count V (Chapters 93A and 176D)

Count V of Wood's counterclaim alleges that RLI engaged in unfair and deceptive business practices in violation of Chapters 93A and 176D. In essence, Wood claims that RLI failed to conduct a reasonable investigation of Wood's coverage, that it unreasonably interpreted the policy, and that it delayed coverage in order to harm Wood, even when its liability was reasonably clear. (See Wood

Answer and Counterclaim 12-13). In its summary motion, RLI argues (1) that Wood cannot proffer evidence that RLI's conduct rose to the level of a 93A violation, and (2) that Wood lacks standing to sue under 176D.

As to the latter point, RLI is correct in that Wood may not sue under 176D directly. See *Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541, 544 n.1 (1st Cir. 1993)* ("Chapter 176D . . . provides no private cause of action and is enforceable only by the [*13] commissioner of insurance."); *Grande v. PFL Ins. Co., 2000 Mass. App. Div. 261, 2000 WL 1476676, at * 4 (Mass. App. Div. 2000)*. Violations of *chapter 176D, § 3(9)*, are directly actionable, but only under *chapter 93A, § 3(9)*, which is available only to individual consumers, and not business plaintiffs. See *M. DeMatteo Const. Co. v. Century Indemnity Co., 182 F. Supp. 2d 146, 161 (D. Mass. 2001)*; *Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 564-65, 750 N.E.2d 943 (2001)*. To the extent that Wood seeks to sue RLI under *chapter 93A, § 11*, for violating chapter 176D, the Supreme Judicial Court has "rejected the theory that commercial plaintiffs may bring suit under *section 11 of chapter 93A* for purported violations of chapter" 176D." *M. DeMatteo Const. Co., 182 F. Supp. 2d at 162*. Instead, a purported violation of chapter 176D is only "evidence of a violation of *chapter 93A, § 11*." *Peterborough Oil Co. v. Great Am. Ins. Co., 397 F. Supp. 2d 230, 244 (D. Mass. 2005)*. Thus, Wood is entitled to "attempt to state a claim under chapter 93A by alluding to conduct that is impermissible under chapter 176D," *M. DeMatteo Const. Co., 182 F. Supp. 2d at 163*, [*14] a proposition RLI has never contested. (RLI's Reply Mem. 10 n.8). I accordingly treat Count V as a claim under *chapter 93A, § 11*.

"Liability under G.L. c. 93A is based upon the employment of unfair or deceptive acts or practices." *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 14, 545 N.E.2d 1156 (1989)* ("BSO"). A violation of 93A occurs only when the defendant's conduct falls within some "recognized conception of unfairness," and is "immoral, unethical, oppressive, []or unscrupulous." *PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (1975)*. In the insurance context, an insurer is not liable when it renders a policy interpretation ultimately deemed incorrect, unless it was reasonably clear that a coverage obligation existed. See *BSO, 406 Mass. 14-15*.

In this case, RLI's policy interpretation was not unfair within the meaning of 93A. Though I rejected RLI's proposed interpretation, and even characterized it as "absurd" and "unpersuasive," *RLI Ins. Co., 2004 U.S. Dist. LEXIS 16805, 2004 WL 1895132, at * 2*, neither of the parties' positions were "free from doubt," *O'Connell v. Reliance Ins. Co., 50 Mass. App. Ct. 334, 337, 737 N.E.2d 13 (2000)*.

[*15] Wood itself conceded through counsel that RLI's interpretation of the "Scheduled Locations Endorsement" — an interpretation that did not support coverage — was "reasonable." (Summ. J. Hearing Tr. 23). In addition, here–as in the BSO case — RLI's policy interpretation was developed in part by relying on the advice of coverage counsel. See *BSO, 406 Mass. at 15*. (Pawlak 6/19/03 Dep. 14-17). Indeed, Raymond Pawlak, RLI's claims examiner, testified that he took the somewhat unusual step of consulting with counsel because Wood's claim was "unconventional." (*Id. 16-17*). Pawlak further stated that it was typical to retain coverage counsel in "complicated situations for analysis of coverage." (Pawlak 3/30/05 Dep. 133).

