UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM PARZIALE,<br><br>    Plaintiff,<br><br>vs.<br><br>AMERICAN HERITAGE LIFE<br>INSURANCE COMPANY, A<br>WHOLLY OWNED SUBSIDIARY<br>OF THE ALLSTATE CORPORATION,<br><br>    Defendant. | CIVIL ACTION<br><br>No.: 04-11377-RBC |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S REPLY BRIEF TO REDACT MEDICAL RECORDS

Plaintiff submits this memorandum in response to Defendant's Reply to Plaintiff's Request to Redact Medical Records Referring to the Insured's Planned CT Scan to call the court's attention to the repeated mischaracterizations contained therein.

The very title of defendant's response leads one to believe that Maryann Veronesi (Veronesi ) had a "*PLANNED CT SCAN*" (emphasis supplied). Not only does defendant use the term "planned CT scan" in the title of the memorandum, it is used throughout the document despite the fact that there is no evidence that Veronesi was ever scheduled for or planned to have a CT scan.

1. **PLAINTIFF'S EXHIBIT A**

The discharge summary of Dr. Christina Williamson (Exhibit A) states, in pertinent part, "She had a chest x-ray ordered by her primary care physician last week, which would be mid July of this year, which showed some question of adenopathy in the chest, *and in the emergency room on July 25, 2001, she was planning to have a ct scan of the chest to investigate this.*" (emphasis supplied). Defendant argues this is a statement made for purposes of diagnosis and treatment and is admissible and further argues that there is no requirement that the speaker be the patient herself. In addition to this argument being moot because Veronesi was diagnosed

1

before the record was created by another physician, defendant's position is not supported by case law. See *Stull v. Fuqua Indus., Inc.*, 906 F.2d 1271, 1273-74 (8th Cir. 1990) (a statement in the medical record that "[a]pparently, [the plaintiff] . . . jumped off the lawn mower and got his left heel caught under the lawn mower" was not admissible under Rule 803(4) because "the word 'apparently' in the hospital record indicates that the statement . . . may not have been made by [the plaintiff]; it may instead represent conjecture on the part of the person filling out the record"). See also *Cook v. Hoppin*, 783 F.2d 684, 690 (7th Cir. 1986). Statements from an unknown declarant relating to an alleged "wrestling match" in medical records were not admissible under Rule 803(4) because they "were not of the type medical personnel generally rely on in making a diagnosis and providing treatment."; see also *Petrocelli v. Gallison*, 679 F.2d 286, 288-91 (1st Cir. 1982)

The parties recently deposed Dr. Christina Williamson. She testified:

- That the source of the information contained in the History section of the Discharge was "Presumably from the record, but I can't verify that . . ." (See Williamson Tr. 12:6-7).

- That since Veronesi can't order a CT scan, that the emergency room staff (referring to the evening of July 25, 2001) ordered it, and she (Veronesi) was aware of the fact that it was ordered [at that time] and therefore she was planning on having it. (Williamson Tr. 13:14-17).

- The CT scan was ordered by the emergency room physician because of her complaints. (Williamson Tr. 22:24-23:1-2).

The great. If not overwhelming weight of the evidence is that neither Veronesi, nor anyone else, made any such "statement" and in all probability the "statement" was extracted from the medical records. As such, it and all other such "statements" should be redacted from the record.

2. **PLAINTIFF'S EXHIBIT B**

Plaintiff has reconsidered and has no objection to this Exhibit being entered into evidence.

3.  **PLAINTIFF'S EXHIBIT C**

The statement contained in Exhibit C, the August 23rd Radiation Note, reads Veronesi "was scheduled for a CT, but reported to the ER" was made long after Veronesi was diagnosed and, in fact, she had already begun treatment. Dr. Rothchild testified that from Veronesi's July 12, 2001 office visit, the one and only time he saw her as a patient, until the time she was admitted to the emergency room on July 25, 2001, he "could not find any evidence of a CT scan scheduled between the time he had seen her and July -- the 25th." (Rothchild Tr. 17:17-19.)

Defendant suggests that because an undated order for a CT scan was found in Dr. Rothchild's file -- that it is a matter for the jury to decide whether Veronesi knew or was planning on having a CT scan. This case is not about whether Veronesi's doctors were considering a CT scan, it is about what Veronesi knew and understood about her health on the day she completed the application for insurance. Dr. Rothchild testified that:

- he could find no evidence that a CT scan had been scheduled between July 12th and July 25th (Rothchild Tr. 17:17-19);
- he did not speak with Veronesi about the need for a CT scan (Rothchild Tr. 19:11-13); and
- the order is undated and he cannot determine when it was written. (Rothchild Tr. 16:15-18).

In light of all of the above evidence, Exhibits C should be redacted as plaintiff requested.

4.  **PLAINTIFF'S EXHIBIT D**

Plaintiff has reconsidered and has no objection to this Exhibit being entered into evidence.

5.  **PLAINTIFF'S EXHIBIT E, G & H**

Plaintiff does not object to that portion of the record which describes Veronesi's medical treatment. Rather, plaintiff objects to a very specific "statement" contained in the records which speak to the issue of a CT scan.