Finally, RLI's policy interpretation fell within the realm of the "plausible, though ultimately incorrect." *BSO, 406 Mass. at 15*. The Commercial Output Program defined "covered location" as "any location or premises where [the insured] has buildings, structures or business personal property covered under this coverage." (Walters Aff., Ex. 9, "Commercial Output Program-Property Coverage Part" 1). The Southbridge location [*16] had no buildings or structures. Thus, it could only qualify as a "covered location" if it had "business personal property." In RLI's view, construction debris, which has virtually no market value, did not qualify as "business personal property." Although I ultimately disagreed, RLI's interpretation was not so outlandish as to be implausible. It therefore fell "outside the scope of the punitive aspects" of 93A, *Guity v. Commerce Ins. Co., 36 Mass. App. Ct. 339, 343, 631 N.E.2d 75 (1994)*.

Wood argues that my previous characterization of RLI's interpretation as "absurd" and "unpersuasive" constitutes "law of the case" requiring a finding of unreasonableness under 93A. Such dicta, however, were uttered in the course of determining whether Wood was entitled to coverage, not in determining whether RLI's conduct fell within the scope of 93A. As dicta, it was not binding, see *Bull HN Information Sys., Inc. v. Hutson, 229 F.3d 321, 326 n.3 (1st Cir. 2000)*, and as a matter of contract interpretation, it was not determinative of Wood's 93A claim. As for Wood's assertion that RLI "used economic leverage to pressure Cyr to change his report," it is not only unfounded, it is [*17] directly controverted by Cyr's own testimony. (Wood's Opp. 7; Walters Aff., Ex. 78, at 125). To the extent that Wood's 93A claim is based on RLI's interpretation of the policy and denial of coverage, RLI is entitled to summary judgment.

Wood also contends that RLI is liable for failure to conduct "a reasonable investigation based upon all available information," as required under chapter 176D. The record, however, is replete with evidence that RLI con-

ducted a thorough investigation of the claim, through multiple meetings and extensive correspondence with Wood, as well as consultations with independent adjusters, accountants, and coverage counsel. No doubt every claim investigation could be more thorough, but claims adjusters cannot be required to follow every lead. See *Thomas v. Metropolitan Life Ins. Co., 40 F.3d 505, 511-12 (1st Cir. 1994)*. The investigation here was adequate. Wood's bald assertion that Pawlak "did nothing to investigate IIG's assertions" (Wood's Opp. 8) is belied by the record (Pawlak 3/30/05 Dep. 190, 197, 206) and by Wood's own expert (Ashley Dep. 154). Wood's claim that LaPierre lied about his conversations with IIG is unfounded and speculative. [*18] Such unsupported accusations cannot form the basis of a 93A claim. Wood has thus failed to proffer any evidence that RLI failed to conduct a reasonable investigation of Wood's claim.

Accordingly, RLI is entitled to summary judgment on Count V.

V. RLI's Liability for Increased Business Interruption Loss Due to Town's Order

RLI also moves for summary judgment on one of the remaining portions of its original complaint. Specifically, it seeks a declaration that it is not liable for any increase in business interruption losses sustained by Wood as a result of the town's October 21, 2002 order. See *RLI Ins. Co., 2004 U.S. Dist. LEXIS 16805, 2004 WL 1895132, at * 1*. Under the policy, business interruption coverage is provided for the "Restoration Period," which is defined as

> the time it should reasonably take to resume 'your' 'business' starting from the date of loss to 'covered locations' caused by a covered peril, and ending on the date the property should be rebuilt, repaired, or replaced.