Exhibit E - dated August 21, 2001, long after Veronesi was diagnosed, states "[s]he was scheduled for a CT scan but developed additional chest pain and was evaluated in the emergency room." Plaintiff requests that "She was scheduled for a CT scan" be redacted from

the record because it is clear from the deposition testimony of Drs. Rothchild and Williamson that Veronesi had not been scheduled to have a CT scan and any such reference should be redacted from the record.

Exhibit G - dated August 21, 2001, well after Veronesi was diagnosed, states "[s]he saw her primary care physician with this complaint and was to undergo CT scanning, but due to worsening chest pain, was referred to the emergency room." Plaintiff requests the words "and was to undergo CT scanning" be redacted from the record because the deposition testimony of Drs. Rothchild and Williamson make it abundantly clear that had not been scheduled to have a CT scan and any such reference should be redacted from the record.

Exhibit H - dated August 23, 2001, is a radiation therapy note, *i.e.* Veronesi was already receiving treatment, "[s]he was then scheduled for a CT, but reported to the ER." This statement is clearly inaccurate and not supported by any tangible evidence or testimony from Dr. Rothchild and should be redacted from the record.

6.  **PLAINTIFF'S EXHIBIT F**

At deposition, Dr. Rothchild authenticated and verified the contents of the letter dated September 29, 2004 and the letter should be admitted into evidence.

WILLIAM PARZIALE,
By his attorney,

/s/ Patricia Michaels
Patricia Michaels
LAW OFFICE OF PATRICIA MICHAELS
10 Tremont Street, 4th Floor
Boston, MA 02108
(617) 227-1550
BBO#642945

Dated: November 3, 2006

### CERTIFICATE OF SERVICE

A copy of this motion and all attachments was served on all parties entitled to such notice in accordance with Rules 7004, 7005 via electronic notification on November 3, 2006.

/s/ Patricia Michaels
Patricia Michaels, BBO#642945)

Dated: November 3, 2006

# In The Matter Of:

*William Parziale v.*
*American Heritage Life Insurance Company*

*Christina Williamson, M.D.*
*October 25, 2006*
*VIDEOTAPED*

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: 617-426-2432*

Original File williamson.v1, Pages 1-26

**Word Index included with this Min-U-Script®**

Page 1

```
                              Volume I
                              Pages 1 to 26
                              Exhibits 1 - 5
              UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
    - - - - - - - - - - - - - - - - -x
    WILLIAM PARZIALE,                 :
              Plaintiff,              :
                                      :
         vs.                          :  Civil Action
                                      :  No. 04-11377-RBC
    AMERICAN HERITAGE LIFE            :
    INSURANCE COMPANY, A WHOLLY       :
    OWNED SUBSIDIARY OF THE           :
    ALLSTATE CORPORATION,             :
              Defendant.              :
    - - - - - - - - - - - - - - - - -x
         VIDEOTAPED DEPOSITION OF CHRISTINA
    WILLIAMSON, M.D., a witness called on behalf of the
    Plaintiff, taken pursuant to the Federal Rules of
    Civil Procedure before Carol H. Kusinitz, Registered
    Professional Reporter and Notary Public in and for
    the Commonwealth of Massachusetts, at the Offices of
    Lahey Clinic Legal Services, 25 Mall Road,
    Burlington, Massachusetts, on Wednesday, October 25,
    2006, commencing at 8:04 a.m.
    PRESENT:
         Law Office of Patricia Michaels (by Patricia
              Michaels, Esq.) 10 Tremont Street, Boston,
              MA 02108, for the Plaintiff.
         Day, Berry & Howard LLP (by Hobart F. Popick,
              Esq.) One International Place, Boston, MA
              02110, for the Defendant.
         Ficksman & Conley, LLP (by Douglas N. Perlo,
              Esq.) 98 N. Washington Street, Suite 500,
              Boston, MA 02114, for the Witness.
         Also Present:  Neil Orenstein, Videographer
```

Page 2

```
                       I N D E X
    WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
    CHRISTINA WILLIAMSON
      BY MS. MICHAELS    4             20
      BY MR. POPICK             16              23
                         * * * *
                       E X H I B I T S
    NO.       DESCRIPTION                          PAGE
     1   One-page Lahey Clinic Ambulatory            8
         Order Form re Maryann Fink, dated
         7/12/2001, ROTH 0044
     2   Second page of Dr. Bilello's Lahey          8
         Clinic Progress Notes re Maryann
         Fink, ROTH 0048
     3   Dr. Williamson's Lahey Clinic              10
         Progress Notes for Maryann Fink,
         dated 7/26/01, ROTH 0094-0096
     4   Lahey Clinic Discharge Summary for         11
         Maryann Fink, Discharge Date
         7/31/01, ROTH 0679-80
     5   One-page Lahey Clinic Emergency            20
         Department - Patient Flow Sheet,
         triage date: 7/25/01, for Maryann
         find ROTH 0025
                         * * * *
```