(Walters Aff., Ex. 9, "Commercial Output Program-Income Coverage Part" 1). "Business" is defined as "normal business activities occurring at 'covered locations.'" (Id.). Excluded from [*19] the "Restoration Period" is "any increase in time due to the enforcement of any ordinance, law or decree that. . . regulates the construction, use, repair, or demolition of any property." (Id.). Thus, any increase in the time that it took Wood to resume normal business activities at Southbridge would be excluded from coverage, if that increase in time was due to enforcement of laws regulating "the construction, use, repair, or demolition of any property."

The town's October 21, 2002 order was plainly meant to "enforce[]. . . an[] ordinance, law, or decree" regulating property-specifically, *M.G.L. c. 148, § 5*, and *527 CMR 1.06*. (See Walters Aff., Ex. 27). The only issue is, therefore, whether the order caused an "increase" in the amount of time that it took Wood to resume normal functioning or not. Answering this question requires some understanding of the nature of Wood's business at the Southbridge site. Wood's revenue came primarily from accepting C&D material. When it accepted C&D material, it received a tipping fee. (Paulino Examination Under Oath ("EUO") 12; see also Herlihy 6/18/03 Dep. 43). This was its primary source of [*20] revenue. Wood also sometimes salvaged metal from the C&D material before depositing it in the landfill, in order to save space; it would either sell this metal for "small amounts" or would give it away for free. (Id. 41-44).

The following facts are not in dispute. First, Wood was able to receive C&D material and therefore tipping fees prior to the October 21, 2002 order. Wood was prohibited from receiving any C&D material from October 21 until November 1. (Walters Aff., Ex. 27). It was thereafter allowed to receive a limited amount of C&D material, in order to aid in the processing of burnt debris. (Id. Exs. 29, 30). On December 12, 2002, the town lifted its prohibition entirely, allowing Wood to return to normal C&D functioning, which it did at some point during that month. (Id. Ex. 31; Paulino Dep. 24).

RLI has adduced evidence that strongly indicates that Wood was unable to return to normal functioning before December 2002 largely because of the town's order. Wood was receiving C&D material prior to October 21, 2002, and Mark Paulino, Wood's president, stated that the only thing preventing it from receiving C&D material between that date and December 12 [*21] was the town's order. (Paulino EUO 53). When the town issued the October 21 order, Wood's counsel sent a letter to IIG, at Wood's behest, notifying IIG that the order "prohibits the recycling facility from receiving further materials and eliminates the facility's sole source of revenue." (Walters Aff., Ex. 2). When the town allowed Wood to accept C&D materials up to 500 tons and then up to 750 tons, in its amended orders of November 1, 2002, and November 18, 2002, it did so at Wood's request. (Walters Aff., Exs. 29-30). And once the town allowed Wood to accept some C&D material, it immediately did so. (Wood's Statement P 72). These facts indicate that Wood was able to accept C&D material during the October 21 to December 12 period, and wished to do so to earn revenue.

However, the record also contains some evidence indicating that Wood's C&D functioning had not returned to normal levels before October 21. Paulino testified that some equipment was damaged in the fire and during the debris-clearing that took place in the immediate aftermath, and that equipment problems continued un-

til December 2002. (Paulino Dep. 28, 46-48). Although these equipment problems did not directly impact [*22] Wood's ability to accept C&D material, they did hinder Wood's ability to process C&D material (id. 28, 86-87), which in turn prevented it from accepting new C&D material (id. 46-48). RLI points out that Wood was below its permitted capacity at some point prior to October 21, which suggests that Wood was able to process C&D material quickly enough to make space for new C&D material. (RLI's Statement P 70). But the record also contains evidence that at certain times after August 12, Wood had to turn away customers because it was not able to process C&D material quickly enough and therefore could not accept new material. (Paulino Dep. 46-48). Paulino further testified that these equipment and processing problems continued through December 2002, when Wood returned to "normal business activities."