Page 3

PROCEEDINGS

[1] THE VIDEOGRAPHER: Good morning. We are
[2] now recording and on the record. My name is Neil
[3] Orenstein. I'm a Certified Legal Video Specialist
[4] for National Video Reporters. Our business address
[5] is 58 Batterymarch Street, Suite 243, Boston,
[6] Massachusetts 02110. Today we are in association
[7] with Doris O. Wong Associates. Today's date is
[8] October 25th, 2006, and the time is 8:04 a.m.
[9] This is the deposition of Dr. Christine
[10] Williamson in the matter of William Parziale,
[11] Plaintiff, versus American Heritage Life Insurance
[12] Company, a Wholly Owned Subsidiary of the Allstate
[13] Corporation, Defendants, in the U.S. District Court,
[14] District of Massachusetts, Civil Action No.
[15] 04113677-RBC.
[16] This deposition is being taken at 25 Mall
[17] Road, Burlington, Massachusetts, on behalf of the
[18] Plaintiff. The court reporter is Carol Kusinitz of
[19] Doris O. Wong Associates.
[20] Will Counsel please state your appearances
[21] and then the court reporter will swear in the
[22] witness. Thank you.
[23] MS. MICHAELS: Good morning. My name is

Page 4

[1] Patricia Michaels. I represent the Plaintiff,
[2] William Parziale.
[3] MR. POPICK: Good morning. Hobart Popick,
[4] Day, Berry & Howard LLP, representing Defendant
[5] American Heritage Life Insurance Company.
[6] MR. PERLO: Douglas Perlo from Ficksman &
[7] Conley for the witness, Dr. Williamson.
[8] CHRISTINA WILLIAMSON
[9] a witness called for examination by counsel for the
[10] Plaintiff, having been satisfactorily identified by
[11] the production of her driver's license and being
[12] first duly sworn by the Notary Public, was examined
[13] and testified as follows:
[14] THE WITNESS: Just one correction. It's
[15] Christina Williamson. You said "Christine
[16] Williamson." Christina.
[17] MS. MICHAELS: For the record, the purpose
[18] of this deposition is to be used as trial testimony,
[19] and Counsel will be making objections as if it were
[20] live testimony at the time of trial. Agreed?
[21] MR. POPICK: Agreed.
[22] DIRECT EXAMINATION
[23] BY MS. MICHAELS:
[24] Q. Good morning, Doctor. Could you please

Case 1:04-cv-11377-RBC   Document 59   Filed 11/03/2006   Page 7 of 13

Christina Williamson, M.D.
October 25, 2006

William Parziale v.
American Heritage Life Insurance Company

VIDEOTAPED

**Page 9**

[1] 7," and some laboratory tests, the ones that were
[2] listed on the previous document.
[3]   Q. And again, Doctor, would it be your
[4] expectation that a CAT scan had been ordered based
[5] on that treatment plan?
[6]       MR. POPICK: Objection. Speculation.
[7]   A. Can I answer that?
[8]   Q. You may.
[9]       MR. PERLO: Yes.
[10]      THE WITNESS: Yes.
[11]  A. There is nothing here under "Plan" that
[12] outlines the need for a CAT scan.
[13]  Q. Thank you. Doctor, in -- do you have any
[14] relationship with the Plaintiff, William Parziale?
[15]  A. No.
[16]  Q. And do you have any relationship with the
[17] Defendant, American Heritage Life Insurance Company?
[18]  A. No.
[19]  Q. Do you have any relationship with Maryann
[20] Fink?
[21]  A. She was a patient of mine.
[22]  Q. And do you have any independent memory of
[23] your care and treatment of Maryann Fink other than
[24] the medical records which we will review?

**Page 10**

[1]  A. I have no independent memory other than the
[2] medical records as documented.
[3]  Q. In preparation for your deposition today,
[4] did you review any medical records?
[5]  A. I reviewed the medical records, my history
[6] and physical, and the notes and subsequent summaries
[7] regarding the clinical course during my care.
[8]       (Document marked as Williamson
[9]       Exhibit 3 for identification)
[10] Q. Doctor, I would like to show you a document
[11] which is labeled "Exhibit 3," and I would ask you to
[12] turn to Page 3 of this document. Is that your
[13] signature --
[14] A. Yes.
[15] Q. -- on Page 3? And, Doctor, can you tell me
[16] when this document was prepared?
[17] A. This was prepared on the 26th of July, when
[18] I saw the patient.
[19] Q. And why was this document prepared?
[20] A. It was prepared because I was asked by Dr.
[21] Neil Weiner to evaluate this patient for a biopsy of
[22] her mediastinal lymph nodes, for a tissue diagnosis.
[23] Q. And the information that's contained in the
[24] "History of the Present Illness," can you tell me

**Page 11**

[1] where you got this information from.
[2]  A. I elicited that information from the
[3] patient.
[4]  Q. And with regard to the "Past Medical
[5] History" and the "Current Medications" and
[6] "Allergies," all of the information contained in
[7] those sections, where did you receive that
[8] information from?
[9]  A. From the patient.
[10]      (Document marked as Williamson
[11]      Exhibit 4 for identification)
[12] Q. Now, Doctor, I would like to show you a
[13] document that has been marked as Exhibit 4. Could
[14] you identify this document for me, please.
[15] A. It is a Discharge Summary from her
[16] hospitalization for her mediastinoscopy.
[17] Q. Doctor, calling your attention to Page 2 of
[18] the document, is that your signature on Page 2?
[19] A. Yes, it is.
[20] Q. Now, Doctor, also on Page 2 there is a note
[21] under your signature, "Lisa M. Moore." Can you tell
[22] me, who is Lisa Moore?
[23] A. She is a physician's assistant.
[24] Q. And what is the significance of the line