Factual disputes thus remain as to whether Wood had resumed "normal business activities" prior to October 21, 2002, precluding summary judgment. Moreover, if I draw inferences in Wood's favor, as I am required to do on RLI's summary judgment motion, and if I assume that Wood had not resumed normal business activities prior to October 21, 2002, further factual [*23] questions remain. A reasonable jury could very well find (1) that Wood did not resume normal business activity before October 21, 2002, but (2) that Wood could have resumed normal business activities at some point before December 2002, except for the town's order. Determining exactly when Wood could have resumed normal business operations is the type of muddy factual question properly resolved by a jury.

Accordingly, RLI's motion for summary judgment on the exclusion of October 21, 2002 to December 12, 2002, from the "Restoration Period" is denied.

VI. Conclusion

RLI's motion for partial summary judgment on Wood's counterclaim is allowed as to Counts II, III, IV, and V. RLI's motion for partial summary judgment is denied on the question of exclusion from the "Restoration Period." Triable issues of fact remain on the length of the "Restoration Period."

**IIG's Motion for Summary Judgment as to Wood's Third-Party Complaint (# 147)**

Wood's third-party complaint against IIG is contingent upon a finding that RLI's policy "does not cover Wood Recycling for business interruption insurance during the time periods August 2, 2002, through August 12, 2002, and October 21, 2002, through [*24] December 12, 2002, due to enforcement of an ordinance, law or decree issued by the Town of Southbridge." (Wood's Third-Party Compl. 10). If the jury finds that the policy does not cover business interruption losses sustained by Wood during those periods, then Wood has asked for entry of judgment rendering IIG liable, for having "failed to procure an insurance policy that would insure Wood Recycling for business interruption damages due to the enforcement of an ordinance, law or decree." (Id.). In other words, Wood contends (in its litigation with RLI) that the specified exclusion from the "Restoration Period" does not apply, but simultaneously contends (in its litigation with IIG) that if the exclusion does apply, then IIG is liable for not procuring a policy without such an exclusion. IIG has moved for summary judgment on several grounds. Because I find that IIG satisfied the duty it owed to Wood, the motion is allowed.

"The relationship between an insurance broker and the insured is not normally thought to be fiduciary in nature, absent special circumstances of assertion, representation and reliance." *Baldwin Crane & Equipment Corp. v. Riley & Rielly Ins. Agency, Inc., 44 Mass. App. Ct. 29, 31-32, 687 N.E.2d 1267 (1997).* [*25] Instead, the insurance broker "ordinarily . . . assumes only those duties normally found in an agency relationship." Id. (quoting 16A Appleman, Insurance Law & Practice § 8836, at 64 (1981)). These duties include the duty to deal in good faith and the duty to carry out instructions, but does not include the duty to advise. See Appleman, § 8836, at 64. Thus, a broker is not generally required to ensure that the insured understands "the full import" of policy provision, and an insured remains responsible for ascertaining the terms of coverage obtained by the broker. See *Baldwin Crane & Equipment Corp., 44 Mass. App. Ct. at 31-32*.

The Baldwin case provides an instructive example of the scope of the typical insured-broker relationship. In that case, the broker had obtained policies for the plaintiff for a number of years. Under its old policy, the insured had paid return premiums, "wherein the deposited premium calculated on estimated sales would be adjusted upward or downward at year's end depending on sales experience." *Id. at 30*. One year, the insured asked the broker to find a new insurer, with a lower premium. The broker conducted research [*26] and provided to the insured a chart comparing four policies; the chart included information on minimum premiums charged under the policies, under which no refund was available. The broker met with an employee of the insured to discuss the chart and the policy options, but did not specifically discuss minimum versus return premiums. The insured's representative, however, was "under the impression . . . that the new premium, like the old, would be of the return type," although no one from the broker had made such a representation. Id. The plaintiff sued, arguing that the broker had breached its duty to inform the plaintiff that the new policy would

carry a minimum rather than return premium. The court rejected the argument, finding that the broker was under no "duty to ensure that [the insured] understood the full import of the meaning of 'minimum premium.'" *Id. at 31*. Because no special circumstances existed giving rise to an expanded relationship between the parties, the court held that the broker owed the insured nothing more than the duties normally found in an agency relationship and that these had not been breached. *Id. at 32*.