**Page 12**

[1] "(Dictating) for"?
[2]  A. She dictated this discharge summary for me.
[3]  Q. And do you have any knowledge as to where
[4] she got the information that's contained in this
[5] discharge summary?
[6]  A. Presumably from the record, but I can't
[7] verify that. You would have to ask Lisa.
[8]  Q. Doctor, I would like to call your attention
[9] to the "History" section of the Discharge Summary.
[10] Specifically, I would like for you to read, if you
[11] would, the line, second line up from the bottom,
[12] beginning with the words -- after the words, "in the
[13] chest." If you could read that.
[14] A. Under the "History"?
[15] Q. Yes.
[16] A. Okay. Let's see. "In the chest."
[17] Q. If you could read that out loud, I'm sorry.
[18] A. "She had a chest x-ray," is that the one
[19] that you wanted me to start with?
[20] Q. Starting with, "and in the emergency room."
[21]      MR. PERLO: In the middle of the sentence?
[22]      MS. MICHAELS: Yes.
[23] A. Oh, okay. I'm looking for... Okay. "And
[24] in the emergency room on July 25th, 2001, she was

Case 1:04-cv-11377-RBC   Document 59   Filed 11/03/2006   Page 8 of 13

Christina Williamson, M.D.
October 25, 2006

VIDEOTAPED

William Parziale v.
American Heritage Life Insurance Company

Page 13

[1] planning to have a CT scan of the chest to
[2] investigate this."
[3]   Q. Can you explain to me, Doctor, your
[4] understanding of this -- of the words, of the phrase
[5] "she was planning to have a CT scan" in the
[6] emergency room.
[7]   A. Well, I would assume that when she was in
[8] the emergency room she was to have a CT scan.
[9] That's the way I read that.
[10]   Q. Okay. Would that mean -- was it your
[11] understanding that she was planning the CT scan, or
[12] that the emergency room, based on her presentation,
[13] was planning to have a CT scan?
[14]   A. My understanding would be, since she can't
[15] order the CT scan, that the emergency room staff
[16] ordered it, and she was aware of the fact that it
[17] was ordered and therefore she was planning on having
[18] it.
[19]   Q. Calling your attention to the "Past Medical
[20] History," the word -- would you agree that the word
[21] "scant" is used to describe the medical history?
[22]   A. Yes.
[23]   Q. And under what circumstances would a
[24] medical care provider use the word "scant" to

Page 14

[1] describe a medical history?
[2]   A. If she had no past history of surgery or
[3] hospitalizations or other medical illnesses that
[4] deserved any recording or documentation.
[5]   Q. On Page 2 of the Discharge Summary that
[6] we're looking at, under the section titled,
[7] "Impression," the last sentence of the paragraph,
[8] could you read that, please, Doctor.
[9]   A. "The patient was planned to undergo a
[10] fiberoptic examination later on this day, July 25th,
[11] 2001."
[12]   Q. And you would agree that this document was
[13] prepared on July 31st of 2001?
[14]   A. Correct.
[15]   Q. So it is somewhat ambiguous, would you
[16] agree?
[17]   MR. POPICK: Objection. Speculation.
[18]   A. I would agree that this information is
[19] probably not relevant to -- so much to the
[20] impression at that time, since it was a done deal.
[21] I mean, it was already done. It was a study that
[22] was done. In addition, it's redundant information,
[23] because it's listed -- the results of the study are
[24] listed the following, next line.

Page 15

[1]   Q. Doctor, I would like to go back to your
[2] 7/26/01 Thoracic and Cardiovascular Surgery Report.
[3] You mention in the "Review of Systems" that Ms. Fink
[4] had a urinary tract infection in December. Based on
[5] your experience and training as a doctor, is a
[6] urinary tract infection considered a serious
[7] illness?
[8]   A. No.
[9]   MR. POPICK: Objection. Speculation.
[10]   Q. Doctor, what does the word "adenopathy"
[11] mean?
[12]   A. Enlarged lymph nodes.
[13]   Q. And is that a medical term?
[14]   A. Yes.
[15]   Q. And would you expect -- what would your
[16] expectation be if a patient -- if you asked a
[17] patient -- strike that. Would you expect a patient
[18] to describe the results of a chest x-ray using the
[19] word "adenopathy"?
[20]   MR. POPICK: Objection.
[21]   A. I would if the physician explained to her
[22] or him what that meant. I would expect them to use
[23] the same terminology, if they had a clear
[24] understanding of the terminology.