Wood apparently [*27] does not dispute that IIG satisfied the normal duty of care owed by an insurance broker. Instead, Wood argues that special circumstances surrounding the relationship rendered it fiduciary in nature and that IIG breached this special fiduciary duty. Massachusetts courts have recognized that an expanded relationship may exist between an insured and its broker, but only in "special circumstances of assertion, representation and reliance." *Rapp v. Lester Burdick, Inc., 336 Mass. 438, 442, 146 N.E.2d 368 (1957)*. This expanded relationship, which imposes a heavier duty on the broker, "generally exists when the agent holds himself out as an insurance specialist, consultant or counselor and is receiving compensation for consultation and advice apart from premiums paid by the insured." *Baldwin Crane & Equipment Corp., 44 Mass. App. Ct. at 32* (internal quotation marks omitted). Wood argues that a special relationship existed in this case because IIG had a "long-standing relationship" with IIG and IIG "held itself out to Wood as an expert in insurance matters and risk protection." (Wood's Opp. 12). According to Wood, IIG therefore had a duty to "adequately inform it about the [*28] business insurance that it obtained and when the insurance afforded coverage and when it did not." (Wood's Opp. 14).

Wood has not presented evidence from which a reasonable jury could conclude that IIG owed Wood anything beyond the usual duties of an agent. There is no dispute that Wood paid IIG only commissions based on RLI's premium, and nothing more. (IIG's Statement PP 13-14; Wood's Statement PP 13-14). Nor does Wood contend that it ever hired IIG to provide consultation and advice on its insurance needs. (IIG's Statement P 15; Wood's Statement P 15). Wood points to IIG's advertisements, in which it claimed significant expertise and experience with the insurance industry, and the skills and products to "distribute risk protection at the right price while providing sophisticated claims management systems." (Wood's Statement P 15). These statements do not establish, however, that IIG was ever hired as a consultant or advisor to Wood.

Rather than establishing that "special circumstances of assertion, representation and reliance" existed in this case, much of what Wood describes instead amounts to "typical brokerage services," as Wood itself describes IIG's work. (Wood's Statement [*29] P 9). For example, Wood states that IIG met with Wood to discuss its insurance needs, researched the insurance market, and obtained quotes, all of which are normal broker activities. The fact that IIG was familiar with Wood's business, that it kept abreast of company changes that could affect insurance coverage, and that it was aware of the need for business interruption coverage likewise do nothing to establish an "expanded relationship" between the parties. Any broker who wishes to procure appropriate coverage for an insured must ascertain the types of risks for which coverage is required.

Wood makes much of the fact that Pamela Caron, an IIG broker, was related by marriage to one of Wood's owners and was familiar with Wood's business, but the relationship alone cannot give rise to a fiduciary relationship. Wood also asserts that it had asked IIG to provide business interruption insurance "for all potential reasons that could occur at its Southbridge location." (Wood's Statement P 67). The record, however, provides no support for this contention. For example, Caron agreed in her deposition that she had intended to obtain for Wood coverage for "business interruption as a result of [*30] a loss at Southbridge for whatever reason." (Wood's Statement, Ex. B, at 58). A few questions later, however, Caron clarified that she was referring to "business interruption coverage for the contractor's equipment." (Id.). This case is concerned with Wood's property coverage, however, not its contractor's equipment; Ms. Caron's statement is thus irrelevant.

Michael Neville, an owner of IIG, stated that "It was my intention for them to have business interruption coverage at Southbridge. That was what we requested and that's what I thought we were getting regardless of where the loss started." (Wood's Statement, Ex. D, at 60). This statement, however, establishes only that IIG was asked to obtain business interruption coverage for the Southbridge site and that Neville believed the business interruption coverage applied to both C&D material and contractor's equipment. (See id. at 59-60). Neville nowhere indicates that he asked IIG to cover every conceivable business interruption. These statements simply do not establish a duty on IIG's part to inform Wood of potential gaps in its business insurance coverage, let alone to obtain for Wood business interruption coverage [*31] that included increases in time due to enforcement of a law or ordinance.