Page 16

[1]   Q. And as you read the Discharge Summary, is
[2] it your testimony that the information that's
[3] contained in this Discharge Summary --
[4]   MR. POPICK: Objection. Leading.
[5]   Q. Where was the information -- again, where
[6] was the information obtained that's contained in
[7] this Discharge Summary? Where did they get this
[8] information?
[9]   A. I would have to defer to Lisa Moore and her
[10] testimony as to where she obtained all of this
[11] information. I can't speculate.
[12]   MS. MICHAELS: I have no further questions.
[13]   CROSS EXAMINATION
[14] BY MR. POPICK:
[15]   Q. Good morning, Doctor.
[16]   A. Good morning.
[17]   Q. It's -- you testified that you have no
[18] independent recollection of Ms. Veronesi; is that
[19] correct?
[20]   MR. PERLO: Ms. Fink.
[21]   Q. I'm sorry. Ms. Fink.
[22]   A. *I have no independent recollection --*
[23]   Q. -- recollection of Ms. Fink?
[24]   A. -- other than what's in the medical record.

Case 1:04-cv-11377-RBC    Document 59    Filed 11/03/2006    Page 9 of 13

VIDEOTAPED

William Parziale v.
American Heritage Life Insurance Company

Christina Williamson, M.D.
October 25, 2006

Page 21

[1]  Q. And, Doctor, you would agree --
[2]     MR. POPICK: Objection. Leading.
[3]  Q. What is the chief complaint listed on this
[4] document, Doctor?
[5]  A. (Reviewing document) Complaint of
[6] difficulty breathing.
[7]  Q. And contained in the body of the document,
[8] what treatment was rendered to Ms. Veronesi, Ms.
[9] Fink?
[10]    MR. POPICK: Objection.
[11] Q. What treatment is outlined on that
[12] document?
[13]    MR. POPICK: Objection.
[14] A. The treatment that is outlined is ENT to
[15] evaluate patient. Lab tests were drawn. And to CT
[16] scan. So a CT scan was ordered by the physician.
[17] Q. Okay. Based on your review of that
[18] document and based on your experience and training
[19] as a physician, would you say that the CT scan was
[20] ordered as a result of her --
[21]    MR. POPICK: Objection.
[22] Q. -- admitting complaint?
[23]    MR. POPICK: Leading.
[24] Q. Let me rephrase that, Doctor. Why was the

Page 22

[1] CT scan ordered on that date at that time?
[2]    MR. POPICK: Objection.
[3] A. The CT scan was ordered because she had
[4] difficulty breathing. She also had chest pain,
[5] looking down further in the history, off and on, and
[6] hoarseness.
[7] Q. Doctor, was the CT scan ordered --
[8]    MR. POPICK: Objection.
[9] Q. Based on that document, was the CT scan
[10] ordered based on adenopathy --
[11]    MR. POPICK: Objection.
[12] Q. -- of the chest x-ray?
[13] A. The CT scan was ordered because of her
[14] presenting symptoms, which was an appropriate study
[15] to do.
[16] Q. So, Doctor, when you testified earlier that
[17] you, looking at your Discharge Summary, that you
[18] believe that the CT scan was ordered because there
[19] was a question of adenopathy in the chest, is it now
[20] your testimony that the CT scan was ordered --
[21]    MR. POPICK: Objection.
[22] Q. -- because of her presenting complaints?
[23]    MR. POPICK: Objection. Leading.
[24] A. The CT scan was ordered by the emergency

Page 23

[1] room physician because of her complaints. Now, in
[2] the emergency room, and this is -- I would assume,
[3] but I can't -- you would have to check with Dr.
[4] Dammin, who is the ER doctor, whether he looked at
[5] the CAT -- the chest x-ray. They didn't order an
[6] x-ray. They went right to a CT scan. So Dr. Dammin
[7] would have to be queried as to whether or not he
[8] looked at that x-ray and, taking that into
[9] consideration, they ordered a CT scan based on her
[10] symptoms, yes.
[11]    MS. MICHAELS: No further questions.
[12]        RECROSS EXAMINATION
[13] BY MR. POPICK:
[14] Q. Doctor, in your experience, would you say
[15] it's highly unusual to order, immediately order a CT
[16] scan without previously ordering an x-ray?
[17] A. Not necessarily. If they're concerned
[18] about a pulmonary embolism, a chest x-ray is going
[19] to be meaningless. So they might go directly to a
[20] CT scan, CT angiogram or a CT study to look for a
[21] pulmonary embolism. So under certain clinical
[22] conditions, it may be the first study, prior to a
[23] chest x-ray.
[24]    However, if the patient already had a chest

Page 24

[1] x-ray, the ER doc might look at that and then
[2] decide, based on that, what -- how to proceed.
[3] Again, you would have to check with Dr. Dammin
[4] whether he saw the x-ray or not. But it's not
[5] documented in his note here.
[6] Q. And based on your understanding of your
[7] treatment of Ms. Fink, is it your -- let me
[8] rephrase. Based on your understanding of your
[9] treatment of Ms. Fink, Ms. Fink had received an
[10] x-ray previously; is that right?
[11] A. Yes.
[12] Q. And is it fair to say that the emergency
[13] room would have had access to that x-ray?
[14] A. Yes.
[15]    MR. POPICK: No further questions.
[16]    MS. MICHAELS: I have nothing.
[17]    THE VIDEOGRAPHER: The time is 8:30 a.m.
[18] We are off the record, and the deposition is
[19] concluded.
[20]    (Whereupon the deposition
[21]    was concluded at 8:30 a.m.)
[22]
[23]
[24]