In sum, Wood has adduced no evidence from which a reasonable jury could conclude that IIG owed Wood a fiduciary duty. There is no factual dispute over whether IIG fulfilled the typical duties of a broker. Accordingly, it is entitled to summary judgment, regardless of any jury's

determination as to the dispute between Wood and RLI.

**IIG's Motion for Summary Judgment on RLI's Counterclaim (# 150)**

RLI has counterclaimed against IIG for common law indemnification and contribution. The parties now agree that IIG was not RLI's agent and that RLI's indemnification claim should therefore be dismissed. As for RLI's claim for contribution, RLI agrees that its contribution claim cannot succeed unless IIG is directly liable to Wood. As explained in my above summary judgment ruling on IIG's motion with respect to Wood's third-party complaint (# 147), IIG satisfied the duty it owed to Wood and therefore is not liable to Wood. Therefore, RLI is not entitled to contribution. Accordingly, the motion is allowed.

**RLI's Motion for Partial Summary Judgment (# 154)**

The motion, which is a duplicate of [*32] a motion previously filed (# 144), is denied as moot. Memoranda and exhibits filed by any party in relation to either # 144 or # 154 shall be treated as filed in relation to # 144.

**RLI's Motion for Leave to Appear Pro Hac Vice (# 164)**

The motion is allowed.

**IIG's Motion to Strike Affidavit of Michael A. Rodman (# 182)**

**IIG's Motion for Leave to File a Reply Memorandum (# 201)**

**Wood's Motion for Leave to File a Sur-Reply (# 203)**

The first motion listed is based on the affidavit filed by Wood in its opposition to IIG's summary judgment motion (# 147). Because the summary judgment motion has been granted and the claims against IIG have been dismissed, the motion to strike is denied as moot. IIG's motion for leave to file a reply memorandum (# 201) and Wood's motion for leave to file a sur-reply (# 203) are similarly denied as moot.

**RLI's Motion to Strike References to Wood's Expert Reports (# 190)**

**RLI's Motion for Leave to File a Reply Memorandum (# 200)**

**Wood's Motion for Leave to File a Sur-Reply (# 202)**

RLI moves to strike certain references to expert reports in Wood's response [*33] to RLI's Statement of Facts, submitted in relation to # 144. Because # 144 has been decided, the motion to strike is denied as moot. To the extent that Wood submitted any inappropriate material in support of its opposition, I have disregarded that material in deciding the summary judgment motion. RLI's motion for leave to file a reply and Wood's motion for leave to file a sur-reply are similarly denied as moot.

**IIG's Assented to Motion for Extension of Time (# 211)**

The motion is allowed.

**Wood's Motion in Limine to Strike Expert Testimony (# 121)**

**Wood's Motion in Limine to Preclude Evidence Pertaining to the Increased Hazard Exclusion (# 134)**

**Wood's Motion in Limine to Strike Expert Testimony of Richard Subak (# 135)**

**Wood's Motion for Leave to File a Reply Memorandum (# 140)**

**Wood's Motion for Leave to File a Supplemental Memorandum (# 142)**

Wood has filed a number of motions in limine that are more properly decided at the time of trial. Accordingly, I defer decision on # # 121, 134, and 135 until the time of trial. Wood's motions for leave to file a reply (# 140) and a supplemental memorandum [*34] (# 142) are allowed.

**Wood's Motion to Compel Documents and Testimony from RLI's Expert Paul McGowan (# 160)**

Finally, Wood moves to compel discovery from RLI's expert, Paul McGowan, a partner at the accounting firm of Matson Driscoll & Damico, LLP ("MDD"). Specifically, Wood seeks disclosure of documents created by McGowan and MDD during August and September of 2004. RLI claims the documents produced during that period are privileged. The party asserting the privilege bears the burden of proving that it applies to the documents at issue. See *Cavallaro v. United States, 153 F. Supp. 2d 52, 56 (D. Mass. 2001)*. Because RLI has not met its burden, the motion is allowed.