# In The Matter Of:

*William Parziale v.*
*American Heritage Life Insurance Company*

*Joseph Rothchild, M.D.*
*October 24, 2006*
*VIDEOTAPED*

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: 617-426-2432*

Original File rothchild.v1, Pages 1-36

**Word Index included with this Min-U-Script®**

Case 1:04-cv-11377-RBC   Document 59   Filed 11/03/2006   Page 11 of 13

William Parziale v.  
American Heritage Life Insurance Company

VIDEOTAPED

Joseph Rothchild, M  
October 24, 2

Page 1

```
                    Volume I
                    Pages 1 to 36
                    Exhibits 1 - 10
        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - -x
WILLIAM PARZIALE,                :
         Plaintiff,              :
                                 :
   vs.                           : Civil Action
                                 : No. 04-11377-RBC
AMERICAN HERITAGE LIFE           :
INSURANCE COMPANY, A WHOLLY      :
OWNED SUBSIDIARY OF THE          :
ALLSTATE CORPORATION,            :
         Defendant.              :
- - - - - - - - - - - - - - - - -x
```

VIDEOTAPED DEPOSITION OF JOSEPH ROTHCHILD, M.D., a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Lahey Clinic Legal Services, 25 Mall Road, Burlington, Massachusetts, on Tuesday, October 24, 2006, commencing at 6:07 p.m.

PRESENT:
   Law Office of Patricia Michaels (by Patricia Michaels, Esq.) 10 Tremont Street, Boston, MA 02108, for the Plaintiff.
   Day, Berry & Howard LLP (by Hobart F. Popick, Esq.) One International Place, Boston, MA 02110, for the Defendant.
   Ficksman & Conley, LLP (by Douglas N. Perlo, Esq.) 98 N. Washington Street, Suite 500, Boston, MA 02114, for the Witness.
   Also Present: Neil Orenstein, Videographer

Page 3

[1]          PROCEEDINGS
[2]    (Documents marked as Rothchild
[3]    Exhibits 1 through 10 for
[4]    identification)
[5]    THE VIDEOGRAPHER: Good evening. We are
[6] now recording and on the record. My name is Neil
[7] Orenstein. I'm a Certified Legal Video Specialist
[8] for National Video Reporters, Incorporated. Our
[9] business address is 58 Batterymarch Street, Suite
[10] 243, Boston, Massachusetts 02110. Today we are in
[11] association with Doris O. Wong Associates.
[12]    Today's date is October 24th, 2006, and the
[13] time is 6:07 p.m. This is the deposition of Dr.
[14] Joseph Rothchild in the matter of William Parziale,
[15] Plaintiff, versus American Heritage Life Insurance
[16] Company, a Wholly Owned Subsidiary of the Allstate
[17] Corporation, Defendant, in the U.S. District Court,
[18] District of Massachusetts, Civil Action No. 0411377-
[19] RBC. This deposition is being taken at 25 Mall
[20] Road, Burlington, Massachusetts, on behalf of the
[21] Plaintiff. The court reporter is Carol Kusinitz of
[22] Doris O. Wong Associates.
[23]    Counsel, please state your appearances for
[24] the record.

Page 2

```
              I N D E X
WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS
Joseph Rothchild, M.D.
  (by Ms. Michaels)   5             30
                                           33
  (by Mr. Popick)            23            32

              E X H I B I T S
NO.                                            PAGE
1  Dr. Rothchild's curriculum vitae              3
2  One-page Lahey Clinic Ambulatory Order Form
   re Maryann Fink, dated 7/12/2001, ROTH 0044   3
3  Dr. Bilello's Lahey Clinic Progress Notes re
   Maryann Fink, ROTH 0047                       3
4  Second page of Dr. Bilello's Lahey Clinic
   Progress Notes re Maryann Fink, ROTH 0048     3
5  Lahey Clinic Diagnostic Radiology Report for
   Maryann Fink, performed 7/13/01, AHL 00451    3
6  Ambulatory Order Form re Maryann Fink,
   undated, ROTH 0041                            3
7  Dr. Rothchild's Lahey Clinic Progress Notes
   from 7/12/01, for Maryann Fink, ROTH 0046     3
8  One-page letter to Law Office of Patricia
   Michaels from Joseph Rothchild, M.D., dated
   September 29, 2004, RE: Maryann Fink          3
9  One-page Lahey Clinic Emergency Department -
   Patient Flow Sheet, Triage date: 7/25/01 for
   Maryann Fink, ROTH 0025                       3
10 One-page Lahey Clinic Progress Note headed,
   "7/25/01 CT Scan" for Maryann Fink,
   ROTH 0024                                     3
```