McGowan and MDD were retained by RLI in August 2002, shortly after the fire, to conduct an analysis of weekly business interruption exposure. (Wood's Ex. A, at 36). They apparently conducted additional analyses that continued into 2003. (Id. at 40). In August 2004, RLI again asked McGowan to conduct business income exposure analyses. (Id. at 41-42). In July 2005, RLI identified McGowan as an expert in a disclosure to Wood. (Wood's

Ex. C).

RLI claims that the analysis conducted by [*35] McGowan in August 2004 is privileged because McGowan conducted that work as a "consultant to RLI's counsel in anticipation of litigation," and more specifically, "in preparation for making a settlement offer." (RLI's Opp. 3). RLI concedes that documents used and considered by McGowan as an expert are not privileged, but argues that McGowan's work in August 2004 was solely "as a consulting expert," and that his work as a testifying expert did not begin until May 2005. (Id. at 6). As evidence, RLI points to the fact that the documents at issue were produced by McGowan in August and September 2004, the period in which RLI, in light of my first summary judgment ruling, developed a settlement offer, which it sent to Wood in late September 2004. (Id. at 2). According to RLI, this timing shows that McGowan was acting solely as a settlement consultant at the time, and not as an expert witness.

The record, however, belies this assertion. In May 2005, in preparation for McGowan's deposition as a Rule 30(b)(6) representative of MDD, RLI's counsel sent a letter to Wood's counsel, stating that RLI would produce McGowan only to the extent that he was acting as a fact witness. It further [*36] noted that "We will object to any question designed to elicit expert opinion and will instruct the witness not to answer if we believe the question is directed at expert opinion and testimony." (Wood's Ex. B). At the May 31, 2005 deposition, McGowan was asked by Wood's counsel about the work he did in August 2004. McGowan responded that he had been asked to "provide various business income exposures" within certain parameters. (Wood's Ex. A, at 42). When asked if he could provide documents related to that analysis, RLI's counsel objected, on the basis that it was "expert testimony," and referred to "objections that were expressed to you previously." (Id. at 45.). In other words, RLI objected to disclosure of McGowan's August 2004 analysis by claiming he was an expert. Only later, in the July 22, 2005 deposition of McGowan as an expert, after he had formally been identified as such, did RLI assert that the August 2004 analysis was privileged because it was conducted in preparation for settlement discussions. (See id. at 221). RLI's position is thus undermined by the fact that RLI itself only identified the privilege as one based on McGowan's status as a consultant after having [*37] previously identified his status as an expert.

RLI claims that "the record demonstrates that Mr. McGowan relied on and considered distinct sets of factual materials in his role as a consultant for settlement negotiations than he did as a testifying rebuttal expert." (RLI's Opp. 7). But the record is not so clear. The deposition testimony they cite does not support this proposition. Instead, McGowan only stated that the documents from August 2004 were still being withheld by counsel. Furthermore, McGowan testified in his May 2005 deposition that he did not know if the work begun in August 2004 had concluded. (Wood's Ex. A, at 45). This contradicts RLI's assertion that the August 2004 analysis concerned only settlement negotiations and was completed by the end of September 2004. Where there is no "clear distinction" between an expert's work as consultant and his work as a testifying witness, the ambiguity must be resolved in favor of discovery. See *Constr. Indus. Servs. Corp. v. Hanover Ins. Co., 206 F.R.D. 43, 52 (E.D.N.Y. 2001)* (internal quotation marks omitted). In this case, the nature of McGowan and MDD's work in August 2004 is sufficiently ambiguous to [*38] require disclosure. This conclusion is further supported by RLI's shifting grounds for its assertion of privilege.

Accordingly, the motion is allowed.


DATE

/s/ Rya W. Zobel

UNITED STATES DISTRICT JUDGE