Page 4

[1]    MS. MICHAELS: Good evening. My name is
[2] Patricia Michaels. I represent the Plaintiff,
[3] William Parziale.
[4]    MR. POPICK: Hobart Popick, Day, Berry &
[5] Howard LLP for American Heritage Life Insurance
[6] Company.
[7]    MR. PERLO: My name is Douglas Perlo for
[8] Ficksman & Conley for Dr. Rothchild.
[9]    JOSEPH ROTHCHILD, M.D.,
[10] a witness called for examination by counsel for the
[11] Plaintiff, having been satisfactorily identified by
[12] the production of his driver's license and being
[13] first duly sworn by the Notary Public, was examined
[14] and testified as follows:
[15]    MS. MICHAELS: Would you agree with the
[16] usual stipulations?
[17]    MR. POPICK: Let's say what they are.
[18]    MS. MICHAELS: We will not object except as
[19] to form, waive objections except as form.
[20]    MR. POPICK: Well, I think that, you know,
[21] given that this is trial testimony, I think perhaps
[22] it would make more sense for us to object as if we
[23] were actually at trial.
[24]    MS. MICHAELS: Okay.

Case 1:04-cv-11377-RBC   Document 59   Filed 11/03/2006   Page 12 of 13

Joseph Rothchild, M.D.  
October 24, 2006

VIDEOTAPED

William Parziale v.  
American Heritage Life Insurance Company

Page 13

[1] can you tell me whether or not Dr. Bilello received  
[2] a copy of this report?  
[3]  A.  I cannot.  
[4]  Q.  Would it be the usual -- what would be the  
[5] usual and customary practice with regard to a  
[6] radiology report ordered by Dr. Bilello?  
[7]  A.  Generally when the residents order  
[8] laboratory studies, there is a report generated to  
[9] both the resident, which in this case would be Dr.  
[10] Bilello, and the attending physician. However, that  
[11] depends on how it was placed in the computer. So  
[12] there are times where the results will only go to  
[13] the attending physician.  
[14]  Q.  And, Doctor, if Dr. Bilello received a copy  
[15] of this, would there be a notation somewhere on this  
[16] report that he received a copy?  
[17]  MR. POPICK:  Objection.  Speculation.  
[18]  Q.  Let me rephrase that.  What would be the  
[19] usual and customary practice when copying a report  
[20] to more than one physician?  
[21]  A.  There is an indication on the copy that I  
[22] receive that it is both sent to more than one  
[23] physician or it could be a physician's assistant and  
[24] a doctor.  This, however, is the report or appears  

Page 14

[1] to be the report from the medical record itself, and  
[2] I do not know whether that same notation would have  
[3] appeared here.  
[4]  Q.  Doctor, is it your testimony that you might  
[5] have a report that would indicate whether this was  
[6] copied to Dr. Bilello?  
[7]  MR. POPICK:  Objection.  Leading.  
[8]  A.  I don't have any -- I would have no way of  
[9] knowing whether it was copied to Dr. Bilello.  
[10]  Q.  Doctor, when you received this report, do  
[11] you -- what would your usual and customary practice  
[12] be with regard to reviewing this report?  
[13]  MR. POPICK:  Objection.  Assuming facts not  
[14] in evidence.  
[15]  A.  The customary practice would be both to  
[16] review the x-ray itself, and since this patient had  
[17] been seen with a medical resident and it would be  
[18] the medical resident's responsibility under my  
[19] direction to contact the patient, we would then  
[20] discuss it.  
[21]  Q.  And, Doctor, if it was your usual practice  
[22] to contact the patient, would any record be  
[23] generated as a result of that contact?  
[24]  A.  Sometimes yes and sometimes no.  

Page 15

[1]  Q.  Looking at the x-ray report, you would  
[2] agree, would you not, that the --  
[3]  MR. POPICK:  Objection.  Leading.  
[4]  Q.  -- findings on the x-ray report -- Doctor,  
[5] would you read the "Impression" down towards the --  
[6]  MR. POPICK:  Objection.  Compound question.  
[7]  Q.  Doctor, please read the "Impression."  
[8]  A.  "Impression:  No. 1) No acute abnormality.  
[9] No. 2) Slight AP window fullness, most likely a  
[10] normal variant.  Prominent pulmonary artery.  
[11] However, CT is recommended to exclude the  
[12] possibility of adenopathy, if no films are available  
[13] for comparison," and in parentheses it says, "(None  
[14] currently available)."  
[15]  Q.  And, Doctor, after -- I'm sorry.  Could you  
[16] continue.  
[17]  A.  "No. 3) The findings were read on a stat  
[18] basis as requested."  
[19]  Q.  Doctor, looking at this x-ray report, would  
[20] you agree that this is a relatively --  
[21]  MR. POPICK:  Objection.  Leading.  
[22]  Q.  -- benign report?  
[23]  MR. POPICK:  Objection.  Leading.  
[24]  A.  In reading this report, I would not be  

Page 16

[1] terribly concerned, based on the report and  
[2] knowledge of the age of the patient.  
[3]  Q.  Doctor, do you have any independent memory  
[4] of speaking with Dr. Bilello regarding this report?  
[5]  A.  No, I do not.  
[6]  Q.  I would like to call your attention to a  
[7] document that's marked as Exhibit 6.  Can you please  
[8] state for the record what this document is.  
[9]  A.  This is another order form with Maryann  
[10] Fink's name and medical record number at the top.  
[11] Again, this would have been a pink order form.  In  
[12] this case it is a blank form, so it was not  
[13] generated the date of the visit, and it contains an  
[14] order.  
[15]  Q.  And you stated that it does not contain a  
[16] date.  So are you able to tell me when this record  
[17] was generated?  
[18]  A.  No, I am not.  
[19]  Q.  Are there any other records that are kept  
[20] in the normal course of business which would help  
[21] you to identify when this record was generated?  
[22]  A.  Not that I'm aware of.  
[23]  Q.  Did you review this record prior to today's  
[24] deposition?

William Parziale v.  
American Heritage Life Insurance Company

VIDEOTAPED

Joseph Rothchild, M.D  
October 24, 2006

Page 17

[1] A. Yes, I did.
[2] Q. After you reviewed this record, did you --
[3] are there -- did you check any appointment books,
[4] appointment ledgers, I believe you said? Did you
[5] do that?
[6] A. Yes. I checked our appointment system to
[7] see if this study, chest CT, had been scheduled, and
[8] on my review I could not find any evidence of it
[9] being scheduled.
[10] Q. Based on your review of the records, were
[11] you able to find any information that Maryann Fink
[12] had been scheduled for a CT scan --
[13] MR. POPICK: Objection. Leading.
[14] Q. -- any time after 7/12, the appointment on
[15] 7/12, but prior to the CT scan on 7/25?
[16] MR. POPICK: Objection. Compound question.
[17] A. I could not find any evidence of a CT
[18] scheduled between the time that I had seen her and
[19] July -- the 25th.
[20] Q. Doctor, I would like to show you a document
[21] that's been marked as Exhibit 7. Do you recognize
[22] this document, Doctor?
[23] A. Yes. It is my clinic note from that --
[24] from the date of July 12th, 2001, and that's my

Page 18

[1] handwriting.
[2] Q. Doctor, I call your attention to the
[3] "Assessment" section of this report. Could you
[4] please read the assessment.
[5] A. "Assessment: Fatigue, adenopathy and left
[6] chest pain. Would consider various infections
[7] including hepatitis, HIV, and mono."
[8] Q. Doctor, when you wrote this assessment,
[9] were you aware of Maryann Fink's history with regard
[10] to mono?
[11] A. Yes.
[12] Q. Doctor, I show you a document marked as
[13] Exhibit 8 --
[14] MR. POPICK: I would like to -- this is the
[15] September 29th letter?
[16] MS. MICHAELS: Correct.
[17] MR. POPICK: I would just like to state for
[18] the record that this document has already been ruled
[19] by the Court in this action to be inadmissible, and
[20] therefore American Heritage Life Insurance Company
[21] objects to any line of questioning involving this
[22] letter.
[23] Q. Doctor, in this letter -- if you would read
[24] for me, Doctor, in the -- going to the second

Page 19

[1] paragraph of the letter, the third sentence,
[2] starting from the third sentence.
[3] A. "This was presumably prior to the emergency
[4] room visit, but unfortunately the order was
[5] undated."
[6] Q. And continue through the paragraph.
[7] A. "I presume that Dr. Bilello had spoken with
[8] her about her need for a CT scan, but I have no
[9] documentation of this. The likelihood is that she
[10] was aware that she needed a CT scan, and aware that
[11] there was a question of adenopathy in the chest. I
[12] myself did not speak with her regarding a possible
[13] diagnosis, other than discussing a possible
[14] infection on July 12th, 2001."
[15] Q. Doctor, can you tell me what information
[16] you base your presumption that Dr. Bilello spoke
[17] with Ms. Fink regarding a CT scan.
[18] MR. POPICK: I will restate our objection
[19] to any line of questioning involving this letter.
[20] A. My presumption was that there had been an
[21] order written by Dr. Bilello for a CT scan. It
[22] would have been the customary practice, before
[23] giving the order to one of the secretaries which
[24] would then allow it to be booked, before giving the

Page 20

[1] order, to speak with the patient, because it would
[2] be improper to give an order without informing the
[3] patient that there was one.
[4] If she had already been to the emergency
[5] room on the 25th, again, I would expect that she
[6] would have informed Dr. Bilello of that, and
[7] therefore he would not have ordered the CAT scan.
[8] Q. And you're referring, Doctor, to the
[9] undated CAT scan?
[10] A. Exactly.
[11] Q. And, Doctor, looking back to the radiology
[12] report, the line that says, "However, CT scan is
[13] recommended to exclude the possibility of adenopathy
[14] if no old films are available for comparison," you
[15] agree, Doctor, that this report -- you've already
[16] testified that you presumably received this report
[17] on July 17th --
[18] MR. POPICK: Objection. Compound question.
[19] Q. -- correct?
[20] MR. POPICK: Objection. Leading.
[21] A. I presume that I saw this on September --
[22] on July 17th, yes.
[23] Q. And on July 17th is the first time that we
[24] see an entry on this report that no films are